**JOHNS–MANVILLE CORPORATION**
**et al., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 465–83C.**

United States Claims Court.

Aug. 6, 1987.

As Amended Nov. 3, 1987.

Harvey G. Sherzer, Washington, D.C., with whom were Robert M. Bruskin, Lewis M. Barr, Michael A. Hordell, Charles J. Engel, James F. Worrall, Charles H. Samel, Anne M. Quigley, and Kevin C. Quin, for plaintiffs. Dennis H. Markusson, Robert D. Batson, Nancy E. Stead, Richard E. Meunier, and St. Clair G. Strong, Jr., Manville Corp., Littleton, Colo., of counsel.

H. Michael Semler, Washington, D.C., with whom were Special Litigation Counsel J. Charles Kruse, Albert M. Cohen, Roger K. Davis, Anthony C. Roth, Janet F. Katz, Scott D. Austin, S. Michael Scadron, Jane Mahoney, and Asst. Atty. Gen. Richard K. Willard, for defendant. J. Patrick Glynn, Director, Torts Branch, and Harold J. Engel, Deputy Director, of counsel.

## OPINION

NETTESHEIM, Judge.

### INTRODUCTION

In this omnibus action, plaintiffs Johns-Manville Corporation and Johns-Manville Sales Corporation (collectively referred to as "Johns-Manville") sued the United States for settlements, judgments, and other damages resulting from 57 personal injury claims or suits (one added in an amended complaint that did not otherwise alter the original) closed prior to commencing suit on July 19, 1983. Damages also were sought resulting from another 327 claims or suits that had not been closed. The complaint prays for $768,361.09 [1] for settlements and judgments in the closed cases and $185,741.55 for attorneys' fees, costs, and expenses incurred in defending these claims and lawsuits. The damages for the pending suits are unspecified.

All the underlying claims or suits arose from shipyard workers' exposures to asbestos during World War II in public or private shipyards either owned or allegedly controlled by the United States Department of the Navy (the "Navy") or in private shipyards allegedly controlled by the United States Maritime Commission (the "Maritime Commission"). The complaint previously was discussed in detail in *Johns-Manville Corp. v. United States*, 12 Cl.Ct. 1, 7,

1. The tabulation at Appendix B to the complaint indicates that the correct figure is $763,361.09.

11 (1987) (order granting and denying motion for judgment on the pleadings), and in *Keene Corp. v. United States*, 12 Cl.Ct. 197, 203 (1987) (order granting and denying motion to dismiss pursuant to 28 U.S.C. § 1500), *appeal docketed*, No. 87–1332 (Fed.Cir. May 7, 1987).

This case has been tried on four principal causes of action. Johns-Manville charged the Government, acting through the Navy and the Maritime Commission, with breach of the implied warranty of specifications that the asbestos-containing products—principally thermal insulation—purchased under Johns-Manville's supply contracts would be free from defects and safe for use. Johns-Manville also contended that the Government had breached its duty to reveal superior knowledge by failing to disclose to Johns-Manville the conditions in which asbestos-containing products were used in the shipyards. Included within the superior knowledge claim are the Navy's and the Maritime Commission's alleged failures to enforce their own health and safety standards governing the application and removal of asbestos-containing products. Johns-Manville's claims based on mutual mistake and equitable adjustment also were tried.

The parties agreed to try this case on the basis of test shipyards and test claimants. Most of the other asbestos-manufacturer plaintiffs that have cases pending against the Government based on World War II exposures have agreed to be bound by the decision in this case.

Two of the test shipyards were owned and operated by the Navy, the Boston Navy Yard and the Philadelphia Navy Yard. Two test shipyards were owned privately, the Consolidated Steel Corporation Shipyard ("Consolidated") in Orange, Texas, and Bethlehem Steel Corporation's Fore River Shipyard ("Fore River") in Quincy, Massachusetts. Although the complaint is directed exclusively to exposures that occurred during or prior to World War II, it was ordered, over defendant's objection, that the number of test claimants be expanded to include five shipyard workers who were exposed to asbestos in shipyards after the war. Subject to defendant's objection, as noted, the parties agreed upon 15 test claimants: seven at the Boston Navy Yard, three at the Philadelphia Navy Yard, three at Consolidated, and two at Fore River. For the most part, private yards constructed new ships and Navy yards engaged in some new construction, as well as conversion, alteration, and repair of Navy vessels. There was no test claimant from a yard allegedly controlled by the Maritime Commission, although Fore River built cargo vessels for the Maritime Commission.

Johns-Manville's other claims for damages in the case at bar for increased insurance and business costs and for loss of business and business reputation have not been tried. Nor has defendant's first amended counterclaim been tried. This is an extraordinary pleading claiming over $33 billion, not for the costs of asbestos abatement or removal, which might have been anticipated, but for performing numerous health and hygiene surveys at worksites where Johns-Manville's products were used, promulgating and attempting to force compliance with health and safety standards with regard to asbestos in shipyards and countless other workplaces throughout the country where Johns-Manville's products have been and are used, conducting public notification and information programs, and so forth. First Amended Counterclaim, filed Nov. 30, 1983, ¶ 148. Thus, the trial that has taken place focused on liability and certain damages with respect to Johns-Manville's World War II claims, but not on all the damages or defendant's counterclaim.

Johns-Manville's case No. 688–83C based on asbestos exposures in shipyards after 1963 and its case No. 1–84C directed to exposures that did not occur solely during World War II or after 1963 are still to be resolved. For purposes of this case, the World War II period was deemed to end on January 1, 1946.[2] Two other plaintiff manufacturers are willing to try jointly their

---

2. *See infra* note 4.

cases covering the period between World War II (or 1947) and 1959, with the decision in that case to be binding on Johns-Manville, as well as most of the other plaintiffs. It has not been determined how the remaining exposure periods, generating claims by Johns-Manville and other plaintiffs, will proceed.

The philosophical underpinning for this action deserves comment. Johns-Manville's premise is that the Government, as the preeminent beneficiary of highly useful asbestos-containing products during World War II, should contribute to making up Johns-Manville's losses due to claims by third-party shipyard workers (not employees of Johns-Manville) based in whole or in part on World War II exposures in the same way that the insurers of Johns-Manville and other asbestos manufacturers have agreed by settlement or have been held by judicial decision to provide coverage for exposures occurring during World War II. *See Asbestos Ins. Coverage Cases,* Judicial Council Coordination Proceeding No. 1072 (Cal.Super.Ct. May 29, 1987). Although the insurance litigation is distinguishable because it involved interpreting contracts that specifically intended to cover risks—with a central question of what events triggered coverage—Johns-Manville's objective is understandable.

Upon a jury verdict in a suit filed on October 20, 1969, against eleven manufacturers, including a wholly-owned subsidiary of Johns-Manville, the Fifth Circuit in *Borel v. Fibreboard Paper Products Corp.,* 493 F.2d 1076 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), held that asbestos manufacturers had a duty to warn industrial insulation workers of the dangers associated with the use of asbestos. *Borel* is an icon to hindsight analysis. The doctrine of strict liability came into its own in the 1960's after the first judicial decision imposing strict liability in 1958. Before strict liability a manufacturer could be held liable in tort generally only if negligence in manufacture was proved, and privity of contract blocked contract actions by users. Strict liability eliminated both obstacles. In extending strict liability on a joint and several basis to asbestos manufacturers in suits by third-party (non-employee) users, *Borel* reached back over three decades to alter the economic expectations of manufacturers and users of asbestos-containing products. The insulation worker in *Borel* was exposed to asbestos between 1936 and 1969 during his employment with various employers, usually in Texas. The *Borel* court held that asbestos-containing products were " 'unreasonably dangerous,' " because the utility of the products did not outweigh the magnitude of the risk of disease, 493 F.2d at 1087–88, so that the manufacturers should be held liable under strict liability for failure to place warning labels on their products.

During World War II, there were 4.5 million shipyard workers, and manufacture of asbestos-containing products was dedicated by law to the defense effort and essential civilian uses. Although the insulation worker in *Borel* may not have been one of them, the decision obviously extended to exposures of shipyard workers during the war years, such as workers in Consolidated, in Orange, Texas, one of the two test private shipyards in this case. In the jurisdictions then comprising the Fifth Circuit, many cases brought by shipyard workers were evolving through the judicial system, as the defendant manufacturers no doubt advised the Fifth Circuit. This makes it all the more remarkable that the appeals court, without acknowledging that it is speculative whether the war on the seas would have been won without the use of asbestos insulation on ships, imposed a new duty to warn insulation workers effective over 30 years earlier.

If the *Borel* court reasoned that an insulation worker, if warned, would have left his job rather than work with asbestos from 1936 through the end of World War II, the hypothesis is conjecture. For example, the alleviation of Depression unemployment by the pre-war industrial build-up was disregarded. Not only did *Borel* create a manufacturer's strict liability to users of its products many years after events giving rise to World War II asbestos exposures, but it did so even though no prac-

tical and effective respirator was available during the war. Mr. Borel testified, according to the Fifth Circuit, "that no respirator in use during his lifetime could prevent the inhalation of asbestos dust...." *Id.* at 1082. *Borel* also avoided dealing with the fact that, even with a manufacturer's warning, it is far from certain that the workers would have worn respirators, because they were cumbersome and uncomfortable and blocked vision. Somehow the *Borel* court reasoned that the duty to warn, primarily about dangers of asbestos and use of respirators, would have enabled an insulation worker to avoid the risk of dangerous exposure. However, the key to a safe environment was low dust levels, and respirators were a second line of defense. It should be noted that, unlike the case at bar in which the record stops at January 1, 1946, the *Borel* court considered evidence developed in the 1960's that even exposure to asbestos at the levels thought safe from 1938 through the war years caused disease and that medical consensus was lacking whether the recommended limit of exposure represented all dust particles or just asbestos particles. Finally, the deluge of lawsuits against asbestos manufacturers by non-employees stemming from World War II exposures that *Borel* legitimized owes its origin to a decision ignoring the hard fact that during World War II there was no proved alternative to asbestos (although, as will be discussed, the Government did not inhibit the development of substitutes).

In 1971 Johns-Manville was a named defendant in approximately a dozen pending asbestos cases, according to John A. McKinney, Johns-Manville's then General Counsel. As of September 30, 1986, the quarterly Form 10Q filed with the Securities and Exchange Commission reported that 12,630 cases [3] had been filed against Manville Corporation ("Manville"), successor in 1981 to Johns-Manville. These suits, the majority of which did not involve Johns-

Manville's employees, were coming in at a rate of 425 per month as of 1982. One half of the cases pending in 1982 involved shipyard workers, and one half of this number resulted from exposures occurring solely or in part during World War II. The rate that shipyard worker cases were being filed had accelerated. Since conceivably 4.5 million World War II shipyard workers could have claims, the tip of the iceberg had been struck. Whatever responsibilities Johns-Manville owed its own employees during the war and whatever a subsequent trial may reveal with respect to Johns-Manville's conduct after January 1, 1946, it is a fact that the *Borel* court assigned liability to Johns-Manville for third-party injuries based in whole or in part on World War II exposures that in the circumstances Johns-Manville would wish to share.

This is a court of law, and, although judicial inquiry is tempered by notions of equity, it is Johns-Manville's burden to satisfy the legal elements of the causes of action that it has chosen to pursue. If the imposition of third-party liabilities on Johns-Manville during the World War II years may be viewed as gratuitous, that circumstance provides no legal, equitable, or moral basis for shifting liability to the Government, as the major user of asbestos-containing products during this time frame or for requiring the Government to share in the consequences of *Borel.* Either result would compound the error of *Borel,* not confine it. If Johns-Manville is to succeed in this court, it must do so, as its counsel argued, based on "traditional principles of government contract law."

Viewed against this backdrop, Manville's decision in August 1982 to seek protection of the bankruptcy laws appears a constructive approach to confining the consequences of *Borel.* Mr. McKinney, who was Manville's CEO at the time, testified that absent shipyard worker cases Manville

---

**3.** Mr. McKinney testified to 16,500 pending suits in 1982, but the important point is the relative number of shipyard worker claims based on World War II exposures. He may have been referring to the number of persons on whose behalf suit had been brought by 1982. *See* First

Amended Disclosure Statement, Second Amended and Restated Plan of Reorganization and Related Documents, *In re Johns-Manville Corp.,* Nos. 82 B 11656, *et al.,* at M–28 (Bankr.S.D.N.Y. filed Aug. 22, 1986). As of September 30, 1986, the number of plaintiffs was 18,030.

would not have initiated bankruptcy proceedings. As of August 1982, Manville faced thousands of claims incapable of satisfaction without destroying the corporation, given that its insurers had ceased reimbursing Manville by 1981 and that the simple multiplication of the number of suits by average liability yielded a contingent liability eliminating Manville's net worth, which would have enabled lenders to accelerate substantially all of its medium- and long-term debt. Through bankruptcy proceedings Manville attempted to channel resources into a fund to satisfy pending asbestos claims, while preserving its viability as a business. Manville's Plan of Reorganization was confirmed in December 1986 and is awaiting consummation after approval by the district court. *See In re Johns-Manville Corp.*, Nos. 86 Civ. 6124, *et al.* (S.D.N.Y. July 15, 1987).

The plan creates two trusts for the benefit of asbestos claimants—the Manville Personal Injury Settlement Trust (the "Health Trust") and the Property Damage Settlement Trust. The proceeds from Manville's settlements with insurance carriers inure to the Health Trust, and 50 percent of the common stock of Manville, preferred stock, a bond and rights to payment under a second bond, and cash also will fund this trust. Twenty percent of any recovery from this litigation, as well as Johns-Manville's other two Claims Court cases, will be paid to the Health Trust. Annual payments are to be made to the trusts, and the trusts have a call on the profits of the corporation. Over time the funding of the Health Trust is expected to exceed $2.5 billion, excluding Manville's stock, profit-sharing payments, or any recovery from the Claims Court cases. All suits against Johns-Manville or its successor based on asbestos exposure, property damage due to asbestos, and punitive damage claims would be barred. Although Manville's Plan of Reorganization is not before this court, its motivation is an outgrowth of the events that spawned this lawsuit.

The facts particular to each of the theories of relief in the World War II case, for the most part, are separate. Due to the number of legal issues and the generally separate factual matrix of each, this opinion will discuss the facts and law under the topic of each legal issue.

All the evidence has been considered. However, due to the massive trial record, evidence not discussed is deemed cumulative. This case involves events that transpired four decades past. Memories have dimmed, capacities to articulate have been impaired, time periods have become confused, yet it was startling that some percipient witnesses were able to testify with precision and assurance on many points. Nonetheless, in the circumstances of this case, credibility should, and has, played a key role in shaping the court's findings. Although disinclined to comment negatively on any witness, the court reluctantly has done so only when a party has taken the position that because a witness made a point its certitude followed as a consequence.

## DISCUSSION

I. *Overview of asbestos—the mineral; types of products supplied by Johns-Manville to the Navy and the Maritime Commission; application of asbestos-containing products; description of ships on which products used*

The ingredient common to all the insulation and fireproofing products involved in this case—asbestos—is a naturally occurring mineral. It is composed of densely packed fibers of various lengths that can be separated into fine strands. Because its fibers are virtually indestructible and incombustible, asbestos provides excellent insulation against high temperatures. Asbestos has been used generally as a thermal, acoustic, and electrical insulator and as a filtration material.

Three types of asbestos, each possessing different chemical, engineering, and physical properties, were used commercially. Chrysotile, which has longer, flexible fibers with high tensile strength and was used to make asbestos textiles and other thermal insulation products, was mined primarily in Canada, Rhodesia, South Africa, and the

Soviet Union. Amosite, which was preferred for most thermal insulation products used aboard ships because of its lighter density and compatibility in mixing, came primarily from South Africa. Crocidolite, distinguished by its high tensile strength and acid resistant properties, was mined primarily in South Africa and Australia.

Because the utility and value of asbestos depended on the length of the fibers, as well, each type of asbestos was classified into several grades. Canadian chrysotile was divided into grades "1" through "7"— the grade assigned depended on the composition percentage of different lengths of fiber, grade 1 having the highest percentage of long fibers. South African amosite was classified into grades "B1", "B3" or "D3", "3DM–1", and "M–1", with the "B3" or "D3" grade containing the longest fibers. The difference in grades was significant because longer fibers increased the strength of thermal insulation products and were more costly.

Prior to and during World War II, Johns-Manville dominantly was a manufacturer of products used in building construction, including asbestos-containing products. Johns-Manville sold a variety of products to the Navy for a number of years. During World War II, Johns-Manville's production for the Navy and the Maritime Commission consisted primarily of high-temperature insulations and fireproofing materials for all types of Naval and Merchant Marine vessels. The products Johns-Manville supplied to the Government included high-temperature and pipe insulation, other types of pipe coverings, asbestos cements, asbestos textiles, asbestos paper and tapes, asbestos felt insulation, and marine bulkhead panels. Johns-Manville was one of the principal suppliers of asbestos products used for ship construction, conversion, and repair. Asbestos products served any of three general purposes in the construction and repair of ships: 1) to enhance engine performance by containing the extreme heat generated by the ship's engines within the engines and steam pipes; 2) to make the ships more fireproof; and 3) to prevent condensation and frost on the outside of cold water pipes.

Although the specific types of asbestos products used by the Navy and the Maritime Commission varied over time, the following addresses the composition, description, and use of the products during World War II. Machinery and pipes in the engine and boiler rooms on Navy vessels required various kinds of insulation, and Johns-Manville sold several varieties of pipe covering to the Navy. It manufactured one type of pipe covering from a material known as "85 percent Magnesia," which was a mixture of approximately 85 percent magnesium carbonate and 15 percent asbestos fibers. The asbestos portion was composed of 40 to 60 percent each of amosite and chrysotile. Shipyard workers known as pipe coverers placed sections of split, cylindrical, pre-formed pipe covers around all the hot and cold pipes within and between the boiler and engine rooms, sawing the covers to fit curves and bends in the pipes and cutting and scraping out interior surfaces of the covers with knives to fit them around couplings. The workers then pasted down the flaps of the covers' canvas wrapping to secure the covers around the pipes.

Shipyard workers applied Johns-Manville's asbestos products directly to ship interiors during ship construction and repair, although some preparatory mixing and cutting of various insulation products was performed in pipe covering shops located within the shipyards. The specific methods of application of each product were illustrated both by a 1944 Federal Security Agency film, *Covering Hot and Cold Pipes,* and by the testimony of several former shipyard workers.

When the workers encountered such features as flanges, elbows, valves, or hangers along the pipes, they employed a combination of other asbestos products to achieve a continuous covering of insulation. For flanges they cut blocks of 85 percent magnesia to fit and filled in the gaps with broken pieces of pipe covering and an asbestos cement or "mud" also made of 85 percent magnesia. For the other irregularities, the workers used broken pieces of pipe covering and cement. Alternatively,

these irregularities could be covered by asbestos cloth cut and sewn to fit.

Where pipes or boilers were subject to higher temperatures, the Navy used a different set of Johns-Manville products. In particular, Johns-Manville produced "450 Cement for Navy" and "Superex Cement for Navy"—both high-temperature asbestos cements. The Superex cement contained diatomaceous earth, asbestos fibers, and clay binders, and the 450 cement contained between 10 and 15 percent chrysotile fiber and mineral wool or rock wool in place of diatomaceous earth. Johns-Manville also produced a Superex pipe covering and Superex blocks.

Weaving chrysotile fibers (70 to 98 percent) with cotton fibers, Johns-Manville manufactured asbestos cloth products, which the Navy used as "lagging"—an insulative outer layer designed either to protect various kinds of pipe covering or to encase other forms of asbestos insulation (such as asbestos felt) to form insulative pads. These asbestos textiles could be cut with shears and sewn with asbestos threads or yarn. Thick rolls or sheets of flexible asbestos fiber felt, cut by saws into desired lengths and widths, were used to wrap medium-temperature pipes. Johns-Manville produced two types of asbestos felt: "Fire Felt," composed of at least 98.5 percent chrysotile fiber, and "Amosite Asbestos Felt," composed of amosite fiber.

Among the other asbestos products Johns-Manville produced for Navy use were "Asbestos Millboard" (for bulkheads), "Ebony Asbestos" (for switchboard panels), "Marine tape" (for wrapping pipe covering), and assorted corrugated asbestos paper and compressed asbestos sheet packing.

The Maritime Commission made use of a different line of Johns-Manville asbestos products. Johns-Manville produced a fireproof bulkhead material called "Marinite." It was composed of asbestos fibers, diatomaceous silica, and lime pressed into sheets. These sheets could then be cut to proper sizes with saws.

Although the design and size of Navy vessels constructed during the war varied greatly, all Navy ships used asbestos products in the boiler and engine rooms. These vessels included battleships, aircraft carriers, heavy cruisers, destroyers, destroyer escorts, minelayers, and seaplane tenders. Submarines were the only Navy vessels that did not use asbestos insulation. In general, as the Navy designed ships with greater speed and size, the resulting higher temperatures in the boilers and engines required higher-temperature insulation. Detailed testimony by witnesses concerning ship design and the location of asbestos insulation within a typical destroyer class ship revealed further general distinctions among Navy vessels in the type of asbestos material used. The insulation materials required for each ship were determined by the material specifications for the particular types of machinery found in the ship.

The Maritime Commission had thousands of cargo vessels built during the war. Marinite sheets were added to them to provide fireproofing bulkhead construction. These cargo vessels also contained asbestos pipe insulation.

## II. *Asbestos-related diseases*

Inhalation of asbestos fibers is associated with three major diseases: asbestosis, pulmonary and bronchogenic carcinoma (lung cancer), and mesothelioma. Asbestosis, caused only by the inhalation of asbestos fibers, is characterized by the permanent disposition of asbestos fibers in the lungs and the resultant scarring, or fibrosis, of the supporting structures of the lungs—the lungs' air sacs and the membrane through which a gas exchange occurs between the air sacs and blood. *See generally Asbestos Ins. Coverage Cases*, Judicial Council Coordination Proceeding No. 1072, slip op. at 27–29. Asbestosis is a latent disease and is the most common asbestos-related disease. The indestructability of asbestos fibers is central to the progressive nature of the disease. Once inhaled and deposited in the lungs, the fibers tend to remain, and the lungs' normal clearance mechanisms are ineffective. As the clearance mechanisms respond to the foreign matter, inflammation is caused by

their inability to destroy it. The inflamation produces fibrosis. Over time the fibrosis affects enough of the lungs to cause clinical symptoms of asbestosis to become apparent.

Dr. Edward A. Gaensler, Johns-Manville's expert in asbestos-related diseases, testified that once asbestosis is detected clinically, it tends to worsen at varying rates. It can cause total and permanent disability. This disease was known before World War II.

The pulmonary or bronchogenic lung cancer traceable to asbestos inhalation refers to a malignant condition of cells arising from tissue scarring caused by asbestos. As with asbestosis the likelihood of lung cancer varies with the magnitude and duration of exposure to asbestos fibers. Mesothelioma, another cancerous condition, arises at the site of asbestos-caused scarring within the lining that covers the outer aspect of the lung or the lining of the abdominal cavity. It is invariably a fatal cancer, a latent disease which has developed in individuals with exposure to small amounts of asbestos. The relationship between lung cancer and asbestos exposure, according to Dr. Gaensler, was not known during World War II, nor was the incidence of mesothelioma.

III. *The effect of World War II statutes and regulations on Johns-Manville's supply contracts with the Navy and the Maritime Commission*

A. *Background*

Johns-Manville's complaint paints a picture of overarching governmental control to the end that Johns-Manville was compelled or forced to perform its supply contracts with the Navy and the Maritime Commission. These allegations have been described in *Johns-Manville Corp.,* 12 Cl.Ct. at 8, 28. Johns-Manville's proof on point, however, described a lesser order of compulsion or control. As its counsel stated in his opening statement and closing argument, consistent with the testimony of Lincoln Gordon, former top official of the

War Production Board, the evidence shows "voluntary compliance in a compulsory system." Johns-Manville devoted considerable effort to prove that the statutory and regulatory framework for allocating strategic or critical materials, such as asbestos, and for implementing the priority system for fulfilling orders requiring asbestos was compulsory. Defendant expended equal effort to show that Johns-Manville took advantage of the business opportunities to supply asbestos-containing products directly to the Navy, to the Maritime Commission, and to other customers with priority orders for these products and that the regulatory system did not encroach on the ability of a supplier contracting with the Navy or the Maritime Commission to propose price and delivery terms in submitting its bid.

What has been referred to as the issue of compulsion and control is not a theory of relief. First, the issue is not the predicate for a finding of contractual duty. Johns-Manville's counsel said at the outset that the issue is "not an issue which we believe is determinative of the case" and that "the case can be decided on traditional principles of government contract law ...," as has been noted previously. In contradistinction is Johns-Manville's pending case in federal district court seeking relief in tort against the United States based on an underlying shipyard worker claimant who was exposed to asbestos after World War II. Johns-Manville contends that the duty owed to the supplier by the Government arose, *inter alia,* from its being forced to supply asbestos during the war years. *See Johns-Manville Sales Corp. v. United States,* 622 F.Supp. 443, 447–49 (N.D.Cal.1985) (order granting and denying motion to dismiss). The issue in that case, unlike the case at bar, is precisely whether compulsion and control created a duty—there, a tort duty.

Second, the compulsion and control issue is relevant to whether privity of contract existed between Johns-Manville and the Navy or the Maritime Commission in respect of sales to suppliers working at pri-

vate shipyards or to the shipyards themselves. As Johns-Manville's counsel argued, it is relevant also to the issue whether Johns-Manville had access to the Navy and private shipyards and was in a position to know about shipyard working conditions. However, it is not relevant, contrary to Johns-Manville's assertion, to the interpretation of wartime contracts, warranties, or price terms.

The precious few wartime contracts in evidence (none of which is a contract for the supply of thermal insulating products by Johns-Manville to the Navy or the Maritime Commission) can be interpreted as a matter of law. Whether an implied warranty of specifications runs to Johns-Manville depends on whether the Navy or the Maritime Commission drafted design specifications mandating the provision of asbestos, not whether Johns-Manville was required to contract with the Government. Regarding price terms, a supplier's ability to set prices was inhibited ultimately by laws capping prices, subjecting contracts to renegotiation, and imposing excess profits taxes in order to disallow excess profits. These types of controls do not amount to government dictation of prices. Several of Johns-Manville's witnesses testified that the wartime economy skewed the supply-demand mechanism for setting prices, as the Government had unlimited demand for defense production. Therefore, the market could not be permitted to set the upper limit on prices, which would have been without ceiling. Dr. Gordon's testimony is illustrative. In 1939, according to Dr. Gordon, national defense took 1.2 percent of the gross national product. In 1943 and 1944 it took 42½ percent. Because the base increased, as well, Dr. Gordon opined that defense production actually increased 50 or 60 times. As will be shown, suppliers could set their prices consistent with the upper limits established by the Government.

## B. *Wartime controls*

September 1, 1939, marked the date the war began in Europe. On September 8, 1939, President Roosevelt proclaimed a state of "limited" national emergency, and on May 27, 1941, the President declared a state of "unlimited national emergency." Japan attacked Pearl Harbor on December 7, 1941, and the United States entered the war. Because this case is attuned to the rapid buildup of shipbuilding efforts in aid of the war effort, it is appropriate to date the beginning of the war in 1940, the earliest date shipyard expansion began.[4] The war ended, for purposes of limiting evidence, no later than on January 1, 1946.

In 1940 the Navy had less than 1.3 million tons of major combat vessels in service, which was considered to be adequate for a one-ocean Navy. The isolation of Great Britain in 1940, coupled with the Japanese aggression in the Pacific, made clear the need for simultaneous Navy action in two or more oceans. In 1940 Congress approved additions to the Navy—2.172 million tons of major combat vessels in order to triple the size of the fleet. After the attack on Pearl Harbor, a five-ocean Navy was planned, resulting in total combat Navy tonnage of approximately 8 million tons. From 1939 through 1945, the nation's shipyards built over 1,580 Naval vessels. Over 1,300 ships were added to the fleet between the attack on Pearl Harbor and October 1, 1945. During the peak wartime shipbuilding years of 1942–1944, the shipyards delivered 3,848 merchant and 1,143 major combat vessels. Dr. Gordon recalled that shortly after Pearl Harbor, President Roosevelt called for building 8 million deadweight tons of merchant vessels in 1942 and 10 million tons in 1943. Although both goals were considered unat-

---

**4.** Before trial it was ruled that no evidence would be admissible concerning events after January 1, 1946, unless ordered otherwise on a case-by-case basis. Order entered Apr. 29, 1987, ¶ 6. Evidence freely was received for years prior to 1940. Were it otherwise, the actual development and evolution of Johns-Manville's products sold to the Navy and the Maritime Commission and of the specifications for these products could not have been ascertained, nor could the history of Johns-Manville's and the

tainable, he said that 9 million tons were built in 1942 and 19 million tons in 1943.[5]

The expansion of facilities has been described by a group of authorities:

Shipbuilding facilities in the United States were increased enormously to carry on World War II shipbuilding. The total money value of these facilities in 1946 was several times as great as the total value at the outbreak of the war. At the time of the attack on Pearl Harbor, there were 24 privately owned shipyards and 8 navy yards that had facilities to build ships of 2,000 gross tons or over. At the end of the war, there were 99 additional yards of this capacity, all of them financed by the Government....

I *The Shipbuilding Business in the United States of America* 161 (F.G. Fassett, Jr., ed. 1948). Between June 1940 and December 1944, the Government spent over $2 billion for shipyard expansion. The number of shipyard workers increased correspondingly with expansion of facilities. In 1939 there were 120,000 workers; the number in December 1943 peaked at over 1 million. Overall there were 4.5 million shipyard workers, and by mid–1942, shipyards employed more workers than any other war industry.

Although the President was given authority to requisition personal property for national defense, statutes and regulations for requisitioning material played a peripheral role in the system of priorities and allocation for materials such as asbestos. It was not impossible, however, that refusal to honor a defense order could result in requisition of a factory.

The Act of June 28, 1940, Pub.L. No. 671, ch. 440, 54 Stat. 676, 677 (the "Priorities Statute"), was intended "[t]o expedite national defense." Section 2(a) provided:

That whenever deemed by the President of the United States to be in the best interests of the national defense during the national emergency declared by the President on September 8, 1939, to exist, the Secretary of the Navy is hereby authorized to negotiate contracts

for the acquisition, construction, repair, or alteration of complete naval vessels or aircraft, or any portion thereof, including plans, spare parts, and equipment therefor, that have been or may be authorized, and also for machine tools and other similar equipment, *with or without advertising or competitive bidding* upon determination that the price is fair and reasonable, *and deliveries of material under all orders placed pursuant to the authority of this section and all other naval contracts or orders and all Army contracts and orders shall, in the discretion of the President, take priority over all deliveries for private account or for export:* ....

(Emphasis added.) While authorizing the Navy to enter into contracts with or without competitive bidding and giving precedence to defense orders over private, the Priorities Statute only referred to private contracts and did not relieve a supplier of its legal liability to other customers that could be incurred by complying with a priority order.

Congress next enacted the Selective Training and Service Act of 1940, ch. 720, § 9, 54 Stat. 885, 892, section 9 of which provided in pertinent part:

The President is empowered, through the head of the War Department or the *Navy Department* of the Government, in addition to the present authorized methods of purchase or procurement, to *place an order with any individual, firm, association, company, corporation, or organized manufacturing industry for such product* or material as may be required, and which is of the nature and kind usually produced or capable of being produced by such individual, firm, company, association, corporation, or organized manufacturing industry.

*Compliance with all such orders for products or material shall be obligatory ... and shall take precedence over all other orders and contracts thereto-*

Government's knowledge of asbestos health hazards.

5. Apparently, the quota for 1943 was also 19 million, according to a December 9, 1943 letter from a Regional Director of Construction.

*fore placed* ... and any individual, firm, association, company, corporation, or organized manufacturing industry or the responsible head or heads thereof owning or operating any manufacturing plant, which, in the opinion of the Secretary of War or the Secretary of the Navy shall be capable of being readily transformed into a plant for the manufacture of arms or ammunition, or parts thereof, or other necessary supplies or equipment, who *shall refuse to give to the United States such preference* in the matter of the execution of orders, or who *shall refuse to manufacture the kind, quantity, or quality of* arms or ammunition, or the parts thereof, or any *necessary supplies* or equipment, as ordered by the Secretary of War or the Secretary of the Navy, or who *shall refuse to furnish* such arms, ammunition, or parts of ammunition, or other *supplies or equipment, at a reasonable price* as determined by the Secretary of War or the Secretary of the Navy, ... then, ... the President, through the head of the War or *Navy Departments* of the Government, in addition to the present authorized methods of purchase or procurement, is hereby *authorized to take immediate possession of any such plant or plants,* and ... to manufacture therein such product or material as may be required, and any individual, firm, company, association, or corporation, or organized manufacturing industry, or the responsible head or heads thereof, failing to *comply with the provisions of this section shall be deemed guilty of a felony, and upon conviction shall be punished by imprisonment for not more than three years and a fine not exceeding $50,000.*

The compensation to be paid to any individual, firm, company, association, corporation, or organized manufacturing industry for its products or material, or as rental for use of any manufacturing plant while used by the United States, shall be fair and just: ...

(Emphasis added.)

The President by Exec. Order No. 8629, 3 C.F.R. 852 (1938–1943 Compl.), established the Office of Production Management (the "OPM") on January 7, 1941, to regulate the production and supply of critical defense materials and to coordinate government activities with regard to these materials. The OPM was charged with determining when, to what extent, and in what manner priorities should be afforded under section 2(a) of the Priorities Statute. The OPM and its successor, the War Production Board, were structured in the Office for Emergency Management of the Executive Office of the President.

The Priorities Statute was amended by the Act of May 31, 1941, Pub.L. No. 77–89, ch. 157, 55 Stat. 236, to expand section 2(a) to reach, *inter alia,* subcontracts; materials could be allocated when a shortage was apparent, not merely when a material was inadequate to meet defense needs; and a supplier was immune from liability for default resulting from compliance with priority orders.

After declaring war, Congress enacted the First War Powers Act, Pub.L. No. 354, ch. 593, 55 Stat. 838, 839 (1941). Section 201 of that act provided:

The President may authorize any department or agency of the Government exercising functions in connection with the prosecution of the war effort, in accordance with regulations prescribed by the President for the protection of the interests of the Government, *to enter into contracts* and into amendments or modifications of contracts heretofore or hereafter made and to make advance, progress and other payments thereon, *without regard to the provisions of law relating to the making, performance, amendment, or modification of contracts whenever he deems such action would facilitate the prosecution of the war: Provided,* That nothing herein shall be construed to authorize the use of the cost-plus-a-percentage-of-cost system of contracting: *Provided further,* That nothing herein shall be construed to authorize any contracts in violation of existing 'aw relating to limitation of profits: *Provided further,* That all acts under the authority of this section shall be made a

matter of public record under regulations prescribed by the President and when deemed by him not to be incompatible with the public interest.

(Emphasis added.)

The Maritime Commission's procurement authority for merchant vessels suitable for national defense needs derived from the Merchant Marine Act of 1936, § 207, Pub.L. No. 835, ch. 858, 49 Stat. 1985, 1986, *as amended*, Act of June 23, 1938, § 2, Pub.L. No. 705, ch. 600, 52 Stat. 953, 954 (1938), which conferred on the Commission authority to enter into contracts "in the same manner that a private corporation may contract within the scope of the authority conferred by its charter." The Maritime Commission's authority to contract was expanded in May 1941 and given priority over private contracts. Act of May 2, 1941, Pub.L. No. 46, ch. 84, 55 Stat. 148, 149.

Executive Order No. 9,001, 6 Fed. Reg. 6,787 (1941), authorized the Secretary of the Navy and the Maritime Commission to exercise the power of the President under the First War Powers Act within the limits of appropriations. The Navy and the Maritime Commission were given virtually unbridled authority to contract "for all types and kinds of things and services necessary, appropriate or convenient for the prosecution of war, . . . including but not limited to, . . . supplies of any kind . . . without any restriction of any kind, either as to type, character, location or form."

Section 2(a)(2) of the Priorities Statute was amended again on March 7, 1942, and incorporated into the Second War Powers Act, Pub.L. No. 507, ch. 199, 56 Stat. 176, 178–79 (1942). That act further provided in pertinent part:

> Deliveries under any contract or order specified in this subsection (a) *may be assigned priority over deliveries under any other contract or order;* and the President may require acceptance of and performance under such contracts or orders in preference to other contracts or orders for the purpose of assuring such priority. . . .

(3) The President shall be entitled *to obtain such information from, require such reports and the keeping of such records by, make such inspection of the books, records, and other writings, premises or property* of, any person (which, for the purpose of this subsection (a), shall include any individual, partnership, association, business trust, corporation, or any organized group of persons, whether incorporated or not), and make such investigations, as may be necessary or appropriate, in his discretion, to the enforcement or administration of the provisions of this subsection (a).

. . . .

(5) Any person who willfully performs any act prohibited, or willfully fails to perform any act required by, any provision of this subsection (a) or any rule, regulation, or order thereunder, whether heretofore or hereafter issued, shall be guilty of a misdemeanor, and shall, upon conviction, be fined not more than $10,-000 or imprisoned for not more than one year, or both.

(Emphasis added.)

On December 8, 1941, the President abolished the OPM and established the War Production Board (the "WPB"). The WPB exercised its authority pursuant to the Second War Powers Act. The OPM and later the WPB operated under Priorities Regulation No. 1, 6 Fed. Reg. 4,489 (Aug. 30, 1941), which mandated that defense orders for any material "must be accepted and fulfilled in preference to any other contracts or purchase orders for such material," but "need not be accepted" if the persons placing such orders are "unwilling or unable to meet regularly established prices and terms of sale." A supplier, however, was not allowed to discriminate against defense orders in establishing such prices or terms. Priorities Regulation No. 1 was the "backbone of the priorities system," according to the WPB. War Production Board, Division of Information, *Priorities and Industry* 5 (Aug. 1942). A system of alpha-numeric preference was prescribed by Priorities Regulation No. 1, with each contract assigned a rating that governed the place it took in the war economy. The

priorities assigned to the orders processed by Johns-Manville carried ratings from A–1 through the highest rating of AAA, according to Clyde Barnett of Johns-Manville's Government Department and Norman J. Adams, a former Johns-Manville senior sales engineer, who also recalled ratings as low as A–10.

Dr. Gordon, who had impressive recall of its operations, began working for the WPB in January 1942. The WPB was not a procurement agency, but was responsible for procurement policy, and its Chairman and the Chairman of the Office of Price Administration served on the Procurement Policy Board, along with representatives of the procurement agencies that awarded the contracts. Under the Chairman of the WPB, who reported to the President, was the Program Vice Chairman, who was responsible for the priority system for allocating scarce materials.

During his tenure at the WPB from 1942 to November 1945, Dr. Gordon worked in the Program Bureau, advancing in April 1945 to Program Vice Chairman and Chairman of the Requirements Committee. Frank V. Connolly, who testified by deposition, served during the war as Director of the Special Ratings Division of the WPB. Dr. Gordon's and Mr. Connolly's testimony, along with histories of the WPB, described the overall operations of the WPB's priority and allocation system. Both the Requirements Committee and the Special Ratings Division were under the Program Vice Chairman. The former represented claimant agencies, such as the Navy and the Maritime Commission, as well as the Office of Civilian Requirements, in order to allocate materials among the claimant agencies to best serve the war effort. The Special Ratings Division stood as watchdog over the assignment of priority ratings. The Operations Vice Chairman, reporting to the Program Vice Chairman, was responsible for the Industry Division. Each of the 12 Divisions represented individual or groups of scarce materials. Pertinent to this case was the Cork, Asbestos & Fibrous Glass Division. Division personnel came from the business world. The Industry Division input industry's needs. The Program Vice Chairman oversaw the adjustment of needs of claimant agencies and industry and informed industry of the WPB's allocation and priority rating guidelines through the Industry Division. For the most part, the procuring defense agencies, not the WPB, issued ratings pursuant to WPB guidelines. A private contractor typically would receive a rating certificate from the procuring agency and, in turn, obtain supplies from subcontractors on the basis of the rating.

The Operations Division also approved orders and contracts involving strategic or critical materials and received reports, when required, of available stocks and usage of scarce materials. The Compliance Division, reporting to the Program Vice Chairman, enforced the WPB's guidelines by investigating producers and manufacturers, conducting hearings after notification of violations, authorizing subpoenas, issuing suspension orders that suspended allotments, and adjudicating appeals of suspension orders.

Dr. Gordon described the WPB's control over industry during the war: "The control was comprehensive. It was by far the most comprehensive control system ever experienced in the United States. It was all-embracing." The WPB controlled what could and could not be produced, the sequence of production, the securing of scarce materials from abroad, and allocation of all scarce materials. The WPB issued limitation and conservation orders. "L orders," or limitation orders, eliminated civilian use of many materials. Scarce materials were allocated among users by "M orders." In Dr. Gordon's opinion, a manufacturer was compelled to accept orders from the Navy or the Maritime Commission because there was no other authorized use for its products and legal compulsions were in place. Dr. Gordon made the point that contractual relationships were taking place in an environment wherein unnecessary civilian production had been eliminated and the economy was mobilized for war. He characterized the latitude for negotiations during the war as "voluntary contracts within a mandatory system.... The com-

pulsory framework was there all of the time, and it was the maximum." However, he agreed that the businesses existed to make profits during the war, although limited by price controls, contract renegotiation, and excess profits taxes.

Although Johns-Manville is correct that the WPB vigorously enforced its guidelines and orders, the Chairman of the WPB said in a 1944 report that the WPB used its powers "as sparingly as was consistent with the job of getting war goods produced...." WPB Chairman, *War Production in 1944* 4 (1945). The WPB provided for appeals when its orders caused hardship by restricting a supplier to a quantity of a material, for example. An elaborate appeals process was in place as of July 1942. Within two years 42,559 appeals were acted on, of which 38,065 were granted in whole or part. Only in a few instances were plants seized. The Navy's policy, spelled out in its Procurement Directives, was that "[c]ompulsory orders ... being extraordinary remedies, shall be resorted to only when efforts to reach a voluntary agreement on reasonable terms have been unavailing." *Navy Procurement Directives* (CCH) ¶ 10,914, at 5401 (1943) (as updated through July 1946).

Dr. Gordon's testimony illustrated the paradox of the compulsory framework. He wrote in 1948 that, while compulsory controls overlap the system, "the mainspring of a war economy in a free society remains voluntary." *Government and the American Economy* 801 (M. Fainsod & L. Gordon rev. ed. 1948). He also wrote: "The system of controls must be publicly accepted as a means for ensuring the best use of these voluntary efforts." *Id.* Dr. Gordon explained that these statements, in context, meant that the producers wanted the controls to work; they wanted the United States to win the war:

> They were freed ... from the fear that if they lost some of their civilian business that some competitor might take it over. Once they were freed from that fear by the control system, they were, for that reason and also for all of the reasons of

patriotic impulse and the situation the country was in, anxious to produce for war purposes. That's the context. This is what I would call voluntary compliance within a system, a compulsory framework of action.

C. *Effect of wartime controls on Johns-Manville's manufacture and sale of asbestos-containing products*

During the war the Navy and the Maritime Commission were the primary users of asbestos for pipe and boiler insulation. Indirect military and essential civilian industries, such as steel plants, petroleum refineries, munitions plants, and artificial rubber manufacturing facilities, were also significant users of high-temperature insulation. During the latter half of 1942, the WPB allocated to shipyards nearly 40 percent of the estimated 36.8 million pounds of asbestos-containing high-temperature insulating pipe covering produced domestically. For 1943 roughly 46 percent of the shipyard allocations of pipe covering went to the construction or conversion of Navy combat and auxiliary vessels, with the remainder to construction of merchant vessels ordered by the Maritime Commission. In 1944, 55 percent of 85 percent magnesia and other high-temperature insulation was required for Navy and Maritime use.

As early as June 1939, Congress turned its attention to stockpiling strategic and critical materials [6] for defense needs. The Army and Navy Munitions Board, charged with implementing the Act of June 7, 1939, Pub.L. No. 117, ch. 190, 53 Stat. 811–12, included asbestos on its list of critical materials because a considerable quantity was imported from Africa. Asbestos remained a critical material throughout World War II, signifying that it was deemed essential to the national defense. Conservation Order No. M–63, 6 Fed. Reg. 6,796 (1941), regulated the importation of scarce materials. It was the first "M" order to affect asbestos. In January 1942 certain grades of asbestos originating in Rhodesia or the Union of South Africa were added to M–63.

---

**6.** The terms "strategic" and "critical" became interchangeable during the war.

7 Fed. Reg. 223 (1942). The allocation of certain grades of African asbestos was restricted to named government corporations or agencies absent permission from the WPB's Division of Operations. 7 Fed. Reg. 2,094 (1942).

Due to the interruption of shipping to the United States in 1940–1941, the Government began taking over the supply of asbestos fibers through the Metals Reserve Company, which was established in 1940 to purchase and import strategic and critical raw materials, including asbestos. Conservation Order No. M–63 also prohibited any person other than the Government from importing certain raw materials, including asbestos, as of January 1942 without government authorization. The Cork, Asbestos & Fibrous Glass Division of the WPB worked with the Canadian Department of Munitions and Supply to control the importation of Canadian chrysotile asbestos fibers. From 1941 through 1944, the United States imported over 191 million pounds of African asbestos fiber. Johns-Manville obtained allocations of asbestos fiber from government stockpiles under the written allocation and authorization of the WPB. Johns-Manville also obtained asbestos from the Metals Reserve Company by contracts that were deemed allocations by the WPB. The Metals Reserve Company sold and delivered at least 6 million pounds of African asbestos fiber to Johns-Manville alone. Although the Metals Reserve Company had control of the importation and, pursuant to WPB guidelines, the disposition of asbestos fiber, it must be remembered that the Metals Reserve Company was established when raw materials imported by ship were being lost at sea. The Metals Reserve Company facilitated shipment and relieved users of the high insurance and difficulty in making transportation arrangements that they otherwise would have encountered.

Conservation Order No. M–79, 7 Fed. Reg. 436 (1942), restricted use of asbestos fiber imported from South Africa to defense orders. The use of chrysotile and amosite was limited exclusively to listed products. Violation of the order was subject to prohibition from further delivery and criminal penalties. M–79 provided for appeal to the WPB in the case of "exceptional and unreasonable hardship," or a "degree of unemployment which would be unreasonably disproportionate compared with the amounts of asbestos fiber conserved," or if compliance "would disrupt or impair a program of conversion from non-defense work to defense work." *Id.* M–79 was amended effective February 28, 1942, 7 Fed. Reg. 436 (1942), to restrict the installation of high-temperature pipe covering to installations wherein temperatures exceeded 300°F or on ships.

Conservation Order No. M–123, 7 Fed. Reg. 2,472 (1942), limited the use of asbestos textiles to manufacturers of industrial packings or orders bearing a given priority rating. This order had a right of appeal, confined to hardship, however, and the same provisions on violations as M–79. Conservation Order No. M–283, 8 Fed. Reg. 1,790 (1943), putting asbestos textiles under monthly WPB allocation, required both suppliers and consumers to obtain authorization to deliver, in the case of suppliers, and to accept delivery, in the case of consumers. Dr. Gordon described M–283 as effecting "100 percent allocation." The order required applications and monthly reports to be forwarded to the WPB. M–283 had no appeal procedure, but included the same type of provision for violations as M–79.

Unquestionably, during the war Johns-Manville received fiber needed for thermal insulation products for sale to the Navy and the Maritime Commission and essential civilian users. Conversion of Johns-Manville's production facilities was not required to accommodate wartime production, however. Johns-Manville's President, Lewis H. Brown, testified before Congress in 1943 that the wartime character of Johns-Manville's business was "[v]ery much the same," as its peacetime business, which he described as "the manufacture of about 1,200 different products, asbestos materials, friction materials, building materials, and so on." *Investigation of the Progress of the War Effort: Hearings Before the House Comm. on Naval Affairs*, 78th

Cong., 1st Sess. 536 (1943) [hereinafter *War Effort Hearings*].

Before the war Johns-Manville had a sales policy to do business with both government and civilian customers, and the Johns-Manville salesmen who testified did not indicate that the policy waned during World War II, although there was a conflict about how actively field sales were sought. Salesmen and District Sales Managers in the field were paid an incentive after a base volume of sales had been achieved. Direct sales to Navy yards counted towards this base volume and were subject to incentive pay, according to the deposition of Charles O. Garcelon, a long-time Johns-Manville salesman from the Boston Office, who sold to the Boston Navy Yard.

Johns-Manville created a Government Department in 1908. Clyde Barnett was the Chief Clerk from 1941–1950 for Johns-Manville's Government Department, located in New York City. Mr. Barnett was not subject to incentive pay. He dealt with the centralized procurement components of several government agencies, including the Navy and the Maritime Commission. Mr. Barnett described his function as receiving invitations for bids or requests for tender from purchasing agencies and executing them. He explained that the Navy generally required at least three bids on a fixed-price supply contract. When Johns-Manville's bids were successful, he signed the contracts on behalf of Johns-Manville and routed them for factory production. The bids Mr. Barnett responded to had been assigned priority ratings by the Navy. When he received a bid, Mr. Barnett would contact the Sales Department to see if adequate material had been allocated. He would then inform the factory of the delivery date, and, if it could be met, price the order. Mr. Garcelon, who went to the Boston Navy Yard to attend as many bid openings as possible, described the process by which the Boston Navy Yard orders were placed with the Boston Office, similarly referring to them as bids.

The purchasing agencies within the Navy were the Bureau of Supplies and Accounts and the Bureau of Ships. The Bureau of Supplies and Accounts was the Navy's centralized procurement agency and bought for the Bureau of Ships, the Bureau of Yards and Docks, and the Bureau of Ordnance, routing the carload orders to warehouses for distribution or direct delivery of smaller lots to Navy yards. He did not testify that orders made by the Navy were shipped to private shipyards. When Johns-Manville was a successful bidder on Maritime Commission contracts, the procedure was the same as for responding to Navy bids, although Johns-Manville shipped the orders directly to the private shipyards.

Of the approximately 30 bids per week Mr. Barnett received, "a good 85 percent" of bids were from the Navy, with the Maritime Commission accounting for "[r]oughly 10 percent." He termed these direct sales. The Navy also purchased to a minor extent through Johns-Manville's district offices, as Mr. Garcelon testified. Mr. Barnett said that 85 to 90 percent of Johns-Manville's sales to the Government were direct sales. Mr. Barnett, who originally compiled the figures, confirmed reports of Johns-Manville's Federal Government sales for 1941 as $20,525,048; for 1942, $54,320,525; $36,-393,903 for 1943; $25,793,231 for 1944; and $16,760,250, for 1945. This is consistent with other testimony that the height of defense production was in 1942. Defendant emphasized that Johns-Manville's Government Department sales for each year were much less than its total sales, in that between 1941 and 1945 the Government Department sales varied from under 20 percent to 50 percent of all sales. Such a comparison tends to minimize the impact of the war economy on Johns-Manville, because many sales were to Johns-Manville's Technical Service Units, approved independent contractors that distributed and installed Johns-Manville's products in shipyards throughout the country, and to essential civilian users that contributed indirectly to the war effort.

Dr. Gordon was skeptical that any meaningful price negotiation occurred between government agencies and suppliers. However, both Messrs. Barnett and Garcelon testified that there was competition for the

contracts on price items. None of Johns-Manville's former salesmen (or sales engineers) who testified in person or by deposition knew how Johns-Manville developed its prices. Mr. Barnett took the price from a price book which was used companywide. Replacement sheets were issued periodically, but not at regular intervals. Senior sales engineer Norman J. Adams said that price changes to the Federal Government were communicated through advance bulletins after a contract had been negotiated.[7] The price book listed prices for each product under a code for the type of customer. "U" designated government customers for which the price generally was lower than for Johns-Manville's preferred Technical Service Units or large industry users. Both Messrs. Barnett and Garcelon testified that the variables in the invitations to bid submitted by the Navy were price and delivery. Delivery definitely was negotiable after Johns-Manville had submitted its bid, but Johns-Manville secured and lost awards based on the firm fixed prices it submitted in its bids.

Peter H. Soroka served as Johns-Manville's Priorities Manager in the Manville, New Jersey plant from 1940–1945 and oversaw a staff of ten. Johns-Manville set up a Priorities Department in its plants as early as 1940 when the OPM, predecessor to the WPB, required reports on the quantities of critical materials used, such as asbestos. Because the WPB required records of use and inventory of priority materials, Mr. Soroka monitored department quotas to determine what material could be used, how much, and for what purpose. Department records were correlated with those of other Johns-Manville plants. Mr. Soroka's department worked from shipping orders. Each order indicated the customer's priority for the material. Johns-Manville's priority in obtaining scarce materials was based on its accumulated customer priorities. Its overall rating was an average of the ratings of all shipped orders. Mr. Soroka held the view, similar to Mr. Barnett's, that 80 percent of

Johns-Manville's overall rating during the war was the top rating of AA or better. According to Messrs. Soroka and Adams and Edward D. Flavin, who was an Assistant District Sales Manager during the war, President's Bulletin No. 19–358 of January 6, 1942, issued by Johns-Manville, accurately set forth its policy on the priority and allocation system:

> It is the policy of Johns-Manville to cooperate 100 percent with our Government's program on Priorities and Allocations. I have seen fit to address these remarks to our entire organization, since all of us, directly or indirectly, in our day to day work contribute to the operation of Johns-Manville under the Priorities and Allocations Program of the Office of Production Management.

Mr. Soroka communicated with the WPB regional representative at least once a week and understood, based on his conversations, that non-compliance with the priorities system would subject Johns-Manville to penalties and loss of its priority ratings. However, Mr. Soroka's contacts at the WPB did not involve the acquisition of asbestos. He asked the WPB representative for, and obtained, priority assistance for special needs. Mr. Soroka also testified that the WPB never questioned Johns-Manville's fulfillment of priority orders or compliance with priority regulations and never threatened Johns-Manville.

Within days after Priorities Regulation No. 1 was issued, Johns-Manville directed on September 1, 1941, that

> [i]t is not necessary under Regulation No. 1 for J–M to bid on all Government openings of which it has notice. However, if at any time a Government representative approaches J–M and requests it to bid on a material normally sold by it, J–M must either submit a bid or have good and sufficient reason for refusing to bid, such as, for example, inability to meet the delivery date because of the requirements of orders bearing higher preference ratings.

---

7. As discussed in part IV of this opinion, Johns-Manville contends that Johns-Manville and the Navy and the Maritime Commission annually negotiated the prices for its asbestos-containing products.

Mr. Barnett said that it was understood that Johns-Manville was required to bid on rated Navy orders. In fact, he would return an invitation to bid only if Johns-Manville could not meet the specifications or the delivery date, and the Navy might come back to discuss adjusting the latter. Mr. Adams was a Johns-Manville sales engineer in the Boston Office beginning in 1937 and in 1940 was promoted to his own territories in Vermont and New Hampshire, where he worked as a senior sales engineer until 1944, taking over western Massachusetts in 1942, as well. While in the Boston Office before January 1940, Mr. Adams received requests for tender from the Navy, which he viewed as obligatory. Failure to honor a request could result in suspension from the bid list or a Navy takeover, according to Mr. Adams. Although between 1940–1944, he never directly received a request for tender or invitation to bid from the Navy and never attempted to sell Johns-Manville's products to the shipyards, Mr. Adams' testimony was consistent with Mr. Barnett's that during the war Johns-Manville was required to bid on Navy contracts. Mr. Flavin, at 89 the oldest witness who testified at trial, served as a Johns-Manville salesman in the Boston Office from 1929–1940, when he was promoted to Assistant District Manager of the New York District for the Industrial Products Division and supervised salesmen through 1946 when he became District Manager. It was his understanding, consistent with Sales Bulletin No. 69–566 of November 10, 1941, that there were defense orders Johns-Manville had to accept.

Messrs. Flavin and Adams believed that this Sales Bulletin also set forth Johns-Manville's policy that a defense order was required for an order to be accepted:

V. What are the responsibilities of the salesmen regarding priorities?

. . . .

3. By becoming familiar with the priorities regulations affecting his major customers, [the salesman] ... should be in a position to educate other customers in furnishing Johns-Manville with priority ratings which will assist the customer in getting the proper preferred place in our production schedules and will assist our factory in obtaining the scarce materials which may be necessary to fill his order.

. . . .

VI. Is the salesman's responsibility on priorities important?

As the defense program accelerates it is becoming increasingly difficult for all industry to secure raw materials and supplies necessary to produce orders. Johns-Manville must know how much of its production is going into defense and other uses. This can only be done through accurate coding of orders which depends entirely upon how good a job the salesman does in handling the customer's order as it is affected by the priority system. This is a selling job.

Mr. Adams' recollection as to whether Johns-Manville aggressively pursued sales during World War II differs from Mr. Garcelon's, in that the former saw himself during the war years as doing less "missionary" selling, as opposed to processing priorities. Mr. Flavin also regarded sales work during the war years as a desk job, not field work. Indeed, salesmen were not being promoted to territories. The salesmen worked in the office by telephone obtaining such information as delivery dates, ascertaining whether priorities had been received, and answering inquiries about the processing of orders. He would not agree with Mr. Garcelon that during the war there was aggressive solicitation of customers.

Although the New York District Office did not make sales to the Navy, Mr. Flavin's testimony represents a more broad based and reliable view than Mr. Garcelon's on the issue of whether Johns-Manville aggressively was seeking sales in the field. Mr. Flavin supervised salesmen and did not operate on his own, unlike Mr. Garcelon; moreover, the court was able to observe Messrs. Flavin and Adams. In essence, Mr. Flavin was able to reconcile the testimony of the field salesmen. He agreed that Johns-Manville wanted all the business it could fill, but to do so it was necessary to secure priority business. As Johns-Man-

ville's President's Bulletin No. 19–358 of January 6, 1942, explained:

> Our Sales Management will instruct the sales force on the specific steps to be taken in connection with securement [sic] of Priority business. We must bear in mind that Priorities are the tangible evidence of our contribution to the war effort which will justify our continued existence. From now on in a constantly increasing degree, goods cannot be considered sold until the salesman has secured from, by or through his customers a priority rating that will enable Johns-Manville to manufacture the product.

Following the January 6, 1942 President's Bulletin, Sales Bulletin No. 65–154 of January 13, 1942, instructed:

> [W]e need all the priority certificates that it is possible for you to get. We are certain that in many instances in the past, in our desire to get an order, we have not been insistent on getting a priority rating along with the order. A promise of a priority certificate at a later date won't help. It should accompany the order at the time that it is placed. To help our country's war program, to keep our factories adequately supplied, to enable us to give you finished goods to sell, start today to secure priority certificates on every order possible.

Johns-Manville had a close relationship with the Technical Service Units that distributed and applied its products, as explained, frequently on an exclusive basis. Sales Bulletin No. 61.3–347 of January 29, 1942, advised that technical service units should be "notified immediately that they must obtain preference ratings."

On October 25, 1943, Johns-Manville published an internal document entitled *The Marine Industry*, compiled by the Power Products and Industrial Department. The purpose of this internal publication, and that of its predecessor on August 17, 1942, was "to organize available information on the U.S. Shipbuilding Program which we felt would be of help to our Districts in their Marine operations." The report begins:

> A world war has brought us a long way from the Maritime conditions of eight years ago when our Marine Department was organized, to the tremendous shipbuilding activity in which our company is participating today. Little did anyone realize then, that in 1943 we would be selling eight million dollars worth of J–M materials for ships alone, and that we would be restricted to that figure solely by production limitations.

A fair reading of this lengthy in-house document reveals that the government marine sales were viewed as a business opportunity. In fact, Johns-Manville was looking towards continuing the business after the war. In discussing pipe coverings sold to the Maritime Commission, the report states:

> [I]t appears that we have done a pretty good job on the whole, and we should be in a fair position with long pull, after-the-war connections. Our prediction is that we will stay in the yards where we are working now and our competitors will remain in theirs—but we must not lose any yards.

Under the heading "The Maritime Shipbuilding Market," the document notes that out of a 4,903–ship total ordered for the Maritime Commission's Victory Program, 176 still remain to be ordered. "Now, what we are really interested in is what types of ships are these 4727, and what have we done towards supplying their requirements of materials that we manufacture."

*The Marine Industry* surveyed the number of ships on which Johns-Manville products had been ordered, indicating that the Maritime Commission work depended, to some extent, on whether it could receive an increase in production from its factories. This document highlights strikingly that Johns-Manville lost orders based on price.

Johns-Manville primarily sold thermal insulation products to the Navy. A December 21, 1942 Officers' Board Meeting Report titled "Insulation" is a history of Johns-Manville's insulation business written during the height of the defense acquisition. It states: "We will secure our share of this business by leading the way

with improved products, lower costs and better selling methods." The report predicted that by 1943:

> In spite of the cancellation of some large ordnance projects, there is little doubt that the demand for insulating materials during the first six months of 1943 will be even greater than in 1942 and there is a good possibility that our factories will be kept running at full capacity for the entire year. This is due not only to the various projects now under construction but further construction in the following divisions of the national program:
>
> Merchant Vessels
>
> Naval Vessels
>
> Artificial Rubber Industry
>
> Petroleum Industry
>
> Steel Industry
>
> Munitions Plants
>
> Transportation
>
> Public Utilities
>
> Miscellaneous War Industry

In 1943 Johns-Manville issued a Progress Report for 1942:

> As a result of war-time construction, many new opportunities were presented for the use of our commodities either in standard or special form.
>
> The chemical, synthetic rubber, aviation, and marine industries, along with new methods of producing high octane gas, etc., have opened up new fields for many of our products.
>
> The aviation industry indicates a very definite trend from normal type packings and insulations. It is anticipated that this trend will lead into further new fields.
>
> Asbestos cement products, such as corrugated and flat transite, flexboard, wallboard, rigid shingles, etc., were used extensively on temporary housing, in ordnance plants, and as interior fireproof linings for army camps and air and naval bases.
>
> Most of the insulating board production was consumed in all classes of army and navy construction.

The report continued: "Federal Government sales for 1942 amounted directly and indirectly to nearly half of our whole sales." The 1944 Progress Report, covering 1943, stated: "War construction continued to account for the majority of new outlets for both standard and special products." Both the Progress Reports of the Government Department for 1942 and 1943 related that "[many] new opportunities were presented for the use of our standard materials and [sic] various types of wartime construction."

The foregoing evidence demonstrates that Johns-Manville discharged its patriotic duty. Its contributions to the war effort were recognized officially, such as award of the Army-Navy "E" Pennant for excellence in war contract performance and permission to fly the Maritime Commission's "V" flag in 1942 because it was engaged in work vital to the Maritime fleet. Johns-Manville at the same time utilized the opportunities afforded by the war to expand its sales. Scrupulously adhering to the priority system, Johns-Manville also adapted to it by assuring that its customers had the requisite ratings so that sales could be made.

The trial record stands inconclusive as to how Johns-Manville determined the prices that went into its price book. Documents discussing sales of products other than asbestos to government agencies demonstrate that price competition was a factor. If anyone should know how items were priced during the war years, it was Johns-Manville's President, Lewis H. Brown. He testified on June 15, 1943, before the House Committee on Naval Affairs that there "wasn't any change in price from peacetime to wartime." *War Effort Hearings, supra,* at 550. As discussed more fully in part IV of this opinion, the evidence does not support a finding that any negotiation or other interface occurred between Johns-Manville and the Navy or the Maritime Commission in establishing Johns-Manville's prices. What has been shown, however, most forcefully through the testimony of Mr. Barnett of the Government Department and also Mr. Adams, is that Johns-Manville submitted bids or tenders,

that it was Mr. Barnett's understanding that the Navy generally was required to obtain three bids, and that contracts were awarded on the basis of the price and delivery terms offered by the bidders.

█ The live and deposition testimony and abundant documentary evidence support both Johns-Manville's and defendant's positions on this issue. Thus, it cannot be said that the World War II regulatory controls rendered Johns-Manville's supply contracts with the Navy or the Maritime Commission contracts of adhesion. It also cannot be said that Johns-Manville was forced to enter into supply contracts with the Navy or the Maritime Commission or customers supplying these agencies, although Johns-Manville was required to respond to invitations for bid or requests for tender when delivery was feasible. Further, it cannot be said that Johns-Manville was required to supply more asbestos-containing products due to wartime exigencies, since Johns-Manville took advantage of the business afforded by the war to increase its production of these products. However, due to the acute need for asbestos thermal insulation and other products, a statutory and regulatory framework was in place to prohibit Johns-Manville from ceasing production or going out of business. The inference that Johns-Manville asked the court to draw—that the threat of government takeover was central to its fulfilling supply contracts and increasing its production— cannot be drawn fairly, but certainly was part of the atmosphere of the total industrial mobilization for the war effort.

What has been described can be characterized as voluntary compliance—in fact, exploitation of business opportunities— within a compulsory system or system of mandatory controls. Johns-Manville was not free to ignore an invitation to bid or request for tender by the Navy or the Maritime Commission when the government order could be supplied, but it expanded that restriction into even more government business, and "the volume [of its sales] doubled or more than doubled, and ... just the change in volume made a difference in more profits before taxes." *War Effort Hearings, supra,* at 550 (statement of Lewis H. Brown, President of Johns-Manville).

IV. *The Navy's policy of self-insurance during World War II, including its policy of assumption of risk*

A. *Background*

Among the claims that were challenged by defendant's motion for judgment on the pleadings were breaches of alleged express or implied-in-fact contracts to indemnify Johns-Manville against risks of performing its fixed-price contracts to supply the Navy with asbestos-containing products. *See Johns-Manville Corp.,* 12 Cl.Ct. at 17–21. These claims were dismissed based on the Anti-Deficiency Act of Feb. 27, 1906, ch. 510, Pub.L. No. 59–28, 34 Stat. 27, 49 (codified as amended 31 U.S.C. § 1341(a)(1) (1982)). 12 Cl.Ct. at 21–25. Even though the counts based on indemnity contracts were no longer in the case, the issue whether the Navy had a policy to assume the risk of performance of supply contracts like Johns-Manville's [8] was tried fully because it related to two issues that remained. The first is whether damages, measured by settlements, judgments, and expenses of defending against claims, actually had been contemplated by the parties as being cost items that the Navy had agreed to sustain. This issue was formulated in the decision on the motion for judgment on the pleadings, as follows: "On a motion for judgment on the pleadings, it cannot be said that a shared understanding of the consequences of performing these government contracts without adequate reserves or insurance did not exist...." *Id.* at 28. The sobriquet for this issue is "shared understanding."

The second issue, relating to Johns-Manville's theory of mutual mistake, is whether the Navy would have agreed to take on the

---

**8.** Johns-Manville presumably would argue that if the Navy had an assumption of risk policy, the Maritime Commission did also.

costs of insuring against or setting up adequate reserves for Johns-Manville's third-party liabilities in order to assure the supply of asbestos-containing products and reduce the costs of these products.

Foreseeability of damages was one of the major issues tried. It secured preeminence because it was unclear before trial whether Johns-Manville would be required to prove that the parties contemplated the specific type of damages it sustained through third-party settlements, judgments, and legal expenses. The question may be approached in three ways. The first approach was espoused by the trial court in *Lopez v. Johns Manville*, 649 F.Supp. 149 (W.D.Wash.1986), *appeal docketed, sub nom. Lopez v. Raymark Indus., Inc.*, Nos. 87–1543, 1544 (Fed.Cir. Aug. 21, 1987). On a motion for summary judgment in an action for breach of the warranty of specifications, *Lopez* held that the Government intends and commits by the warranty of specifications to pay for performance to complete the contract; that the cases recognizing the cause of action "did not involve indemnification for tort judgments of settlements incurred by the contractors;" and that "[s]uch liability is manifestly collateral to contractual performance...." 649 F.Supp. at 160. This approach thus excludes as a matter of law third-party liabilities from recoverable damages in an action maintained against the Government for breach of the implied warranty of specification. Part X of this opinion discusses the first approach in more detail.

The second approach was adopted by this court in *Johns-Manville Corp.*, 12 Cl.Ct. at 28 (discussing *Lopez v. Johns Manville*). Given *Lopez*, this court stated that Johns-Manville's complaint, proposed findings, and other submissions defending against the motion for judgment on the pleadings circumvented *Lopez* by asserting that as a matter of fact the Navy agreed to self-insure against claims for third-party liabilities arising out of its purchase of asbestos-containing products. *Id.* However, this court (and *Lopez*) neglected to address the third approach, which is also a subject of part X. This approach assumes that third-party liabilities cannot be considered costs of performance of a contract as a matter of law and cannot be proved to have been within the parties' contemplation of costs of performance as a matter of fact. Nonetheless, this approach would allow recovery of third-party liabilities as damages resulting foreseeably or proximately from a breach of the implied warranty of specifications or the duty to reveal superior knowledge. The third approach is unhampered by the definition of "cost of performance" and looks squarely to the breach and its consequences and the context in which the contract was made. The issue, obviously important to both parties, is central to defendant's case, because if defendant prevails on this third approach, it will be in a position to block the other actions maintained by asbestos manufacturers in the Claims Court, at least covering exposures occurring prior to the early 1960's and the advent of strict liability, on the ground that third-party liabilities and the other damages (increased insurance and business costs, lost business, and lost business reputation) are not recoverable damages.

The focus of this section is to examine whether Johns-Manville proved as a matter of fact that the Government agreed to indemnify it for third-party liabilities, or, framed another way, whether the parties had a shared understanding.

During trial and after Johns-Manville rested its case, defendant moved pursuant to RUSCC 41(b) for involuntary dismissal on the ground that Johns-Manville had failed to prove that the Navy had a policy to assume the risks of performance of fixed-price supply contracts and that, based on the *Lopez* rationale, indemnification for third-party liabilities could not be considered a cost of performance. Defendant's motion did not address what is referred to as the third approach, because *Lopez* would subsume and disallow any further examination into damages once it was determined that indemnification for third-party liabilities is not a cost of contract performance. In deciding a motion for involuntary dismissal, the court can weigh evidence and resolve conflicts,

*Stearns v. Beckman Instruments, Inc.,* 737 F.2d 1565, 1568 (Fed.Cir.1984), and enter judgment for defendant if the court is convinced that the evidence preponderates against plaintiff. *See Lemelson v. United States,* 3 Cl.Ct. 161, 164–65 (1983), *aff'd in part, vacated in part, and remanded on other grounds,* 752 F.2d 1538 (Fed.Cir. 1985). Although defendant's motion was not granted, its thesis sets forth the fundamental principle for analyzing the evidence on this issue: It is Johns-Manville's burden to prove by a preponderance of evidence that the policy of assumption of risk applicable to fixed-price supply contracts did exist, not defendant's burden to prove its nonexistence. Johns-Manville's emphasis that defendant offered no witnesses on the subject must be viewed in this context.

With the benefit of over 45 years' perspective that a trial of such remote events offers, it is remarkable that during the war procurement procedures were standardized and documented. *See Navy Procurement Directives* (CCH 1943) (as updated through July 1946) [hereinafter *Navy Procurement Directives* ]. The Navy's Insurance Division assembled a contemporaneous history of the insurance program developed during World War II. *See* Navy Dept., Office of Procurement and Material, Ins. Div., *History of the Purchase and Administration of Insurance on Navy Department Contracts During World War II* (1945) [hereinafter *Navy Insurance History* ]. The Navy also issued an insurance manual, Navy Dept., Office of Procurement and Material, Ins. Div., Ins. Circular Letter 330–13, *Manual of Instructions for Purchase and Administration of Insurance on Navy Department Contracts,* (Oct. 13, 1943) [hereinafter *Navy Insurance Manual* ]. Moreover, Navy officials periodically testified before Congress concerning the cost savings achieved by self-insurance. The *Procurement Directives, Navy Insurance History, Navy Insurance Manual,* and the congressional testimony do not describe a policy whereby the Navy undertook to assume the risk of third-party liabilities for personal injury claims for contractors that supplied products directly to the Navy or to Navy contractors under fixed-price contracts. Johns-Manville was not troubled by the paucity of documentary evidence because its proof was witness testimony, coupled with documentation that it reads as consistent with the existence of such a policy, assuming the testimony is deemed credible.

Three of the percipient witnesses, all former government officials, who testified at trial on this subject were approached by the Government with a view to ascertaining whether their testimony would be helpful. These individuals chose to testify for Johns-Manville. Although the willingness of witnesses to step forward in support of Johns-Manville's assumption of risk policy does not enhance the probativeness of their testimony, no adverse inference is drawn from the fact that Johns-Manville will pay handsomely for the services of these witnesses and other witnesses who testified on point. They are honorable men who served their country with distinction; several were architects of the Navy's procurement policies during World War II; and all of them have continued a lifetime of achievement after the war. However, Johns-Manville's witnesses, individually and as a phalanx, do not overcome what is not shown by the documents. The transcript of trial cannot fully reflect the uncertainty, hesitancy, and confusion that the witnesses exhibited to the trier of fact in testifying about the assumption of risk policy. To credit the witness testimony beyond what is supported by documentary evidence, in these circumstances, would require a suspension of belief that is unwarranted on the record.

B. *Whether a Navy policy to assume the risk of liabilities for third-party injuries was communicated to or relied upon by Johns-Manville in pricing its supply contracts*

■ As will be discussed in section C. of part IV, the Navy had a policy of self-insurance whereby it directly assumed the risk for some losses and for others reimbursed contractors for reduced costs of insurance. During World War II, the Navy did not eliminate insurance, contrary to the testimony of two of Johns-Manville's witnesses.

Even if the evidence had shown otherwise, the court was impressed with the lack of evidence that Johns-Manville acted on the policy of self-insurance that it urges. The resolution of this issue displaces consideration of whether any such policy existed with the Navy, although the court makes findings on that issue in section C.

During World War II, the Navy primarily used two forms of contracts for the purchase of supplies: Firm fixed-price and cost-plus-a-fixed-fee ("CPFF"). Under the former the contractor agreed to furnish designated supplies or services at a specified firm price. Under the latter the Navy agreed to reimburse the contractor for allowable costs in performing the contract, with some allowance for profit. Johns-Manville contracted in fixed-price contracts to supply the Navy with asbestos-containing products. Dr. Howard W. Wright, Johns-Manville's expert in government cost accounting principles, defined a firm fixed-price contract in his text *Accounting for Defense Contracts* 3 (1962): "The firm fixed price contract provides for a price which is not subject to any adjustment by reason of the cost experience of the contractor in the performance of the contract...." *See also* 3 J.C. McBride, *Government Contracts* ¶ 24.240[5], at 24–144 (1987) (Absent specific language in a fixed-price contract that the Government assumed the risk, "the presumption is that the events giving rise to ... [a] tort claim are not part of the contract work, and that costs expended in defense ... are not reimbursable.").

On March 20, 1943, Under Secretary of the Navy James V. Forrestal issued a directive to all procurement officers of the Navy setting forth the Navy's policy that over a relatively short term fixed-price contracts are more satisfactory than a cost method of compensation. Among the problems with cost and CPFF contracts were that the Navy's control of contract costs was difficult; the contractor lacked incentive to reduce costs; the uncertainties of cost determinations gave rise to time-consuming controversies, which may have delayed production; and the supply of competent accountants was inadequate. *Navy*

*Procurement Directives, supra,* ¶ 10,551, at 5321. Appearing before Congress on March 7–8, 1944, then-Secretary Forrestal testified that the Navy's policy was to avoid CPFF contracts. As of December 31, 1943, the Navy had $5 billion in outstanding CPFF contracts and $24.9 billion in outstanding fixed-price contracts, or a 5 to 1 ratio. *Problems of Contract Termination: Hearings Before a Subcomm. of the Senate Comm. on Military Affairs,* 78th Cong., 2d Sess. 701, 706 (1944) (statement of James V. Forrestal, Secretary of the Navy).

Amended Directive No. 2 of the WPB issued on October 10, 1942, set forth a policy of contract by negotiation. However, "negotiation" was defined as "not only face-to-face dealings, but also purchasing by securing informal written bids or telephone quotations." The directive continues: "Where consistent with the required speed of war procurement, notification of the proposed procurement shall be given to a reasonable number of qualified contractors and quotations secured from them." A draft by the Historical Section, Bureau of Supplies and Accounts, *A History of Purchasing Within the Supply Group, World War II* 88 (circa 1945), describes the function of the Commodities Purchase Branch, including the "[c]onduct of direct negotiations where this method of purchase is deemed most advantageous," as well as "[r]eview of tenders." A 1942 protocol for preparing Navy contracts co-authored by H. Struve Hensel, who designed the Navy's wartime procurement system, states that "negotiation has largely supplanted the peace-time method of Government procurement...." H.S. Hensel & C.B. McDougal, *Preparation and Signing of Navy Department Contracts* 9 (May 18, 1942) [hereinafter the *1942 Contracts Protocol*]. The protocol also recognizes that contracts still were let pursuant to competitive bids or tenders. *Id.* at 13.

Johns-Manville contends that an annual negotiation took place between Johns-Manville (perhaps through its Sales Department) and representatives of the Navy. In this negotiation, according to Johns-Man-

ville, the policy of assumption of risk for third-party personal injuries caused by products purchased by the Navy was communicated to and acted upon by Johns-Manville, in that the unit price offered by Johns-Manville excluded *pro rata* costs of insurance or set asides for contingency reserves that would have been added to the price absent the Navy's policy to assume the risk. Johns-Manville argues that pursuant to these annually negotiated contracts for its products sold to the Navy, Johns-Manville would submit bids or tenders reflecting the negotiated prices or the Navy would order its requirements under these annual contracts.

The witnesses who testified for Johns-Manville that a policy existed for assuming the risk of third-party liabilities for fixed-price contracts took the position that in order to be implemented it had to have been communicated to the individual contractors. However, none of these witnesses was competent to testify that such a policy was communicated to Johns-Manville or any other supplier, although they testified that it was their understanding, based on reports from subordinates, that the policy of assumption of risk was being implemented through contract negotiations.

The witnesses who had first-hand knowledge of Johns-Manville's sales, Messrs. Barnett, Garcelon, and Adams, did not speak to annual negotiations, rather a process of competitive bidding. Mr. Adams came closest to substantiating the notion that Johns-Manville's prices to the Government were based on negotiations. Although he did not know what factors went into setting the price to be charged the Government for a product, he said that headquarters would issue bulletins informing sales personnel that

> the following are the new prices for the . . . [negotiated] [9] contract with the U.S. Government, and you are to honor them at every district office. And we in the district offices had to be advised of this, or we may even double-cross unknow-

ly what was going on . . . between Washington and our headquarters.

Even giving this testimony the most favorable gloss, it is insufficient. Mr. Adams made no sales to the Navy after 1940 and never sold asbestos-containing products to the Navy. The assumption of risk policy was traced to shortly after the United States declared war, at any rate. Mr. Adams' testimony is inconsistent with that of Mr. Barnett, who was the most knowledgeable witness about Johns-Manville's direct sales to the Navy and the Maritime Commission during the war and who took the position that bids succeeded and failed based on price. Mr. Barnett's testimony that the Government Department received and acted on 30 bids a week is inconsistent with the likelihood that so many contracts were negotiated. Moreover, Dr. Wright testified that the process described by Mr. Barnett—submission by a few contractors of bids reflecting firm fixed prices derived from standard commercial price lists, with delivery subject to negotiation—was a limited form of advertised competitive bidding.

Johns-Manville management, which also would have had first-hand knowledge, did not demonstrate awareness of a Navy policy to assume the risk. Johns-Manville's President, Lewis H. Brown, it will be recalled, testified before Congress that the prices Johns-Manville charged for its products at the height of World War II 'were based upon the prices we charged in peacetime:"

> We have items that we continue to sell for shipbuilding and other purposes in industry in peacetime, and then it took virtually the same products and we sold them in wartime, and the volume doubled or more than doubled, and there wasn't any change in price from peacetime to wartime, and just the change in volume made a difference in more profits before taxes. . . .

*War Effort Hearings, supra,* at 550. In President's Bulletin No. 19–362 of January 30, 1942, Mr. Brown set forth the guide-

---

**9.** In the quoted matter, Mr. Adams said "renegotiated" instead of "negotiated." However, since he earlier referred to "government negotiated contract," it is clear that he misspoke in this passage.

lines for Johns-Manville's Sales Division to integrate the risk of product hazard into the price of new or revised products:

The Sales Division representative, in approving the proposal, assumes the responsibility for customer acceptance, based on the assumption that the product has the properties indicated in the proposal. He also takes the responsibility for estimating the profit potential involved in the sale of the new or revised product and in deciding that this profit potential is satisfactory and sufficient to counterbalance any hazard involved in the sale of the product due to factors which are not fully known at the time the decision must be made. The approval of the Sales Division should be accompanied by a revised estimate of sales and potential profit.

Roger Hackney, a Johns-Manville employee in 1941 and Treasurer for 17 years beginning in September 1942, was responsible for insurance and was the "final authority" on what should be covered. He testified by deposition over defendant's objection. Mr. Hackney said that Johns-Manville carried products liability insurance before and during the war. Although he did not recall whether insurance was carried for asbestos-containing products during the war, he took no action to reduce or eliminate insurance coverage. His knowledge that the Government told Johns-Manville not to carry or charge for certain insurance was traced to recent discussions with Johns-Manville's counsel. He recalled no order to cancel insurance during the war years. Manville Corporation's present General Counsel, Richard Von Wald, agreed that in the California insurance litigation Johns-Manville had taken the position that its insurance coverage was substantially unchanged since 1934. However, Johns-Manville apparently did not carry insurance for its thermal insulation and fireproofing products. Mr. Hackney did not recall whether Johns-Manville's contingency reserves during the war years included provision for the risk of third-party product liabilities. Thus, the testimony of Johns-Manville's salesmen and management does not construct an annual negotiation that

resulted in reduced prices based on the Navy's policy of assumption of risk.

Testimony of Naval personnel who worked on procurement fails to support a finding of annual price negotiation excluding insurance costs or reserves pursuant to an assumption of risk policy. George D. Lockhart was a contract procurement employee for the head of the Requisition and Contract Section of the Navy's Bureau of Ordnance from January 1942 to March 1943 and thereafter joined the Navy serving in the same capacity in the Procurement Legal Division, which is discussed in detail in section C. He functioned as a scrivener, putting together a contract by using boilerplate and attaching a schedule with the specifications, price, and delivery date. Until the end of 1942, he sat in on fixed-price contract negotiations, but none involving manufacturers of asbestos-containing products. He recalled Captain H.L. Merring, his superior, making sure overhead did not contain the cost of insurance liability to others, "because the Navy acts as its own insurer." Even though Mr. Lockhart could not testify to the content of the policy of insurance other than to state that the Navy acted as its own insurer, of interest to this discussion is Mr. Lockhart's testimony that the Bureau of Ordnance entered into approximately 8,000 contracts monthly based on the 30 or 40 contracts that crossed his desk daily from one division out of nine technical divisions of that Bureau. The majority were fixed-price contracts. He testified that there were only six negotiators; that he would have no idea whether as a part of negotiation of a contract there was any discussion of insurance or self-insurance, unless he was directed to put something in a contract about self-insurance; that he did not recall any such directions; and that as a scrivener he put together the entire agreement between the parties.

Harris L. Kempner was a contract negotiator with the Navy's Bureau of Aeronautics during the war. He testified that he negotiated both fixed-price and CPFF contracts. He had no recollection of whether the Navy assumed a contractor's risk of

loss, or whether the Navy excluded from the contract price the cost of insurance against risks of loss, or whether he dealt with insurance of any kind during his work as a negotiator. He had no recollection of annually negotiated supply contracts.

The evidence of actual contracts does not support Johns-Manville's characterization of annual price negotiations. For example, a contract for cloth, combination glass, and asbestos between the Asbestos Manufacturing Company and the Navy's Bureau of Supplies and Accounts dated April 18, 1945, states that it is a "Negotiated Contract." Given the 1942 WPB directive, that label is not conclusive, as it could have been awarded under the relaxed form of competitive bidding permitted by the directive. Two purchase orders, respectively issued on March 23 and July 10, 1945, by the Navy's Bureau of Supplies and Accounts to the Ruberoid Company for pipe covering and thermal insulation refer to "Your quotation on Negotiation No.... to Bu S and A [Bureau of Supplies and Accounts] dated...." These purchase orders are also consistent with receipt of a bid under the relaxed form of competitive bidding. Moreover, like the contract with the Asbestos Manufacturing Company, the Ruberoid purchase orders list all terms and conditions of the negotiated purchase, none of which reflects mention of insurance.

The *Navy Procurement Directives* contain a "Price Analysis for Navy Contract Negotiations." *Id., supra,* ¶ 11,183, at 5557. It requires the listing for each unit price of the amounts attributable to "[o]ther cost factors" and "[c]ontingencies." This is consistent with a formal negotiation. A 1944 uniform contract form from the Navy Department prescribed by the *Navy Procurement Directives, supra,* ¶ 11,217 at 5593, refers to "Negotiated Contract No ..." and states, "This negotiated contract is made pursuant to the provisions of the First War Powers Act, 1941." *Id.* ¶ 11,247 at 5597. The WPB directive providing for relaxed competitive bidding recites that it was passed pursuant to the First War Powers Act. This form also goes on to include the standard provisions seen in the Asbestos Manufacturing Company contract, with no reference to insurance.

The *1942 Contracts Protocol* states that "[a]nnual requisitions" are permitted as to many items, such as food or fuel, when annual requirements can be anticipated. *Id., supra,* at 14. There is evidence of supply contracts with Johns-Manville consistent with requirements contracts. From this Johns-Manville argues that the contracts themselves were entered into annually after negotiation. However, the contracts, or documents referring to the contracts, indicate that if there were requirements contracts between the parties they were competitively bid and not negotiated. For example, a June 11, 1940 Contract Bulletin published by the Bureau of Supplies and Accounts covers packing for the Naval Service for the period July 1, 1940, to June 30, 1941. Johns-Manville is listed as a contractor. Although covering a year-long period and stating that the quantities required cannot be determined, the document states: "Contracts were made after newspaper advertisement. Award was made to the lowest satisfactory bidder...." During the war the Navy was relieved of a requirement to advertise, but Mr. Barnett of Johns-Manville's Government Department testified pointedly that the contracts entered into between the Navy and Johns-Manville were bid competitively.

Other documents referring to contracts with Johns-Manville for packings mention negotiation, but in the context of a negotiated schedule, which is not inconsistent with the testimony of Mr. Barnett that, in responding to invitations to bid, Johns-Manville inserted delivery dates that were subject to negotiation. According to Mr. Adams, the requests for tender he received from the Navy between 1937–1940 were substantially the same as a wartime form. A 1943 "Request for Tender" used by the Navy's Bureau of Supplies and Accounts reads, in pertinent part:

The articles or services described in the accompanying negotiation are required by the Navy. If you are interested in furnishing any of such articles or services, you may submit a tender EXE-

CUTED IN DUPLICATE for opening on the date and at the time specified in the Schedule annexed....

The Tender itself, in pertinent part reads:

The undersigned

....

offers, if this tender be accepted within 30 days from the last date on which tenders may be submitted on this negotiation, to deliver any or all of the items in the accompanying Schedule upon which prices are named, at the price stated opposite each item. This offer is made subject to all the terms and conditions set forth in such Schedule and the General Provisions on the reserve side hereof, the Supplier being therein referred to as the "Contractor" and the United States of America as the ["]Government". Acceptance of this tender, in whole or in part, by the United States of America will constitute a contract for the portion accepted....

This form, the provisions of which do not discuss insurance, is as consistent with relaxed competitive bidding as formal negotiation. Since Johns-Manville contends that the Navy changed its policy in World War II and the tender form, according to Mr. Adams, was used in 1937, the form does not implement a changed policy. The renegotiation report for 1942 of another manufacturer of asbestos thermal insulation, Union Asbestos & Rubber Company, reflects that the company stated that its sales to the Government had all been made by competitive bidding.

The documents of record either are as consistent with relaxed competitive bidding as formal negotiations; refer to requests for tender or bids; or state that all the terms and conditions, none of which mentions insurance or costs of insurance, are expressly set forth in an attachment to the tender or bid.

This evidence does not show that a policy of assumption of risk or any form of Navy self-insurance was made the subject of price negotiation between Johns-Manville and the Navy.

C. *Whether the Navy's policy of assumption of risk for third-party liabilities extended to fixed-price contracts*

H. Struve Hensel was Johns-Manville's pivotal witness on the existence of policy whereby the Navy assumed the risk for third-party personal injuries caused by Johns-Manville's products. Mr. Hensel began working with the Navy Department in December 1940 as Special Assistant to Under Secretary Forrestal. He was the innovator of what became the Procurement Legal Division (the "PLD"). Mr. Hensel recognized that contracts were not signed by the personnel who negotiated them and that the Navy had no legal counsel for its contracting program, nor any business experience in negotiating contracts. Mr. Hensel's concept for the PLD was a commercial law firm, whereby in each of the Navy's six bureaus a team of negotiators and contracting officers worked with a bureau counsel, who reported to Mr. Hensel as Chief of the PLD, who, in turn, reported to Under Secretary Forrestal. The PLD was established by directive dated December 13, 1942. The PLD was redesignated as the Office of General Counsel on August 3, 1944, and Mr. Hensel became General Counsel of the Navy. Mr. Hensel was appointed Assistant Secretary of the Navy in January 1945 and took charge of all aspects of Navy contracting.

After he established the PLD, Mr. Hensel was advised by the negotiators and bureau counsel that insurance premiums were included in pricing or costs of contracts. The insurance protected against consequential damages, which Mr. Hensel defined as damages to other government property and damages and injury to property and persons of third parties. Initiating a study of insurance, Mr. Hensel also learned that before the war it had been customary to include costs of Miller Act performance bonds in fixed-price contracts. However, during the war it became apparent that the Navy needed the goods it was buying, not money damages provided by performance bonds, and the bonds became a useless expense. It was Mr. Hensel's view that as the volume of contracts in-

creased, insurance premiums should decrease, since the spread of risk was expanded. Accordingly, Mr. Hensel met with 15 or 20 of the larger insurance companies that wrote these policies and asked them to reduce their premiums, but they declined.

Mr. Hensel concluded that since the Navy now was awarding contracts equivalent in size to an earlier year's entire annual Navy appropriation, a spread of risk was created that no insurance company could match. He saw that the Navy also could eliminate the high administrative costs of an insurance policy by itself assuming the risk. Thus, Mr. Hensel resolved that it would be cheaper for the Navy to assume the costs of insurance rather than have contractors buy private insurance and pass it on as costs. On Mr. Hensel's recommendation, Under Secretary Forrestal decided that all insurance charges should be eliminated from the price of Navy contracts, both CPFF and fixed-price, and that the Navy would assume the corresponding risk of loss. Mr. Hensel testified that Under Secretary Forrestal announced the assumption of risk policy either before or just after Pearl Harbor at one of the weekly meetings attended by the bureau chiefs and Mr. Hensel. Mr. Hensel was given the job of applying the assumption of risk policy, and undertook to communicate the policy to all bureau counsel and the negotiators. Thereafter, according to Mr. Hensel, "the insurance policies disappeared from the shelves of the insurance companies...." To Mr. Hensel's knowledge, the assumption of risk policy was not reduced to writing. He explained that the Navy's Insurance Division was established after the assumption of risk policy had been adopted and that the Insurance Division had no authority to change that policy.

Although itself not perfect, the documentary evidence establishes that the Navy, through the Insurance Division, eliminated the costs of performance bonds; reimbursed contractors for casualty insurance premiums on CPFF contracts—but not products liability coverage—assuming the risk for third-party liabilities when the insurance was inadequate; assumed certain risks for government-owned property, but not risks of third-party products liability, for both CPFF and fixed-price contracts; and assumed specified risks to government-owned property and for third-party liabilities for subcontracts on CPFF contracts. The documentation suggests that the Navy also assumed the risk for third-party liabilities for CPFF contracts when the Navy provided no reimbursement for insurance, but is definite that any extension of this policy to fixed-price subcontracts expressly was made part of the contract. The documents are conclusive that the Insurance Division administered all Navy self-insurance programs, including assumption of risk. Moreover, the testimony of Johns-Manville's other witnesses does not eliminate the problems with Mr. Hensel's.

The *Navy Insurance History*, written by the Insurance Division in 1945, explains that the genesis of the Navy self-insurance policy was the cost of payment and performance bonds, as well as the contractual requirement that the contractor maintain insurance against loss of or damage to property employed in connection with the performance of contracts, especially where the Navy held title to or lien on such property. *Navy Insurance History, supra,* at 1. It describes the meeting with insurers, to which Mr. Hensel referred, as a meeting of the committee of the surety industry. *Id., supra,* at 3. In 1942 W. John Kenney was Mr. Hensel's Deputy Chief of the PLD, later serving as General Counsel of the Navy Department, Deputy Chief of the Office of Procurement and Material, Assistant Secretary of the Navy, and Under Secretary of the Navy. He also confirmed that the insurance study and meeting focused on Miller Act bonds.

Contrary to Mr. Hensel's recollection of Secretary of the Navy Frank Knox's testimony, the latter stated in 1942 that the Government should carry its own insurance with respect to the cost of performance bonds; he did not recommend that the Navy should self-insure for consequential damages. *Navy Appropriations Bill for 1942: Hearings Before the House Subcomm. on Appropriations,* 77th Cong., 1st Sess. 16 (1941) (statement of Frank Knox,

Secretary of the Navy). The result of the unsuccessful meeting with the surety representatives was that the Navy relieved contractors of the requirement for these bonds, but did not jettison all liability insurance. *See id; Navy Insurance History, supra,* at 3. Thereafter, the Office of Procurement and Material was established on January 30, 1942, to coordinate all the material procurement activities of the Navy Department. *Navy Procurement Directives, supra,* ¶ 10,141, at 5131. The tremendous increase in volume of contracting had distorted the insurance rating structure creating excessive rates. It was decided that a central insurance division should be established to serve all the contracting bureaus, *Navy Insurance History, supra,* at 4, and a directive by then-Acting Secretary Forrestal dated May 6, 1942, established a "Central Insurance Division." He directed that the Division, within the Office of Procurement and Material, "will formulate uniform insurance procurement policies and procedure for the Navy Department and supervise their execution...." *Navy Procurement Directives, supra,* ¶ 12,702, at 7011. The *Navy Insurance History* goes on to state that "with the one exception noted [approval of Supply Officer's Bonds], the Insurance Division assumed all insurance functions previously performed by the several Bureaus and offices of the Navy Department." *Id., supra,* at 4.

Mr. Kenney agreed with Mr. Hensel that the policy of self-insurance went beyond eliminating Miller Act bonds. *Navy Insurance History* concurs, but charts the development of a policy primarily geared to CPFF contracts in 1942, which was before the explosion in fixed-price contracts reported by Secretary Forrestal in 1944:

> One of the first and most important questions facing the Insurance Division was that of providing Government contractors under the rapidly multiplying volume of cost and cost-plus-fixed-fee contracts with insurance against their statutory liability under the several Workmen's Compensation and Employers' Liability Acts of the United States and of the several States and Territories and against their common law liability to third persons for personal injuries or loss of or damage to their property.

*Id.* at 5. The approach adopted by the Insurance Division was the War Projects Insurance Rating Plan, a method of determining insurance premiums at cost, applicable to workmen's compensation, employers' liability, automobile and general bodily injury, and property damage liability insurance. The contractor selected the carrier, subject to approval of the Insurance Division, and premiums were set on a cost basis, with the Navy assuming the uninsured liability in excess of the policy limits for third-party automobile and general liability damages. *Id.* at 5. Products liability coverage was eliminated. *Navy Procurement Directives, supra,* ¶ 12,851, at 7058. The *Navy Insurance History* reflects that the Rating Plan was "described in detail," *id., supra,* at 5, in the *Navy Insurance Manual* issued on October 13, 1943, and in a September 4, 1942 Insurance Circular Letter, which appears in the *Navy Procurement Directives, supra,* as ¶¶ 12–841–72, at 7055–62.

The Insurance Division also developed a plan for assuming the risk of loss of or damage to government-owned property while in the hands of Navy contractors, be they cost, CPFF, or fixed-price. This principle was extended to CPFF subcontracts. *Navy Insurance History, supra,* at 6. The *Navy Insurance History* does not detail what risks were assumed with respect to government-owned property, other than to name the types of insurance coverage offered by insurers with which the Insurance Division consulted. *See id., supra,* at 8. However, an August 6, 1942 directive specified:

> In assuming the risk of loss of or damage to Government-owned property, the Navy Department is assuming such risks as are normally covered by the following types of property insurance: fire, windstorm, earthquake, hail, explosion, riot, civil commotion, vandalism, malicious mischief, smoke damage, vehicle damage, aircraft damage, transportation, aircraft flight and crash insur-

ance. Such list is indicative of the hazards assumed but is not all-inclusive.

*Navy Procurement Directives, supra,* ¶ 12,811, at 7052; *see Navy Insurance Manual, supra,* at 47. Unlike the casualty insurance covered by the War Projects Insurance Rating Plan, the enumerated risks operate on government property, not third persons or their property.

Prior to 1942 shipbuilding contractors were required to carry builder's risk insurance covering risks of loss of or damage to the ship and the materials used in its construction, as well as the contractor's liabilities to third-parties from the time of launch to delivery. *Navy Insurance History, supra,* at 8–9. The testimony of the Chief of the Insurance Division before Congress makes clear that the builder's risk insurance was eliminated only for CPFF contractors. *Policy and Procedure of Letting Insurance Contracts by the Navy Dept.: Hearings Before the Comm. on Naval Affairs,* 94th Cong., 2d Sess. 408 (1945) (statement of Lt. Cmdr. Saverio F. Procopio). Additionally, the Navy assumed risk of loss or damage covered by war damage insurance for property acquired under CPFF contracts and fixed-price contracts for the construction of vessels. *Navy Insurance Manual, supra, id.*

Johns-Manville points to other language of the *Navy Insurance History* that identifies as separate Insurance Division functions:

II. Supervising, reviewing and approving insurance arrangements, consistent with sound insurance procurement principles and economy, of contractors in accordance with established uniform requirements which, in the main, involved:

A. Non-insurance of risks of loss or damage to Government-owned property used by contractors;

B. Use of the War Projects Insurance Rating Plan, a method of determining insurance premiums at cost, to Workmen's Compensation and Liability hazards of contractors;

 . . . .

III. Determining the responsibility of the Department and contractors under

risk of loss provisions which provide for assumption by the Government of the risks of loss or damage to Government-owned property and *liabilities to third persons, not covered by insurance, arising out of the performance of contracts.*

*Id., supra,* at 12–13 (emphasis added). Although this language can be construed merely as distinguishing between administering assumption of risk for government-owned property and the War Projects Insurance Rating Plan, which included liability for overages beyond the insurance maintained by the contractor, on the one hand, and determining responsibility of the Navy and the contractor under the program, on the other, Johns-Manville's reading that the Navy insurance program comprehended assumption of risk of loss for uninsured losses is fortified by the *Navy Insurance Manual,* which the *Navy Insurance History* refers to for details of the Rating Plan. The *Manual* provides, in pertinent part:

20.1 It is the intent expressed in true-cost and CPFF contracts that allowable costs of . . . [illegible] certain risks attending the work undertaken by contractors are to be assumed by the Government. Therefore, no attempt is being made to insure the maximum hazard or exposure to loss. Self-insurance by the contractor of third party liability risks will not be encouraged, although consideration will be given thereto if the work under contracts with the Department cannot be separated from commercial work or fixed price work being performed in the same plant.

 . . . .

20.3 The Navy Insurance program specifies the kinds of insurance and limits of liability which are required or may be approved, the minimum qualification requirements for insurance carriers, the methods of procurement and the forms of insurance policies. *The limits of liability and the kinds of insurance so specified are not intended to cover catastrophe hazards or those hazards for which the Government provides no insurance. Losses due to such hazards*

*are reimbursable to the contractor.* The insurance requirements herein set forth are based primarily upon the desirability of obtaining for contractors and the Government the experienced service facilities of insurance carriers, particularly expert safety, investigative, and claims service.

*Id., supra,* at 4 (emphasis added). Since products liability insurance was excluded by the War Projects Insurance Rating Plan, the implication of this language is that the Navy self-insured against this type of liability. The problem with this interpretation is that the subject is CPFF contracts. While the *Navy Insurance Manual* provides for extension of the insurance policy for CPFF insurance to fixed-price subcontractors (Johns-Manville was a subcontractor at private shipyards), it states that both the prime and subcontractor's contracts "should clearly set forth the basis for such insurance arrangements" and that "subcontracts requiring only a delivery ... function ... at the project site should not be negotiated ex-insurance...." *Id.* at 32. Performance of Johns-Manville's subcontracts was complete on delivery.

What is and will remain in doubt, as defendant concedes, is whether the Navy intended to cover additional risks beyond those listed in the War Projects Insurance Rating Plan. Defendant steadfastly maintains, however, that the Navy only assumed additional risks in CPFF contracts and/or that whatever risks were assumed in CPFF and fixed-price prime and subcontracts were written into the affected contracts. The evidence predominates in favor of defendant's position. Since the Insurance Division established uniform insurance requirements for contractors, *Navy Insurance History, supra,* at 12, it is unlikely that any policy of assumption of risk applicable across the board to fixed-price contracts was not within the competence of the Insurance Division and that Insurance Division documents, including Insurance Circular Letters, would not have reflected it explicitly. Given that fixed-price contracts were more prevalent than CPFF contracts, it is implausible that the Navy would have no history or administrative

protocol reflecting a policy of assumption of risk of third-party personal injury liabilities for fixed-price contracts. The reference to subcontracts, as explained, expressly required that the contract contain a provision concerning insurance and disqualified Johns-Manville because it did not perform a function on the site after delivery.

■ According to Mr. Hensel, the assumption of risk policy was recognized by custom and usage and it was unnecessary to express the policy in a contract. When the policy appeared in writing, it was memorialized in the Guaranty Clause of fixed-price contracts. By this standard clause in supply contracts, the contractor guaranteed that at the time of delivery the articles provided for under the contract would be free from any defects in material and workmanship and conform to the requirements of the contract. The contractor was obligated with all possible speed to correct or replace the defective or nonconforming article or part at the Government's request. *Navy Procurement Directives, supra,* ¶ 11,271, at 5600. Because the contractor's obligations for defective products were so limited, according to Mr. Hensel, it can be inferred that the Navy assumed all other risks of loss.

Patrick H. Hodgson gave perhaps the freshest testimony, in that he testified by deposition in 1970. The deposition was taken in connection with litigation in which Mr. Hensel was seeking to defend a client manufacturer against a claim for liability due to the manufacturer's defective component that damaged an aircraft (end item) bought from the Navy. Mr. Hensel's client, the manufacturer of the component, filed a third-party complaint against the United States on the ground that the Navy had agreed to self-insure against damage to end items. Mr. Hensel arranged for Mr. Hodgson to testify and conducted the direct examination.

Mr. Hodgson came to the Navy as a Special Assistant to Under Secretary Forrestal in 1941. He worked with Mr. Hensel in the PLD, moved over as bureau counsel for the Bureau of Ships ("Bu-

Ships"), and later became Assistant General Counsel of the Navy Department in 1944 and General Counsel in 1945. Mr. Hodgson agreed with Messrs. Hensel and Kenney that the policy of assumption of risk was developed due to the great number of contracts during the war thereby putting the Navy in a better position than any insurer to spread the risk. He also agreed that the objective was to save the cost of premiums and administrative expenses of insurance. Mr. Hodgson concurred with Mr. Hensel that the policy applied to all contracts and covered "every kind of casualty risk." Specifically, he described the assumption of risk policy as insuring against consequential damages, which he defined as damages to an end product caused by a defect in a component. Like Mr. Hensel, Mr. Hodgson looked to the Guaranty Clause as the source of the Navy's limited recourse against the manufacturer of a defective product. He did not discuss injuries to persons and spoke of the policy as running only between a contractor and the Navy. Given the context of the lawsuit in which he was testifying, Mr. Hodgson focused on damage to property— in fact, damage to government property— and was not required to address the situation of third-party property damage or personal injuries. To the extent that both Messrs. Hensel and Hodgson found the embodiment of the assumption of risk policy in the Guaranty Clause, this court, construing it as a matter of law, cannot accept their opinions. The Guaranty Clause obligates the contractor to repair or replace defective items. Assuming that it defines the Navy's entire right for defective items to repair or replacement, it does not absolve the contractor of responsibility for third-party liabilities.

Mr. Hodgson diverges from Mr. Hensel's testimony that the Insurance Division could not change the assumption of risk policy. According to Mr. Hodgson, the Insurance Division implemented the policy. He agreed with the *Navy Insurance History* that the Insurance Division was patterned on an insurance company set up within the Navy and that representatives from private insurers assisted the Navy in this project.

*See id., supra,* at 4. Indeed, Mr. Hodgson recalled that the assumption of risk policy was in writing when he first learned of it and that the PLD memoranda embodying the policy instructed the lawyers to take up "all matters of insurance ... with the insurance section that was developing." He then identified the head of the "insurance section" as Lester F. Beck, who was the first Chief of the Insurance Division. *See id., supra,* at 4. Mr. Hodgson thus laid authority for the assumption of risk policy at the door of the Insurance Division, contrary to Mr. Hensel's testimony.

Mr. Hodgson also recalled a specific letter that came from Captain N.W. Gokey, who was a contracting officer in BuShips, requiring contractors to cancel their current insurance and to refund premiums to the Government. However, the documents introduced at trial over Captain Gokey's signature or stamp were consistent with the existence of a policy of assumption of risk applied to fixed-price supply contracts only in respect of loss of or damage to government-owned property. For example, a February 19, 1944 memorandum from Capt. Gokey, that Mr. Hensel said was "dead wrong," stated that the Navy did not assume liabilities to third persons under propulsion machinery contracts (which were mostly fixed-price) of BuShips. With respect to fixed-price vessel contracts, Capt. Gokey said that defective design was not within the Navy's assumption of risk. Another Gokey memorandum dated April 1, 1944, set forth an amendment to insurance provisions of vessel contracts to assure contractors, including fixed-price, that the Navy's policy of assumption of risk for government-owned property extended to other types of insurance the contractors customarily carried in the absence of the Navy insurance program. The letter had to be executed and returned for the coverage to become effective. This memorandum did not discuss third-party liabilities and is consistent with the policy of assuming the risk of loss of or damage to government-owned property set forth in the *Procurement Directives* and described in the

*Navy Insurance History* and the *Navy Insurance Manual.*

Mr. Hensel said that an undated letter [10] from BuShips apparently to contractors was "a pretty good shorthand statement" of the assumption of risk policy. This letter referenced "Insurance under Navy Type Contracts with BuShips for Shipbuilding, Ship-Repair or Industrial Facilities." Announcing adoption by the Chief of the Office of Procurement and Material of a uniform policy with respect to assumption of risk of loss of or damage to government-owned property and the War Projects Insurance Rating Plan for casualty insurance, the letter states:

> II. In assuming the risk with respect to Government-owned property, the Department has agreed to make no claim against you for, or on account of, loss of or damage to Government-owned property and to assume the risk with respect to third party catastrophe hazards.

This letter, read as a whole, is consistent with the program of casualty insurance, including the assumption of risk for third-party liabilities in excess of policy limits, and the program of assuming specific types of risk to government-owned property. In fact, these latter risks—confined to loss of or damage to the property—are listed in the letter. A subsequent letter, dated October 16, 1942, which indicates that it was sent to contractors, is substantially similar, except that it is captioned "Insurance under Contracts with the Bureau of Ships for the Construction of Naval Vessels." It states:

> 2. The risk of loss or damage from any cause to Government-owned property is being assumed by the Navy Department, and the Department will make no claim against you with respect to the loss of or damage to such property....
>
> 3. The new policy with respect to casualty insurance against third party liabilities does not apply to fixed price contracts, and is intended to be confined to vessel construction contracts of the cost-plus-a-fixed-fee type. That policy is explained hereinafter.

Defendant contends that the October 16, 1942 letter is the final version of the earlier draft. It is unnecessary to make that finding because the meaning of the language quoted in the earlier version can be ascertained by reading the entire document. The important point of the latter letter is that it states that vessel contracts, or amendments to existing contracts, were being drafted to contain provisions effectuating the insurance program. No contract introduced in this case contained any such provision. Johns-Manville responds that the October 16, 1942 letter does not apply to fixed-price supply contracts. That is true, but the undated earlier letter does not, so that its summary of the assumption of risk policy for fixed-price supply contracts is doubtful. At any rate, if any such policy had to be written into vessel contracts, Johns-Manville offers no reason why the requirement would have differed for supply contracts.

Mr. Kenney took the position that the assumption of risk policy was contained in and covered all the risks in the procurement directives, but that he did not find it in the Guaranty Clause. His testimony about the relevant procurement directives was confusing and cannot support any inference in Johns-Manville's favor.

Richard G. McClung, who served in the PLD and later the Office of General Counsel from April 1942 to January 1945 and as Mr. Hensel's aide when the latter became Assistant Secretary of the Navy, first learned about the assumption of risk policy from discussions with Messrs. Hensel and Kenney. Like Mr. Hensel, but unlike Mr. Hodgson, Mr. McClung recalled that the Insurance Division had no role in adopting the assumption of risk policy. Mr. McClung testified that the policy of assumption of risk for third-party liabilities in fixed-price contracts was implemented without a specific contract term. He did not recall discussion of the Guaranty Clause in connection with the assumption of risk policy. According to Mr. McClung, an October 16, 1942 directive, which he

---

**10.** The date October 1, 1942 appears in handwriting.

wrote, confirmed the assumption of risk policy. Although Mr. McClung said that there was no directive that stated that the Navy adopted an assumption of risk policy for fixed-price contracts, he described the October 16, 1942 directive as setting forth a general policy for all Naval contracts. He defined assumption of risk, within the contemplation of the October 16 directive, as including fire and theft and liability to third-parties. Messrs. Hensel and Kenney also pointed to this directive, which reads:

> *In order to effectuate the policy as to the assumption by the Government of the risk of loss of or damage to Government-owned property and certain liability to third persons arising out of the performance of Navy contracts, ...* [heretofore adopted by the Navy Department], the Secretary of the Navy hereby approves the use of contract provisions conforming substantially to the language of the provisions set forth in Enclosure (A) in Navy contracts for supplies on a cost-plus-a-fixed-fee basis. The Secretary of the Navy also hereby approves the use of contract provisions conforming substantially to the language of the provisions set forth in Enclosure (A), with appropriate changes in terminology, in Navy construction contracts, other than facilities contracts, on a cost-plus-a-fixed-fee basis.

*Navy Procurement Directives, supra,* ¶ 12,711, at 7011 (emphasis added; ellipses in original). Messrs. Hensel, Kenney, and McClung construe this directive to recognize a previously adopted assumption of risk policy for all Navy contracts, although the directive approves only an implementing provision for CPFF supply and construction contracts, other than facilities contracts. It will be recalled that the casualty insurance plan whereby the Navy assumed liabilities to third-parties in excess of policy limits applied only to CPFF contracts. Enclosure A to the directive formalizes the contractual language in CPFF contracts, reflecting the Navy's assumption of risk of loss of or damage to government-owned property and third-party liabilities not compensated by insurance or otherwise, as well as reimbursement for casualty insurance. The October 16, 1942 directive does not include such contractual language for use in fixed-price contracts.

Messrs. Hensel and McClung drafted an outline of a lecture on "War Contracting and War Contracts" dated September 15, 1943. At 71 pages the document is comprehensive. It makes no mention of the assumption of risk policy for third-party liabilities with respect to fixed-price contracts. The insurance summary tracks the program of limited assumption of risk reported in the *Navy Procurement Directives* and *Navy Insurance History.* The outline which covers pricing also does not indicate that the price terms of a contract included an allowance for assumption of risk.

Messrs. Hensel and Hodgson spoke of consequential damages as damages flowing from defective products, and Messrs. Kenney and McClung considered consequential damages as those resulting from a loss covered by the assumption of risk policy. Although Mr. Hensel also broadly defined consequential damages as those to government-owned property and damages for injuries to properties and persons of third parties, he restricted the assumption of risk policy to damages from defective products.

It is unnecessary to discuss the letters accumulated by defendant and discussed with Mr. Hensel in which he corresponded almost two decades ago with Mr. Hodgson and others to test their recollections of the existence of a Navy assumption of risk policy and found that memories had faded considerably. A letter written to Mr. Kenney on August 26, 1986, after Mr. Hensel had been retained to testify for Johns-Manville in this case, discusses what Mr. Hensel meant by assumption of risk:

> We never envisioned a case where the damage would result from full adheren[c]e to the specifications i.e., the asbestos case. What we would have done if we had thought of the possible case is, of course, Monday morning quarter backing. But I think we can safely say that had we thought of the case we would have sought a solution which would have provided for protection to the contractor

in some form or other—and I am sure that the idea of insurance would have been treated with derision by the insurance fraternity. So we would have self-insured.

. . . .

... While it can be done in the briefs, I suppose that we could point out that literally, the language of one of the directives referring to "damage to third parties by Government material" covers the asbestos case. We would have to admit that we did not have this case in mind but could we not say we were trying to cover as broad a field as we could then conceive.

The purport of the quotation is that Mr. Hensel was of the view that the Navy's policy of assumption of risk as of World War II was not the same as his formulation of the policy in August 1986, but that a creative solution would have been developed in World War II if the Navy had been confronted with a claim like Johns-Manville's. By the time of trial, Mr. Hensel still considered that the assumption of risk policy covered defective products, which he defined as products that were not in compliance with specifications. The case at bar involves products that did comply with specifications. Mr. Hensel's policy of assumption of risk does not cover these products.

■ Mr. Lockhart, the scrivener in the Bureau of Ordnance, testified that he was not sure what the assumption of risk policy meant and that he never heard the term consequential damages. Mr. Kempner, the Bureau of Aeromatics negotiator, was mute on the subject of assumption of risk. Mr. Lockhart testified that he drew up contracts on the basis of boilerplate and schedules, and it is interesting to note that Mr. Hensel's *1942 Contracts Protocol* agrees that boilerplate was used to make up competitively bid fixed-price contracts and contracts let on tenders. *See id., supra,* at 12. Having reviewed Navy contracts making specific mention of insurance coverage and cost, the court concludes that such provisions took the form of boilerplate or letter amendments and would have been included in the fixed-price supply contracts in evidence had insurance considerations been part of the agreements.

Assuming, *arguendo,* that it is conceivable that the Navy had an assumption of risk policy for third-party liabilities arising out of fixed-price supply contracts and arising out of products that were defective, but complied with specifications, it was not reduced to writing. Striking indications are present in the written procurement directives, however, that make the existence of an unwritten policy improbable. On October 1, 1943, Secretary Forrestal ordered that all Navy Procurement Directives be compiled. The "comprehensive compilation" of directives, *inter alia,* "establish[es] the general policies of the Navy." *Navy Procurement Directives, supra,* 1. It is inherently improbable that a policy as important as Mr. Hensel's assumption of risk would not have found its way explicitly into these comprehensive directives. The written directives do make mention of fixed-price contracts. The October 16, 1942 directive approved for inclusion in fixed-price contracts a loss payable clause making losses payable to the Navy if the contractor procured or maintained insurance for any material upon which a lien existed in favor of the Navy by virtue of any partial advance payments made to the contractor. *Id.* ¶ 12,733, at 7015. The October 16 directive also approved a provision for inclusion in fixed-price contracts to memorialize the assumption of risk policy for government-owned property. *Id.* ¶ 12,734, at 7015–16.

The provision covering government-owned property to be included in the fixed-price contracts required the contractor to represent

that the prices stated ... *do not include the cost of insurance, nor any provision for a reserve, covering the risks of loss of or damage* to the Government-Furnished Material which are assumed by the Government under this paragraph. While the Government-Furnished Material is in the custody of the Contractor, the Government, notwithstanding the provisions of the Section of this con-

tract entitled "Responsibility for Articles Tendered", assumes all risk of loss of or damage to the Government-Furnished Material, including expenses incidental to such loss of or damage, except that the Government does not assume at any time the risk of, and the Contractor shall be responsible for, any loss or damage (i) from spoilage, breakage, or defective workmanship for which allowance is not otherwise expressly made in this contract, or (ii) which is caused by negligence of the Contractor, its agents, servants, or employees and against which the Contractor has not heretofore customarily carried insurance or provided a reserve for self-insurance, or (iii) which is in fact covered by insurance or for which the Contractor is otherwise reimbursed, or (iv) for which the Contractor is responsible under the express terms of this contract. Government-Furnished Material delivered to a subcontractor shall not be considered in the custody of the Contractor until redelivered to the Contractor.

*Id.* at 7016 (emphasis added). If a fixed-price contractor was required to certify that insurance costs and contingency reserves covering government-owned property were excluded from price, a similar certification would have been required in respect of third-party liabilities had they been covered by a policy of self-insurance.

The *Navy Procurement Directives* also include the War Projects Insurance Rating Insurance Plan for CPFF contracts. Contractors and subcontractors, whose annual insurance premiums were between $500–5,000 were directed to obtain insurance by competitive bidding and not under the Rating Plan, and the plan did not apply if the premium was less than $500. *Id.* ¶ 12,848, at 7056. It is unlikely that the policy of self-insurance testified to by Messrs. Hensel, Kenney, Hodgson, and McClung (to the extent that the Navy expressly agreed to assume the risk of third-party liabilities) extended to all fixed-price supply contracts when CPFF contracts were not covered unless the premium was at least $500.

The *Navy Procurement Directives* approved for inclusion in CPFF contracts provisions for assumption of risk for government-owned property and risk of loss for third-party liabilities beyond what the Rating Plan covered. *Id.* ¶¶ 12,731, 12,761–71, at 7013–14, 7017–19. Other directives, *id.* ¶¶ 12,751–52 at 7016, establish that the risk of loss for government-owned property and assumption of risk of liability to third persons shall extend only to subcontractors of CPFF contracts. *But see Navy Insurance Manual, supra,* at 32.[11]

The July 19, 1943 directive, *Navy Procurement Directives, supra,* ¶ 12,761–71, at 7017–19, sets forth procedures for "Reimbursement under Navy Contracts Providing for Assumption by the Government of Risk of Loss of or Damage to Government-owned Property and of Liability to Third Persons." Johns-Manville contended in its closing argument that this directive embodied the assumption of risk policy. The directive contains a detailed procedure for making claims and obtaining reimbursement from the Navy. *Id.* ¶¶ 12,765–68, at 7017–18. By its terms the directive applies only to claims "arising under contracts containing the provisions approved under" specified references, which do not contain provisions covering liability to third persons not compensated by insurance or otherwise in the context of fixed-price contracts. *Id.* ¶ 12,761, at 7017. It is unlikely that a claims procedure regarding third-party liabilities would be detailed for CPFF contracts and not fixed-price, especially since the procedure applies to claims in respect of repair or replacement of government-owned property under fixed-price contracts. *See id.* ¶ 12,768, at 7018. Indeed, Johns-Manville's witnesses could not point to a claims procedure for claims for third-party liabilities under fixed-price contracts or speculate as to what the procedure would have been.

**11.** The two directives and *Navy Insurance Manual* can be reconciled in that the latter, issued after the directives, allows for extension of the insurance coverage to fixed-price subcontracts in the event they are awarded on "a basis excluding the cost of the required insurance coverages." *Id., supra,* at 32.

Finally, the *Navy Procurement Directives* prescribed general provisions for all fixed-price supply contracts:

> Comparison of fixed-price supply contracts issued by the various Navy contracting activities has disclosed variations in substance and form which are not justified by differences in the articles procured or in the problems of the issuing activities. The purpose of this directive is to *eliminate unjustifiable variations* and, to the extent practicable, to *prescribe uniform provisions. . . .*

*Id.* ¶ 11,201, at 5591 (emphasis added). The clauses do not include any undertaking to exclude costs of insurance or contingency reserves or any discussion of insurance or reserves.

One obvious indication that the policy of self-insurance existed would have been testimony or documentation that the Navy had been called upon to satisfy claims for third-party liabilities. The record is barren of any such evidence. No witness recalled any such claim having been made. Mr. Hensel testified that in 1969–1970, when he worked on the litigation with Mr. Hodgson, he found no evidence that claims had been made to the Navy for third-party property damage or personal injuries. Messrs. Hensel, Hodgson, Kenney, and McClung testified to a policy of mutual trust and understanding between the Navy and its contractors that developed during the wartime exigencies. The Navy was interested in obtaining material, not nitpicking its contractors; the contractors were interested in providing needed material under intense, rushed conditions. The limited assumption of risk policy that the Navy Procurement Directives implemented does not disserve the mutual trust and understanding. The court refuses on this record to extend the assumption of risk policy beyond what the documentary evidence unequivocally supports.

It is found that during World War II the Navy did not have a policy of assumption of risk with respect to fixed-price supply contracts, other than in respect of specified risks to government-owned property; that the Navy's policy of assumption of risk always was memorialized in its contracts; that Johns-Manville and the Navy did not negotiate fixed-price supply contracts on an annual basis, excluding the costs of insurance premiums or reserves for third-party liabilities from the price of Johns-Manville's products; and that Johns-Manville did not alter its insurance coverage or contingency reserves during World War II in reliance on any such Navy policy of assumption of risk.

## V. *Privity of contract*

### A. *Background*

During the war there were over 100 private shipyards, which primarily were responsible for the construction of new Navy vessels, and but eleven major Navy yards. Johns-Manville sued on the basis of the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982), which confers jurisdiction over any claim against the United States founded upon an express or implied contract with the United States. Only a party with a direct contractual relationship with the United States can bring a breach claim under the Tucker Act. *Merritt v. United States,* 267 U.S. 338, 340–41, 45 S.Ct. 278, 279, 69 L.Ed. 643 (1925). Subcontractors supplying material for use in government contracts have no privity with the United States. *Severin v. United States,* 99 Ct.Cl. 435, 442 (1943), *cert. denied,* 322 U.S. 733, 64 S.Ct. 1045, 88 L.Ed. 1567 (1944); *Putnam Mills Corp. v. United States,* 202 Ct.Cl. 1, 8, 479 F.2d 1334, 1337 (1973). The Federal Circuit in *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1551 (Fed.Cir.1983), set forth a three-part standard to support a finding of privity based upon an agency relationship:

> [T]he prime contractor was (1) acting as a *purchasing* agent for the government, (2) the agency relationship between the government and the prime contractor was established by clear contractual consent, and (3) the contract stated that the government would be directly liable to the vendors for the purchase price.

(Citations omitted; emphasis in original.) On defendant's motion for judgment on the pleadings, it was ruled that resolution of

114

the factual issue whether the private shipyards were agents of the Navy and the Maritime Commission should await trial. *Johns-Manville Corp.*, 12 Cl.Ct. at 32.

This issue is crucial to Johns-Manville's claims, because two of the four test shipyards, Consolidated and Fore River, are private. Although eight cargo vessels were built for the Maritime Commission at Fore River, neither private test shipyard is a Maritime Commission yard.[12] Five of the 15 test claimants were drawn from these two private shipyards.

### B. *Sales to private shipyards*

Privity of contract is established in respect of Johns-Manville's sales to the Navy, whether to the Bureau of Supplies and Accounts, other purchasing agencies, or to Navy yards. However, Johns-Manville's relationship with private shipyards stands on a different footing, since Johns-Manville did not sell products used on Navy vessels to private shipyards.

According to Johns-Manville, Mr. Barnett of its Government Department stated that Johns-Manville's products sold to the Navy were delivered to private shipyards. In fact, the witness only testified that small lots sold to the Navy were delivered to Navy yards. Mr. Hensel's *1942 Contracts Protocol* confirms this procedure. *Id., supra*, at 13. Work on Maritime Commission vessels also was performed in private shipyards, but here the testimony of Mr. Barnett that the Maritime Commission sales were delivered to private shipyards—not made to the shipyards—was credible and unrefuted.

During World War II, Johns-Manville made sales to Consolidated through Asbestos & Magnesia Materials Co. ("A & M"), one of Johns-Manville's Technical Service Units ("TSU's"), which have been described as independent contractors that distributed and applied Johns-Manville's products, usually on an exclusive basis. Sales of Johns-Manville's products were made di-

rectly to Fore River by district salesmen out of the Boston Office. Johns-Manville introduced one order for asbestos cloth dated June 1945, manufacturer unnamed, from Fore River to the Norfolk Navy Yard. The order suggests that Fore River could have obtained asbestos-containing products from the Navy to which indisputably Johns-Manville sold directly. Johns-Manville argued that this proof went to damages in that an allocation should be made between direct sales to the Navy, thence delivered to Fore River, and sales directly to the private shipyard. The question, instead, is whether the evidence is persuasive that Johns-Manville's products sold to the Navy were used at Fore River. This document does not merit a finding in Johns-Manville's favor.

At trial Johns-Manville introduced no evidence of any contract between the Navy or the Maritime Commission, on the one hand, and private shipyards or suppliers, on the other, providing that the Navy or the Maritime Commission would be directly liable to a supplier for the purchase price of any asbestos-containing products. The assumption of risk policy argued for by Johns-Manville dealt with assuming risks for third-party liabilities, not assuming liability for the purchase price of supplies. Even if the assumption of risk policy is considered tantamount to responsibility for payment in the circumstances of this case, the issue has been resolved against Johns-Manville in part IV of this opinion. Johns-Manville could not locate any of its supply contracts with the Navy and the Maritime Commission for asbestos-containing products, but the Federal Circuit's standard in *Johnson Controls* does not excuse a failure of proof on any of the three elements for privity based on an agency relationship. On this basis alone, Johns-Manville has not sustained its burden of proof.

Although Johns-Manville could not establish that the Government would be liable to Johns-Manville for the price of its asbestos-containing products, Johns-Manville tries to

---

**12.** Compared with the eight cargo vessels for the Maritime Commission, more than 60 vessels were constructed at Fore River for the Navy between 1940 and January 1, 1946—aircraft carriers, heavy and light cruisers, one battleship, destroyers and destroyer transports, and escorts.

surmount the privity bar by first focusing on the relationship between the Navy and private shipyards, which it depicted as an agency relationship. Second, Johns-Manville constructed a scenario of governmental intrusion into contract performance whereby the Navy and the Maritime Commission, rather than the private shipyards, controlled every facet of performance.

### C. *Private shipyards as agents*

Johns-Manville points to a memorandum dated April 15, 1941, by the Judge Advocate General ("JAG"), approved by the Acting Secretary of the Navy, which refers to private shipyards as "contractors who, to all intents and purposes, are agents of the Government, employed under the direction and supervision of naval officers in the performance of such contracts." [13]

The Office of Supervisor of Shipbuilding was established within the Navy's Office of Procurement and Material. The function preexisted World War II, as the Navy previously had an officer on site at Fore River only to monitor vessel construction. During the war the Navy placed at every private shipyard constructing Naval vessels a uniformed Naval officer known as the resident Supervisor of Shipbuilding. Edwin R. Wilkinson, who testified by deposition, was head of the Battleship Cruiser Machinery Desk of BuShips in Washington, D.C., from 1940 to February 1942. He explained that once a contract was awarded to a private shipyard, the Supervisor of Shipbuilding saw that the vessel was built according to plans. Along with his staff of Naval officers, the Supervisor of Shipbuilding continually observed installation and application and carried out paperwork for changes in plans and specifications to the end that the vessel would be built and delivered in ac-

cordance with the plans and specifications. The mission of the Supervisor of Shipbuilding was "[t]o get complete, well-built ships delivered as rapidly as possible at a reasonable and fair price." II *Navy Dept. Bureau of Ships, Historical Section, Administrative History of the Bureau of Ships During World War II* 257 (1952). In addition to administering Navy "shipbuilding, conversion, completion and repair contracts," and ensuring "conformance to contract terms, plans, and specifications," the Supervisor of Shipbuilding was responsible for maintaining satisfactory production and meeting scheduled completion dates. *Id.*

The Maritime Commission had a similar group of Resident Plant Engineers, whose function was to insure that Maritime Commission "vessels are constructed in accordance with approved plans, that the proper material is used, that the workmanship is up to standard, and that operational performances of all equipment, systems, and machinery are satisfactory." II *The Shipbuilding Business in the United States of America* 207 (F.G. Fassett, Jr., ed.) (1948).

Facilities contracts between private shipyards and the Navy show that the Government paid for expansion of facilities and owned all or part of the expanded facilities, although the contractor obtained the exclusive right to operate them.[14] A vessel construction contract between the Maritime Commission and Fore River shows that the shipyard was designated as "an independent contractor, and not an agent." Three vessel construction contracts between the Navy and Fore River, while not expressly disclaiming an agency relationship, do not evidence clear contractual consent by the shipyard to act as the Navy's agent or show that the Navy consented to have Fore

---

**13.** Johns-Manville offered the document also because it recommends in 1941 extension of assumption of risk to fixed-price contracts. Even though the discussion related in the main to state-mandated insurance, such as workmen's compensation, the document is a recommendation and there was no evidence that it was adopted.

**14.** A 1943 amendment to a Fore River facilities contract disclaimed insurance as a cost item in

a CPFF contract, nor could insurance be taken into account in determining any fixed price to be paid by the Navy under any contract with the Navy. This amendment does not exemplify assumption of risk in a fixed-price supply contract, as Johns-Manville contends. It demonstrates that provisions excluding insurance as cost items—whether in CPFF or fixed-price contracts—were made part of the contract, by amendment, if necessary.

River act as its agent.[15] Contractual provisions to the effect that the Government has the right to approve subcontracts and subcontractors do not create an agency relationship between the United States and its prime contractor. *Continental Illinois Nat'l Bank & Trust Co. v. United States,* 112 Ct.Cl. 563, 81 F.Supp. 596 (1949).

■ The documentary evidence does not warrant a finding that an agency relationship between the Navy, the Maritime Commission, and Fore River was established by clear contractual consent. There was no evidence other than the facilities contracts to suggest that an agency relationship existed with respect to the Navy and Consolidated, and they are insufficient. The 1941 JAG memorandum characterizing private shipyards as government agents fails to bridge the gaps in the contracts themselves. Finally, the Supervisor of Shipbuilding and Resident Plant Engineer acted to assure compliance with specifications and scheduling. They did not supplant the private shipyard as the entity with which the supplier dealt in the case of Fore River. In the case of Consolidated, Johns-Manville did not sell to the shipyard.

### D. *Intrusive involvement in performance of supply contracts*

The two purchase orders for asbestos products from the Ruberoid Company introduced by Johns-Manville provide that delivery would be accomplished by a bill of lading to be furnished by the Resident Inspector of Naval Material (the "Resident Inspector"); that invoices for payment were required to be submitted to the Resident Inspector for forwarding to the Navy; and that the Resident Inspector was to inspect a shipment prior to acceptance. These purchase orders were issued by the Navy's Bureau of Supplies and Accounts, and not private shipyards, but they illustrate the role of the Resident Inspector. Along with the Supervisors of Shipbuilding, the Resident Inspectors were part of the

Office of Procurement and Material's Inspection Administration. The Resident Inspectors, also Naval officers, were the Supervisors of Shipbuilding's counterparts at manufacturing plants and often maintained offices at plants, such as Johns-Manville's. The on-site Resident Inspector was responsible generally both for testing Johns-Manville's asbestos-containing products for specification compliance, with the authority to reject sub-standard material, and for expediting orders. *See* Navy Dept., *Organization and Functions of Offices of Inspector of Naval Material, Office of Procurement and Material Inspection Administration* 21–22 (1944). The Resident Inspector also forwarded samples of Johns-Manville's products to the EES for testing.

As discussed in part VII of this opinion, the Navy's Supervisors of Shipbuilding and Maritime Commission's Resident Plant Engineers were the Government's representatives charged with implementing the Minimum Requirements for safety in private shipyards. If a private shipyard wished to procure safety equipment, the Supervisor of Shipbuilding was required to secure approval from BuShips in Washington, D.C., since the protective equipment was an allowable cost in CPFF contracts. Moreover, one vessel construction contract between the Navy and Fore River specifically obligated Fore River to provide and protect the plant in accordance with safeguards required or approved by the Chief of BuShips. The Supervisor of Shipbuilding at Fore River was responsible for implementing BuShips' directives on fire prevention. The Supervisor of Shipbuilding also undertook to train workers employed by Fore River and even to recruit asbestos workers for the shipyard.

A & M was Johns-Manville's TSU at Consolidated, and its products used at Consolidated came to the shipyard only through sales to A & M. A & M bought Johns-Manville's products under a blanket contract, which were released in portions as the work progressed. Thus, after A & M

---

**15.** The Navy's CPFF contracts with Fore River contained clauses providing for reimbursement of insurance premiums consistent with the other evidence demonstrating that when insurance

coverage was a matter that affected the price of CPFF, as well as fixed-price contracts, a provision was inserted into the affected contract.

locked Johns-Manville in on prices, individual orders would be approved through BuShips in Washington, D.C., before Johns-Manville could begin manufacture. For example, a July 3, 1945 memorandum from the Supervisor of Shipbuilding at Consolidated requested of BuShips in Washington, D.C., that the material under an order from A & M be allocated for delivery. The Navy gave Consolidated a priority rating, which usually was AA–1; Consolidated passed it on to A & M; and the priority was then assigned to Johns-Manville, according to John Dragisic, A & M's Treasurer during the war. The Supervisor of Shipbuilding at Consolidated communicated directly with the Resident Inspector at Johns-Manville concerning delivery.

Johns-Manville argues that the requisite privity is established because of the Government's regulation of every step of the performance of its supply contracts in allocating asbestos, fixing price ceilings, approving orders, monitoring quality control, releasing products for delivery, approving safety equipment in the shipyards in which Johns-Manville's products were applied, and renegotiating contracts. Even granting that what Johns-Manville describes is a pervasive system of wartime controls, Johns-Manville's contracts for sales to Consolidated and Fore River none-

theless were made with, and performed for, A & M and Fore River, respectively.

 The Maritime Commission bought Marinite and marine board directly from Johns-Manville. It is unclear whether the Maritime Commission bought thermal insulation products from Johns-Manville. However, because the products sold to the Maritime Commission were delivered to private shipyards, it is reasonable to infer that they were used at Fore River. Each of the Maritime Commission cargo vessels was built under a three-party contract involving the American Export Company, Fore River, and the Maritime Commission. Although Johns-Manville cannot prove that Fore River was an agent of the Maritime Commission, the delivery of direct sales establishes the requisite privity.

It is found that Consolidated and Fore River were not agents of the Navy and the Maritime Commission with respect to Johns-Manville's subcontracts for the supply of asbestos-containing products. Since Johns-Manville's claims emanating from the World War II period have been tried on a test case basis, the result is that there is no privity of contract with respect to any private shipyard for products used in the construction or repair of Navy vessels that were shipped to private yards. Privity does exist with respect to direct sales to the Maritime Commission.[16]

---

16. During trial the court indicated that even if Johns-Manville did not prevail on its substantive theories of liability, findings would be made on the reasonableness of the settlements with the 15 test claimants. Parts VI–IX of this opinion conclude that Johns-Manville cannot establish liability, and parts IV and X conclude that the damages sought were not foreseeable. In addition, the court has concluded with respect to the two test private shipyards that privity of contract was lacking for Johns-Manville products used on Navy vessels. The decision on privity *vis a vis* Navy vessels does not remove private shipyards from the ambit of this case, because what the Navy knew about shipyard working conditions in private shipyards is a source of the Government's knowledge of shipyard working conditions generally. However, the ruling on privity dominates all five test claimants from private shipyards, since they worked only on Navy vessels. Although two worked at Fore River where there was some Maritime Commission work, Joseph W. Teta, Jr., worked exclusively on Navy vessels at Fore River from 1942

to 1944, and Philip Houten began working at Fore River after the last Maritime Commission cargo vessel was delivered. The record is complete on the reasonableness of settlements with all test claimants, but given the decisions on privity, as well as substantive liability and damages, these findings would be premature.

The court has developed a methodology attuned to the facts presented that would be used if additional findings were required. Commending this approach is that it extrapolates from the test claimants—who represent diverse illnesses, amounts of settlements, and jurisdictions in which the claims were brought—to all claimants in the relevant period, thereby maximizing the effect of the decision. The court would find that Johns-Manville made a tender of defense when it approached the Navy and the United States Department of Labor in connection with a tort suit involving a Tucker Act claim. *See Glover v. Johns-Manville Corp.,* 525 F.Supp. 894, 901 (E.D.Va.1979), *aff'd in part, vacated in part on other grounds, and remanded,* 662 F.2d 225 (4th Cir.1981) (if Government af-

## VI. *Breach of the implied warranty of specifications*

### A. *Background*

Johns-Manville also advances a claim for the Government's alleged breach of the implied warranty of specifications. Under this theory the Government becomes liable for Johns-Manville's increased costs of performance of its contracts when those costs can be attributed to defects in design specifications provided by the Government for purchase of asbestos-containing products.

The theory of an implied warranty of government-designed specifications originated with *Spearin v. United States,* 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918). In *Spearin* the Court upheld a judgment against the Government for a contractor's extra expenses incurred in performing unforeseen tasks necessary to the completion of a contract for the construction of a dry-dock. Finding that the government-supplied plans and specifications were defective in that they did not indicate the presence of a dam within an adjacent sewer that was to be relocated, the Court stated that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." 248 U.S. at 136, 39 S.Ct. at 61. The Government's "insertion of the articles prescribing the character, dimensions and location of the sewer imported a warranty that, if the specifications were complied with, the sew-er would be adequate." *Id.* at 137, 39 S.Ct. at 61. The Government's liability did not depend on any negligence or fault in its preparation of the specifications; the fact that it drafted the specifications and plans was sufficient to extend an implied warranty to the contractor.

■ The nature of the warranty, as it has evolved, encompasses two types of representations by the Government. It warrants, first, that the specifications are accurate and, second, that the production of the item and any method of production specified will be feasible and that the finished product will be suitable if the design specifications are followed. *See* Patten, *The Implied Warranty That Attaches to Government Furnished Design Specifications,* 31 Fed.B.J. 291 (1972) [hereinafter Patten, *Implied Warranty* ].

■ *Spearin* is of the former variety; the Government's breach of the warranty by providing inaccurate specifications excused the contractor's halting of construction and allowed the contractor to recover the additional expense attributable to the inaccuracy. *See USA Petroleum Corp. v. United States,* 821 F.2d 622 (Fed.Cir.1987). *Helene Curtis Industries, Inc. v. United States,* 160 Ct.Cl. 437, 312 F.2d 774 (1963), and *Laburnum Construction Corp. v. United States,* 163 Ct.Cl. 339, 325 F.2d 451 (1963), mark out the Court of Clairs' extension of the warranty into the realm of producibility. In both cases design deficiencies in the government-drafted specifi-

---

forded opportunity to take part in settlement negotiations, manufacturer need establish its potential, not actual, liability). The court also would find that it is appropriate in the context of mass tort litigation to assess the reasonableness of settlements in light of that particular atmosphere. From these two findings, the court would proceed to determine whether Johns-Manville failed to investigate a valid legal defense to any underlying claim, such as an applicable statute of limitations; assess whether there was some reasonable medical evidence of an asbestos-related disease; and look at the jurisdiction in which a claim or lawsuit was pending and the identity of plaintiff's counsel to gauge the reasonableness of amount. Based on the evidence in this case, the court would be prepared to exclude as unreasonable only those settlements in which Johns-Manville failed to

investigate the statute of limitations defense. An allocation then would be made between exposures in shipyards and other working environments, again on the basis of the evidence on the test claimants. The court would not be prepared to assign the Government full responsibility for a settlement or judgment if there were any significant period of exposure other than during the war. Finally, the court would apply the fraction of reasonable settlements to the aggregate settlements and legal expenses, reduced by a factor to account for mixed exposures, to determine the amount by which the settlements, legal fees, and expenses sought should be reduced. The same process would apply to judgments, legal fees, and expenses, except that reasonableness would not be considered and punitive damage awards, if separately identifiable, would be excluded.

cations interfered with the contractor's ability to perform the contract. In *Helene Curtis* the defective specifications caused added costs to the contractor which had to resort to an additional manufacturing step beyond what was anticipated under the contract. In *Laburnum* the contractor's recovery included both the extra costs necessary to comply with the specifications and the costs of idleness of the construction company during delays due to the defective plans. These cases make clear the general rule that a contractor may seek appropriate relief, *e.g.*, recover additional costs of performance or be excused from performance of the contract, when the Government breaches its implied warranty of specifications by providing government-drafted design specifications that prove defective either because they are inaccurate or because they specify certain materials, methods of production, or processes that render performance of the contract impossible without increased costs to the contractor.

■ Two elements of this warranty are particularly important to the facts of this case. First, it is essential that the specifications under the contract be of the "design" type, rather than the "performance" type, or the warranty does not attach. Distinguishing between the two kinds of specifications is not always an easy task. The Court of Claims described the distinction in general terms. Design specifications "set forth in precise detail the materials to be employed and the manner in which the work ... [is] to be performed." *J.L. Simmons Co., Inc. v. United States*, 188 Ct.Cl. 684, 689, 412 F.2d 1360, 1362 (1969) (per curiam). By contrast, performance specifications "set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection." 188 Ct.Cl. at 689, 412 F.2d at 1362.

The rationale underlying the application of the warranty to design specifications only is as follows: "[I]f no method of production or design specifications criteria are indicated in the specifications, then the risk is usually on the contractor to produce an end product within the performance specifications stated in the contract." Patten, *Implied Warranty, supra*, at 306–07. But when the contractor is denied the flexibility or opportunity to use its ingenuity to meet the specified standard by any method it chooses because the Government has prescribed the materials or method in great detail, the contractor should not be forced to shoulder the risk that the Government's specifications might be faulty. Rather, the contractor should be able to rely on the Government's implicit representation that the contractor's compliance with the specifications will result in a suitable product and that the contractor's costs will not be increased by adherence to the government-drafted design specifications.

The second element critical to a warranty determination here is that the design specifications be devised and drafted by the Government. Because of the often extensive interplay between contractors and the Government during the development, modification, and purchase of products, it must be determined whether design specifications are truly the Government's own, or whether the contractor has assisted in their drafting and provided such expertise as to negate the Government's implied warranty, because the Government specifications, in effect, endorse the contractor's product or input. This second element of the warranty requirement—that the Government drafted the subject specifications—will be discussed first, since development of the specifications for each product sold to the Government elucidates the nature of the specifications as design, performance, or mixed.

Three Court of Claims cases establish the general parameters for determining the Government's responsibility for the specifications. In *Hol-Gar Manufacturing Corp. v. United States*, 175 Ct.Cl. 518, 360 F.2d 634 (1966), the Air Force contracted for electric generators to be manufactured under detailed specifications that were drafted entirely by the Government. The contractor attempted, but was unable, to pro-

duce the generators under the existing specifications. The contractor prevailed on a breach of specifications theory for the added costs necessary to comply with alterations in the Government's defective design. In *Austin Co. v. United States*, 161 Ct.Cl. 76, 314 F.2d 518, *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963), the contractor's implied warranty claim failed because its proposed technical modifications were incorporated into the Government's specifications. The contractor's voluntary preparation of the specifications for what was essentially a new product indicated to the court that the contractor had assumed the risk of impossibility of performance, and the court found no implied warranty by the Government. In *Bethlehem Corp. v. United States*, 199 Ct.Cl. 247, 462 F.2d 1400 (1972) (per curiam), the court also denied a warranty of specifications claim. Although the Government had drafted the specifications for an environmental test chamber, it did so in reliance on extensive information provided by the contractor and with the contractor's full knowledge that the Government was relying on its expertise. The court held that the contractor had assumed the risk of non-performance.

■ These cases instruct that the nature and degree of contractor involvement in the specification process define which party should be held to warrant the efficiency and safety of a specification. During trial Johns-Manville brought to the court's attention cases, in addition to those cited in pretrial briefs, that apply the guidelines of *Hol-Gar, Austin,* and *Bethlehem.* Although each has been considered, they do not represent a different view or recognize a warranty in circumstances like those presented in the case at bar. *See, e.g., Radionics, Inc.*, ASBCA No. 22727, 81–1 B.C.A. (CCH) ¶ 15,011 (contractor not involved in developing design specifications); *Tranco Indus., Inc.*, ASBCA No. 22379, 78–2 B.C.A. (CCH) ¶ 13,307 (contractor withdrew proposal after which Government adopted it, so that contractor not held to advocate solution that it prepared and vouched for up to time of agreement). The point of departure in determining whether the Government has assumed a role in drafting specifications such that a warranty should run in favor of a contractor-manufacturer is that the general buyer-seller relationship imposes the responsibility of warranting a product on the party that manufactured it. To reverse this typical commercial expectancy requires evidence that the Government, by its conduct, supplanted to a significant extent the manufacturer's role in controlling its product.

On defendant's motion for judgment on the pleadings, this court ruled that the Government may have made "a warranty based on the parties' shared knowledge of the risks inherent in the production of asbestos-containing products according to government specifications." *Johns-Manville Corp.*, 12 Cl.Ct. at 28. This formulation of the warranty took cognizance of Johns-Manville's averments that it was forced to manufacture asbestos-containing products during World War II and that the Navy and the Maritime Commission had increased its costs of contract performance by aggravating dangers or defects inherent in the products. Rather than responding to this formulation apoplectically, since the contractor must have equal or less knowledge of the defect than the Government in order for the Government to be held responsible for drafting specifications, *see Bethlehem Corp.*, 199 Ct.Cl. at 254, 462 F.2d at 1404 (citing cases), defendant proceeded to trial and put forward a theory of defense that the Navy and the Maritime Commission did not draft the specifications in the first place. This was an altogether fitting approach, since the court also had ruled that the specifications must be drafted by the Government and that the characterization of the specifications of the design or performance type must await trial. *Johns-Manville Corp.*, 12 Cl.Ct. at 27–28. In this case it has been held in part III that Johns-Manville's production overall was not forced and, as will be discussed, that Johns-Manville had a significant role in developing the specifications for all but one of the products in suit and, per part VII, had knowledge of the hazards of asbestos and knowledge of shipyard working conditions

to negate superior knowledge on the part of the Government. Thus, whether the Government can be held liable when 1) the Government promulgates design specifications; 2) the contractor is forced to enter into the contract and does not increase production, as did Johns-Manville, to take advantage of exigent circumstances; and 3) the Government drafts the specifications, but both parties know that the specifications are defective are questions that remain for another case. *Cf. A.C. Hoyle Co.*, ASBCA No. 15,563, 71–2 B.C.A. (CCH) ¶ 9,137 (contractor and Government responsible for specification for novel product resulting from collaboration and mutual effort).

B. *The Navy's process for developing specifications*

During World War II, the Navy purchased components used in the construction of Navy vessels on the basis of standard specifications that described in detail the quality, grade, size, and so forth of the article desired. The use of standard specifications ensured standardization for Navy material, thereby mitigating inventory problems, facilitating inspection of products, and enabling the Navy to describe to bidders its general or precise needs without delay. Although the Ship Technical Branch and the Research and Standards Branch of the Navy's BuShips had responsibility for the development, design, and writing of Navy vessel component specifications, the process by which a final specification was arrived at often involved considerable interaction between manufacturers of the item and the Navy.

Leon S. Birnbaum, *testifying for defendant*, described in general the sequence of events by which the Navy develops and drafts specifications. Exceptions to this general format occurred, of course, at times. Mr. Birnbaum is a former BuShips employee whose experiences ranged from materials engineer at the Philadelphia Navy Yard's Industrial Test Laboratory during the war to head of the coatings, engineering, and chemistry groups at BuShips. The latter position included responsibility for thermal insulation materials beginning in 1965. His explanation of the specification process for products during the war years and thereafter follows.

In response to the Navy's "field experience" with various products and materials, BuShips' Materials Research and Design group continually would assess the Navy's needs and desired goals regarding products and materials. After determining a particular need, BuShips searched product catalogs of potential suppliers and sometimes alerted industry to a present or future need. BuShips would solicit industry for information regarding new products of which it was unaware. This dialogue often resulted in industry's submitting product samples to the Navy for testing. Once BuShips and the Navy laboratories had analyzed the test results, they prepared a draft specification which might be either a minor change or amendment to an existing specification, a wholesale revision, or an entirely new specification. They then would circulate the draft for internal Navy review and comment.

According to Mr. Birnbaum, any draft revision of the specification would be sent to industry and trade associations for their comment, with a view toward both devising a specification that would demand a quality product and increasing the number of potential suppliers of the product. For example, Clyde Barnett, the head of Johns-Manville's Government Department, routinely received specifications from BuShips for comment. Then a "cognizant engineer" at BuShips, *i.e.*, one knowledgeable of that product type, would resolve all comments with the draft, often in consultation with industry and the Navy laboratories, and prepare the final draft. After final review and approval by a specifications committee, the Navy would issue the specification.

Once the specification had been issued, procurement under the specification could begin. If a supplier's product had not been approved previously, it was required to submit its products for brand approval—Navy testing to ensure the product met the requirements of the specification—before the supplier was allowed to bid on a contract. After the contract was signed and

production had begun, further sampling and testing by an inspector of Naval materials and by the Navy laboratory ensured conformity between the product and the specification. Delivery of the product to the Navy and its use set the stage for another cycle in this continuous process of field experience, revision of specifications, and additional procurement.

Although Mr. Birnbaum's testimony was generalized, his description of the overall process was corroborated by the testimony of Johns-Manville's witnesses and the documentary evidence concerning the development of the subject specifications. In closing argument Johns-Manville urged that the evidence revealed the Navy's growing sophistication in and commandeering of control of the specifications from the early years through World War II, culminating in Navy expertise on its own requirements and dictation of the details of products to fulfill them. The schema may be correct as a matter of history, but does not fully account for the development and evolution of the specifications in this case, since, for the most part, the Navy and the Maritime Commission procured products from Johns-Manville that had been supplied either commercially or to the Navy before World War II. The ensuing discussion traces how the development of the subject specifications tracked the general scenario or varied therefrom.

### C. *Products sold to the Navy and the Maritime Commission during World War II*

In order to determine whether the first element of the warranty of specifications—whether the product specifications at issue were design specifications—is satisfied, it is necessary to trace the development and evolution of the various Navy product specifications and the corresponding products supplied by Johns-Manville under those specifications. The defect responsible for increased costs of performing the contract must be required by design specifications. When the specification is a mixed design and performance type, the defect must be found in the design portion of the specification. Since the alleged defect in this case is the requirement that various insulation products contain asbestos, Johns-Manville must show that the design specification or design portion of the specification required Johns-Manville to include asbestos in the products that it supplied for the Navy's or the Maritime Commission's use. Johns-Manville presented its proof on this point in two ways. First, it showed that most of the specifications included a mandatory composition of various materials, including asbestos. Second, when the specification contained no explicit mention of asbestos as a required material, Johns-Manville took the position that the required physical characteristics of the finished product were such that they could only be satisfied at that time through the incorporation of asbestos into the product.

### 1. *85 percent magnesia*

An analysis of the individual asbestos products supplied by Johns-Manville begins with its 85 percent magnesia pipe covering, thermal block, and cement. Eighty-five percent magnesia was patented in 1886 and became widely available commercially. Johns-Manville began producing it in 1899, advertising the pipe covering for use on high pressure steam surfaces and the block and cement as boiler insulation. By 1904 Johns-Manville was attempting to sell these magnesia products to the Navy.

Johns-Manville presented two witnesses, Phillip S. Bettoli and Donald B. Wingerter, to recount the development and evolution in Navy specifications for magnesia products. Mr. Bettoli was a chemist and later became Director of Research at Ruberoid Company, another asbestos manufacturer. Mr. Wingerter began his employment with Johns-Manville as a quality control supervisor in 1949 and had advanced to the position of Director of Research at the time of his retirement in 1978. These experts presented Navy specifications and Johns-Manville documents dating from approximately 1935 through 1946. On cross-examination defendant supplemented this evidence by offering documents that give a more complete picture of the magnesia products and their specifications beginning

with the first Navy specification, 23–L–1, in 1908.

Although Johns-Manville had asked Mr. Wingerter to develop expert testimony focusing on the specifications for the asbestos-containing products sold to the Navy as they existed from the mid–1930's through the war years, the court agrees with defendant that the picture portrayed was disjointed and did not reflect fairly or accurately how the specifications came into being or evolved. For example, if a manufacturer had a decisive role in developing a specification before World War II, it does not matter that during the war the specification was fine tuned as to its defective aspect, but it does matter if it was significantly altered. It is also impressive that defendant managed to give full context to the development of the subject specifications during cross-examination and reserved for its defensive case only Mr. Birnbaum's overview of the specifications process and the introduction of documents.

Specification 23–L–1, for "Magnesia Insulating Covering," was no more than a compositional requirement of "not less than 85 per cent carbonate of magnesia, not less than 10 per cent asbestos fiber, and not more than 5 per cent impurities." The required asbestos and magnesia content remained the same until specification 32–L–1a lowered the minimum magnesia percentage to 80 percent in 1913. This specification also required that asbestos fibers be "long" fibers. Specification 32–L–1c returned the minimum magnesia content to 85 percent in 1918. Despite several revisions of the specification for magnesia insulation covering between 1908 and 1941, the Navy consistently required not less than 10 percent asbestos.

Specification 32–P–7, issued in 1941, introduced "detail requirements," for such "physical properties" as density and hardness. Magnesia pipe covering was required to meet established values for each of these attributes. In 1942 the Navy incorporated magnesia pipe covering into a high-temperature pipe covering specification, 32–P–8, that included categories for pipe covering made from other materials.

Similarly, in 1941 the Navy had incorporated magnesia block into a high-temperature block specification, 32–I–3. These new specifications no longer explicitly required an asbestos content; the material requirements simply called for "heat resisting compounds suitable for the temperature conditions and the purpose intended." They also established separate categories, each with its own physical requirements, based on the temperature range for which each grade was suitable and on the maximum densities allowed.

Johns-Manville makes two arguments with respect to these changes. It contends, first, that even though the explicit asbestos content requirements were dropped, the Navy still was mandating indirectly the use of asbestos, because, Johns-Manville argues, the "physical requirements" contained in the specifications could be achieved only if asbestos was used.

Assuming, *arguendo*, that these specifications still mandated asbestos, the analysis shifts to the second element of the warranty: the Government's responsibility for the inclusion of asbestos in the specifications. On this point Johns-Manville's proof falls short. Both Mr. Wingerter's testimony and the documentary evidence revealed that Johns-Manville's production of 85 percent magnesia insulation preceded the first Navy specifications for the magnesia products; that the Navy adopted 10 percent as the minimum allowable asbestos content and kept it constant throughout many specification changes; and that when a temporary compositional change in magnesia occurred in 1918, Johns-Manville objected to the Navy, arguing that the increased magnesia content required necessarily would reduce the amount of asbestos in the product, thereby weakening the material. The Navy apparently acceded to Johns-Manville's request by reducing the magnesia content requirement to the 1913 level of 80 percent. Moreover, Johns-Manville offered no persuasive evidence that the magnesia insulation materials that it sold commercially to non-Navy customers differed markedly in asbestos content from those supplied under Navy specifications. To the contrary, Johns-Manville's 1939

"Finished Product Specification" for magnesia pipe covering for commercial customers, for example, calls for "not less than 85 percent of pure hydrated magnesium carbonate ... and not less than 10 percent long-fibre asbestos." Likewise, its 1942 finished product specification for magnesia pipe covering and blocks allowed a range of 83 to 90 percent magnesia and 10 to 15 percent long fiber asbestos in products destined for its non-Navy customers—not significantly different from the 85 percent minimum magnesia and 10 percent minimum asbestos contents of its Navy products.

Johns-Manville also argues that the Navy's differentiation of its 85 percent magnesia specification for pipe covering, 32–P–7, into two grades with density maxima of 12 pounds per cubic foot and 16 pounds per cubic foot, respectively, forced Johns-Manville to substitute a lighter type of asbestos (amosite instead of chrysotile) to meet the requirements of the new light-weight magnesia grade. Johns-Manville then characterizes this change as the introduction of a defect into the specifications, since it contends that amosite is a more dangerous type of asbestos whose fibers are longer and which releases more dust when cut. Whether or not the Navy, by virtue of its changed specification, may have induced Johns-Manville to switch to amosite in order to meet the lower density requirement, Johns-Manville has failed to show that amosite fibers are considered by medical experts to be more dangerous than chrysotile fibers. Indeed, the most Johns-Manville's expert medical witness, Dr. Edward A. Gaensler, could say on this point was that all three types of asbestos fibers —amosite, chrysotile, and crocidolite— cause asbestosis. Dr. Gaensler did not give an opinion that there was any danger differential among the three types.[17] The testimony on point of John A. McKinney, Johns-Manville's former CEO, was not competent. Moreover, the trial court in the

*Asbestos Insurance Coverage Cases,* Judicial Council Coordination Proceeding No. 1072, slip op. at 26 (Cal.Super.Ct. May 29, 1987), after taking testimony from eight medical experts, made no such distinction. Without this distinction any switch from chrysotile to amosite that might have been required by specification 32–P–7 cannot be considered to be the introduction of a defect into the specification. Even assuming that longer fibers were more hazardous, no evidence quantified any increase in the risk. Therefore, Johns-Manville's implied warranty of specification claim based on its supply of light-weight 85 percent magnesia must fail.

### 2. *Superex pipe covering and block*

To meet the need for insulation materials that could withstand temperatures above 600°F, Johns-Manville began producing a diatomaceous earth insulation in the early 1920's. In February 1925 its product was announced as "Johns-Manville High Temperature Insulation." It could withstand temperatures up to 1500°F and was composed primarily of diatomaceous earth and long fiber asbestos. In September 1926 Johns-Manville renamed its products "Superex Pipe Covering" and "Superex Block." Johns-Manville was among those manufacturers that responded to the Navy Bureau of Engineering's 1924 request to firms to submit materials for testing for use as pipe covering and lagging at temperatures between 500° and 700°F. Johns-Manville also offered detailed suggestions on the Navy's proposed diatomaceous earth specification, recommending that the hardness requirements be made more stringent and the abrasion test be eliminated. Otherwise, Johns-Manville found the specification "satisfactory in all its requirements." In February 1927 the Navy issued specification 32–P–3, requiring at least 50 percent diatomaceous earth, 4 percent asbestos, and the remainder hydrated magnesium carbonate, or hydrated calcium carbonate, or both.

---

**17.** Dr. Gaensler did recognize that some controversy still surrounds the question of whether exposure to longer fibers (more characteristic of amosite) posed a greater danger of asbestosis than exposure to shorter fibers, with the prevailing body of opinion being that they do. He did not testify that the differential had been established with any medical certainty. *See infra* note 24.

When the Navy revised the specification in 1933, the new specification, 32–P–3a, did not contain an explicit asbestos requirement, mandating instead "a suitable high temperature heat resisting compound." Correspondence between the Navy and Johns-Manville indicates that the Navy sought Johns-Manville's comments on proposed specifications for diatomaceous earth pipe covering and, on one occasion, incorporated all but one of Johns-Manville's suggestions into the proposed high temperature specification.

Before and during the war, the Navy revised its 32–P–3 specification several times, with Superex pipe covering eventually falling under 32–P–8 (comprehensive pipe covering specification) and Superex block under 32–I–3 (comprehensive thermal block specification). None of the revised versions contained an explicit compositional requirement of asbestos. Furthermore, Mr. Wingerter testified that Superex had contained asbestos from the day it was invented and before the Navy issued its first specification for Superex in 1927.

Johns-Manville announced the development of another new product in 1940— "Light-Weight Superex" ("L–W Superex") for pipe covering and blocks at temperatures up to 1500°F. At the same time, it renamed its 1900°F Superex "High-Temperature Superex." Johns-Manville already had been manufacturing the L–W Superex for both the Navy and non-Navy customers at the time of the public announcement of the product. The new and distinctive feature of L–W Superex was its low density of 20 pounds per cubic foot maximum. Mr. Wingerter testified that, when Johns-Manville began experimenting with the product in 1938, the Navy specification in effect, 32–P–3c, allowed a maximum density of 27.5 pounds per cubic foot. The lowest density ultimately required for high-temperature diatomaceous earth pipe covering by the Navy during the war was 25 pounds, in specification 32–P–8 (INT, or interim). Mr. Wingerter testified that the Navy requested Johns-Manville to develop a light-weight diatomaceous earth insulation, so that even though the later formal Navy specifications lowering the density to

25 or 27 pounds could have been written around existing products, such as L–W Superex, Mr. Wingerter implied that Johns-Manville created L–W Superex only because the Navy had directed its development. However, the fact that the Navy may have expressed to manufacturers a desire to purchase light-weight diatomaceous earth insulation does not prove either that Johns-Manville had no independent commercial reason of its own for developing L–W Superex or that the Navy was so involved in Johns-Manville's development of the product as to be considered to have directed its creation. Likewise, two 1939 Johns-Manville Inspection and Control Department reports referring to orders for L–W Superex products to be shipped to Fore River and Newport News, Virginia Navy Yard, indicating density test results lower than some unnamed "Navy Specification" of 20 pounds density, fail to establish that L–W Superex was created or modified at the Navy's behest.

At the heart of Johns-Manville's claim regarding L–W Superex is its contention that the density requirement of the Navy's light-weight pipe covering and thermal block insulation forced it to use amosite asbestos instead of chrysotile and to use it in greater percentages in order to produce these products under the specifications. Two facts tend to undermine this claim. First, despite Mr. Wingerter's assertions that Johns-Manville was averse to using amosite because it owned a chrysotile mine in Canada, Johns-Manville had developed a product (on its own initiative) between 1935 and 1937 called "Johns-Manville Super Fire Felt Insulation" that was nearly 100 percent amosite. This molded amosite asbestos pipe covering was submitted to the Navy for testing and brand approved by the Navy in 1937 prior to the first Navy specification for amosite asbestos pipe covering, 32–P–6. None of the evidence indicates that the Navy required Johns-Manville to use amosite in creating Super Fire Felt. Indeed, the specification under which it was approved already was satisfied by Johns-Manville's 85 percent magnesia product. Johns-Manville's devel-

opment of molded amosite pipe covering lends support to the Government's argument that Johns-Manville was willing to use amosite in its products when it was to its economic advantage—not only when amosite composed 5 to 6 percent of the product, as in L-W Superex, but also when it made up nearly 100 percent of the product, as in Super Fire Felt.

Second, the difference between the percentages of amosite contained in regular Superex and in L-W Superex, respectively, must be considered minimal, if not inconsequential. Every Superex product made contained at least 4 percent asbestos; and although changes and adjustments were made in the formulae, in no instance did the asbestos content change by more than one or two percentage points. Neither the testimony nor documentary evidence reveals even a rough estimate of the percentage change in amosite content involved in the development of L-W Superex. Furthermore, the single adjustment in the product formula that Johns-Manville was able to document proved not to have been made in an effort to satisfy a change in Navy specifications, but, rather, was made to correct some unexplained problem in the production of a L-W Superex product that had already received Navy brand approval under specification 32-P-3d in 1939.

The increase in asbestos content from Superex pipe covering to High-Temperature Superex pipe covering, as reflected in Johns-Manville's own 1937 manufacturing specifications, similarly was approximately 1.2 percent of the finished material (or an increase from 10.82 to 12.0 percent).[18] However, there was evidence that at times Johns-Manville successfully substituted a mixture of amosite and other asbestos fibers for its regular amosite blend, presumably reducing the amosite content in its High-Temperature Superex to meet both the Navy's and its own test requirements. This indicates that the percentage content of amosite used by Johns-Manville in its High-Temperature Superex was not fixed rigidly by the requirements of the Navy's

specifications. Moreover, Johns-Manville failed, as noted above, to establish that even if the proportion of amosite was increased the result would be a more dangerous product.

### 3. *Superex Cement and No. 450 Cement*

■ In addition to its 85 percent magnesia cement, Johns-Manville also produced a Superex cement (containing diatomaceous earth and asbestos) and a "Number 450 Cement" (containing mineral wool and asbestos). Johns-Manville developed both products for commercial, rather than Navy use. The Navy's testing station first found Superex cement suitable for Naval use in 1928 under specification 32-P-3. In an effort to develop an acceptable list of high temperature insulating cements for Naval use and to prepare a specification for them, the Navy's Bureau of Engineering had the Navy Engineering Experiment Station conduct tests on manufacturers' samples, including those of Johns-Manville. Four years later, in 1937, the Navy issued specification 32-C-14. The Navy had certified Johns-Manville's Superex cement and its No. 450 cement for brand approval earlier that year under specification 32-C-14 (INT).

Despite several revisions of the specification between 1937 and the end of the war, Mr. Wingerter could not attribute any compositional changes made by Johns-Manville in either product's asbestos content to any Navy specification changes made after the Navy's initial brand approval of the products under specification 32-C-14. For example, when Johns-Manville experienced difficulty during production in meeting the Navy's hardness and abrasion requirements for Superex cement, Johns-Manville changed the formula, but not the asbestos content. Similarly, Mr. Wingerter testified that the Navy's omission of its requirement that the mineral wool component of mineral wool cement (No. 450 cement) be "nodulated" was not a "significant change." This

---

**18.** Johns-Manville would characterize this change as a 12 percent increase in the percent-age content of asbestos.

was the only compositional change made in the Navy's 32–C–14 specification throughout the course of its revisions. Furthermore, Mr. Wingerter acknowledged that the physical property requirements under the 32–C–14 specification series had been written by the Navy consistent with the results obtained in its tests of products submitted by Johns-Manville and other manufacturers.

Johns-Manville also produced a version of its No. 450 cement that it called "450 cement for Navy." This product was brand approved under 32–C–14. Specification 32–C–14 lists asbestos content as a compositional requirement, but gives no required percentages. Johns-Manville introduced a progress report containing a one-product formula that met the Navy's specification and that Johns-Manville intended to use to fill a special 40–ton order for the Navy. Although this detailed formula listed a 15–percent asbestos content, Mr. Wingerter conceded that Johns-Manville had leeway to choose whatever formula and asbestos percentage it wanted from among those that met the Navy's requirements of the specification.

### 4. Asbestos cloth

Johns-Manville started making asbestos cloth in the late Nineteenth Century and by 1918–1919 was attempting to sell asbestos cloth to the Navy. Johns-Manville also sold asbestos cloth products to commercial customers for a wide variety of uses. The Navy issued its first specification, 32–C–11, for asbestos cloth in 1933. Specification 32–C–11 set the required asbestos content at 90 percent. In developing this specification, the Navy corresponded with Johns-Manville, requesting information on what varieties of cloth might be "regularly produced" and soliciting comments on its proposed specification.

Johns-Manville's claim regarding asbestos cloth is based on the argument that the Navy's specifications for asbestos cloth required Johns-Manville to customize the cloth products that it sold commercially by increasing the percentage of asbestos content. Yet, when both the 32–C–11 series of specifications, under which asbestos cloth was produced for Navy use, and the documents concerning Johns-Manville's commercial sales are examined, it becomes apparent that substantial overlap exists between the two categories in terms of asbestos fiber content. The Navy required some types of asbestos cloth to contain 80 percent asbestos and other types to contain at least 95 percent. Although Mr. Wingerter testified that Johns-Manville's commercial grade cloths had asbestos contents of 75 to 80 percent and that they sold no commercial grade as high as 90 percent asbestos, a 1937 Johns-Manville publication describes a style of cloth that appears to be a commercial product [19] as containing 95 percent asbestos.

In addition to the overlap in asbestos content between some commercial products and the Navy specifications, a 1945 Johns-Manville manufacturing specification document shows an even closer identity of products. It sets out manufacturing instructions for two products—one for Navy and one for commercial use (denoted as "Laundry")—having identical asbestos percentages of 90 to 95 percent and the same manufacturing number and differing only in the weave of the cloth. Such examples persuade that although Johns-Manville sometimes made separate asbestos cloth products for the Navy, according to Navy specifications, those products were not significantly different in respect to their asbestos cloth content percentages from those that Johns-Manville produced for its commercial customers.

### 5. Asbestos Felt

Johns-Manville produced two types of asbestos felt products—asbestos Fire Felt and amosite asbestos felt—that are included in the warranty of specifications claim. The parties offered scant evidence on ei-

---

**19.** The description of Johns-Manville's asbestos cloth style No. 912 lacks the notation appearing in the product description for style No. ME–5011 (the next style on the list) that it "[m]eets the requirements of Navy Specification 32–C–11." Instead, it more closely matches the description of the commercial product immediately preceding it on the list.

ther product. Johns-Manville's predecessor company, the H.J. Johns Company, began marketing its Fire Felt to the Navy in 1898, seven years after it had first sold the product commercially. Although one Navy specification under which Johns-Manville produced Fire Felt, 32–F–16, was admitted into evidence and shows an asbestos content of 98.5 percent to be required, Johns-Manville offered no evidence that the Navy required that the product to be any different from Johns-Manville's commercial Fire Felt.

By contrast, amosite asbestos felt appears to have been developed by Johns-Manville for the Navy's use under specification 32–F–3. The evidence does not reveal any prior commercial production of the felt by Johns-Manville. The Navy in March 1939 issued specification 32–F–3, which required a minimum of 95 percent asbestos fiber. A 1942 Johns-Manville research report states that development of the blanket began on June 6, 1939. By May 1942 Johns-Manville had the product ready for testing, and the Navy ultimately accepted it as satisfactory. Defendant's evidence on this product failed to contradict Johns-Manville's proof that it developed amosite asbestos felt initially for the Navy in accordance with the requirements (including asbestos content) of Navy specification 32–F–3. However, as defendant contended in closing argument, finding that the Government drafts a design specification does not satisfy a contractor's burden of proof, since the Government also must be shown to have knowledge superior to the contractor's concerning that part of the specification representing or causing the defect. As discussed in part VII, Johns-Manville did not prove that the Government had superior knowledge about the hazards of asbestos or the hazards associated with its use in shipyards.

### 6. *Miscellaneous products*

Johns-Manville also bases its implied warranty of specifications claim on its production of three minor products for the Navy. The first of these is asbestos packing sheet. This product was covered by Navy specification 33–P–13c, issued in 1944, which requires an asbestos content of 70 percent. Johns-Manville acknowledged that it also produced an asbestos packing sheet for commercial customers that was different from the product described by the Navy specification. However, since Mr. Wingerter admitted that the Navy specification required a higher rubber content, and therefore a lower asbestos content, than the commercial analog, any customization performed by Johns-Manville to meet the Navy's specification would have resulted in a less defective product. For this reason Johns-Manville's claim regarding asbestos packing sheet must fail.

The second minor product is asbestos electrical insulation. Johns-Manville produced various electrical insulations during the war under Navy specification 17–I–29, which it had been producing commercially for some time before the war—the asbestos paper variety since the late Nineteenth Century. Only with regard to non-ferrous asbestos paper is there any indication that the Navy specification varied from Johns-Manville's commercial electrical insulation. A May 1942 Johns-Manville Progress Report on asbestos electrical insulation notes the Navy specification's requirement of a 90–percent minimum asbestos content. Johns-Manville's two non-ferrous asbestos papers had asbestos contents of 84 and 86 percent, respectively. The report then opines that Johns-Manville will have to develop new non-ferrous papers to meet the 90 percent asbestos requirement, which it apparently did to produce these items for Navy use.

Johns-Manville's production of two 90–percent asbestos non-ferrous papers can be viewed as modification in the composition of two existing commercial products. Although the degree of customization seems *de minimus*, it is technically a modification of these products, by increasing the asbestos content, that was necessary to comply with the Navy's specification's compositional requirement.

Defendant presented evidence of Johns-Manville's participation in the drafting of specification 17–I–29 for electrical insulation. The Progress Report mentioned

above noted that the Navy had adopted some of Johns-Manville's suggestions on the interim specifications that preceded the final issue of 17–I–29. However, there is good reason to assume that the percentage of asbestos content was not among the suggestions adopted, since the same report complains of the need to develop a new 90–percent paper to meet the specification's requirements. An increase of four to six percentage points in asbestos content, even though its *raison d'etre* is attributable to the Government, is insignificant. The content of the commercial products was nearly 90 percent, and the slight increase for the Navy's products cannot be said to create or augment the defect such that the Government is responsible for the overall asbestos content.

The third minor product is asbestos Millboard. Millboard is a form of asbestos paper about one-eighth to one-quarter inches thick and used as a fireproof sheet. Johns-Manville had sold it commercially since the 1890's. The Navy first issued a specification covering the product in 1906 and made several revisions in it up through specification 32–M–1e in 1941. Early versions of the specification had no compositional requirement of asbestos beyond the specification's title, "Asbestos Millboard." The Navy listed asbestos as one element of its compositional requirement for the first time in its 1922 version, 32–M–1c. Only with the 1941 version did the Navy begin to specify a particular percentage of asbestos—a 75–percent minimum.

Although the specification for Millboard did require asbestos to be included in the product during the war, there was no evidence that the Millboard Johns-Manville produced under the Navy specification had an asbestos content that was any different from the Millboard that it produced for its commercial customers. To the contrary, Mr. Wingerter testified that he had found no evidence that Johns-Manville customized its Millboard product for the Navy during the war. Therefore, the Navy, in specifying the use of asbestos—even a particular percentage of asbestos (75 percent)—was not requiring Johns-Manville to produce a product that was any more dangerous than

the Millboard it was already manufacturing commercially.

During trial counsel for Johns-Manville conceded that no liability could be found for asbestos products if none of the test claimants testified to their use. Although test claimant Thomas P. Drinan recalled cutting Millboard, none of the other test claimants referred to the use of either asbestos packing sheet or asbestos electrical insulation. Johns-Manville's claim based on its production of these two products therefore would fail, even if it had been found that the Government was responsible for the specifications for these products.

Finally, Johns-Manville included in its pretrial findings references to three additional products to be included in its claims. These products are marine tape, ebony asbestos, and acoustic felt. At trial Johns-Manville dropped its specifications claim with respect to these products.

### 7. *Marinite*

The United States Maritime Commission oversaw the construction of merchant marine vessels during the war. Just as the Navy had its materials specifications, the Maritime Commission wrote its own specifications. Johns-Manville's expert witness, Burton H. Tower, was involved in drafting the material specifications for insulation board products, such as Johns-Manville's Marinite product. The Maritime Commission's material specification covering Marinite was the only Maritime Commission specification for asbestos-containing products. Accordingly, Marinite will be the only Maritime Commission product discussed in connection with the claims for an implied warranty of specifications.

Although the exact dates are uncertain, the parties agree that Mr. Tower wrote the Maritime Commission specification covering Marinite sometime in late 1938 or early 1939. His testimony made it clear that he drafted the specification to describe in a general way existing commercial products, including Marinite, that had been or were being tested by the National Bureau of

Standards laboratory. Despite the fact that Johns-Manville's development of Marinite preceded the Maritime Commission's drafting of the specification, Johns-Manville argues that the warranty should apply and contends that it developed and produced Marinite only because it was requested to do so by a Senate Subcommittee. However, the sequence of events brought to light by Mr. Tower's testimony and various documents refutes that contention.

Marinite is a light-weight, heat-resistant construction board composed of lime, diatomaceous silica, and amosite asbestos. The focal point for the Government's awareness of the need for such a product was the Senate Commerce Committee's investigation beginning in 1935 into the shipboard fires on the *Morro Castle* and the *Mohawk*. Senate Commerce Comm., *"Morro Castle" and "Mohawk" Investigations*, S.Rep. No. 184, 75th Cong., 1st Sess. (1937) [hereinafter Senate Report]. The *Morro Castle* disaster occurred on September 8, 1934. Johns-Manville Sales Bulletin No. 69–408 of October 8, 1934, notes that the company already had been working on the development of suitable fireproof construction materials for ships. More to the point, several Johns-Manville histories of the development of Marinite detail the events along the road of Johns-Manville's development of Marinite. This path had its origin in Johns-Manville's Millboard product before the *Morro Castle* fire. Johns-Manville's research and development on Marinite and a similar, but heavier product, marine sheathing, were well underway by 1934, according to a 1937 article in *Power Specialist*, a trade journal. Johns-Manville's tentative manufacturing specification for Marinite also had been written by April 29, 1936. Indeed, Johns-Manville had sent samples of Marinite to both private and Government shipyards by this time.

Furthermore, correspondence in 1938 between Johns-Manville and the Maritime Commission lends support to the Government's contention that Johns-Manville was involved in the Maritime Commission's specification drafting process for Marinite. Johns-Manville sent product information and samples to the Maritime Commission, and the Maritime Commission thanked Johns-Manville for its cooperation on the proposed insulation specification. The significance of this interaction is diminished somewhat by the fact that Mr. Tower did not recall contacting manufacturers for suggestions or comments while he was writing the insulation board specifications. However, Johns-Manville really does not allege that its Marinite product was modeled after the Maritime Commission's 1939 specification drafted by Mr. Tower. It claims instead that it complied with the earlier requirements found in the Senate Report that set forth fire safety measures for ships.

The Senate Report was a 1937 preliminary report by the Senate Commerce Committee on its investigations into the *Morro Castle* and *Mohawk* disasters. Mr. Tower testified that he conformed the Maritime Commission's insulation board specification that he wrote to the requirements of this same report. However, Johns-Manville's tentative manufacturing specification for Marinite predates the issuance of the Senate Report. In addition, Johns-Manville argued, but failed to prove, that Marinite or its manufacturing specification for Marinite changed after the Senate Report issued. That Marinite was well into production and use when the Senate Report was issued is borne out by an October 1939 Johns-Manville's report in its publication, *Stockholders' News*, noting that the reason Johns-Manville's fireproof materials had been selected for the construction of the new *S.S. America* was that "they had been successfully employed in ship construction during three previous years on some 50 cargo and passengers ships." The stockholders' report also describes Johns-Manville's research in fire-resistant building materials as "parallel[ing] that of the government program," rather than a response to Government requirements.

■ In sum, the weight of evidence suggests rather strongly that Johns-Manville sought to benefit from the increased interest in light-weight, fire-resistant construction materials for ships that was prompted by the *Morro Castle* fire. Johns-

Manville accelerated its research and development in this area, producing both marine sheathing and a lighter variant, Marinite, by April 1936. It encouraged Marinite's use by both private shipbuilders and the Maritime Commission. When the Maritime Commission wrote its first insulation board specification in 1938–1939, the drafter wrote it around the general compositional descriptions of the few commercially available insulation boards, including Marinite.

### D. *Nature of the specifications for asbestos-containing products and involvement of Johns-Manville in their drafting*

One element of the implied warranty of specifications identified above is that the specifications be of a design type. Examination of the many specifications under which Johns-Manville's asbestos products were manufactured reveals nearly all of them to be mixed design and performance specifications, since they contain both design and performance requirements.

 When a specification includes a compositional requirement, that portion is a design specification because it tells the manufacturer which materials must be used. *USA Petroleum Corp.*, 821 F.2d at 627; *J.L. Simmons Co.*, 188 Ct.Cl. at 689, 412 F.2d at 1362. When a specification includes a requirement that the product conform to certain standards for density, tensile strength, or ability to withstand vibration, for example, the distinction between design and performance specifications becomes more clouded. The categorization of such requirements must depend on the circumstances attendant to manufacturing the product or products covered by the particular specification, if the distinction between design and performance specifications is to have any theoretical integrity. At the crux of this distinction is the degree to which the contractor or manufacturer is free "to exercise his ingenuity in achieving that objective or standard of performance, [and] selecting the means" to do so. *J.L. Simmons Co.*, *id.* When the contractor is left no discretion or choice in the materials to be used, the specification (or

portion of it) is design-type. The specification is no less a design specification when, although a particular material or composition is not required expressly, it is apparent that only one material or a certain composition will enable the product to meet the performance standards expressed in the specification. By contrast, the very same performance standard can be construed as a performance specification if the manufacturer remains free to exercise its ingenuity in meeting the standard because more than one material or composition will suffice.

For those asbestos products sold by Johns-Manville to the Government for which the Navy's specification did not list asbestos as a compositional requirement, the repeated testimony by Johns-Manville's expert witnesses that asbestos was the only material that would have enabled its products to meet the performance standards of the subject specification is persuasive that those specifications, when viewed against the background of contemporaneous materials technology, required the use of asbestos. Consequently, they must be considered to be design specifications for purposes of the warranty of specifications.

 Before a warranty of specifications can be imputed to the Government, the design specification also must be shown to have been drafted by the Government. Analysis of this element involves looking at both the degree of collaboration, if any, between the contractor and the Government, and the relative knowledge of the parties concerning the existence of the defect in the specification. Regarding the latter issue, the evidence presented by the parties on Johns-Manville's superior knowledge claim in part VII shows that Johns-Manville possessed an understanding of the hazards associated with asbestos that was equal to or superior to that of the Government, such that the company was, or should have been, aware of the alleged defects in the design specifications. *Bethlehem Corp.*, 199 Ct. Cl. at 254, 462 F.2d at 1404. Its experience as an industry leader

in the manufacture of asbestos products, including information gained through health-related asbestos surveys and research sponsored by Johns-Manville, complaints and suits by employees, and access to or presence in the shipyards gave Johns-Manville a level of knowledge with which to recognize and appreciate the alleged defects at the time it entered into contracts under the Navy and Maritime specifications.

As is evident from the discussion above of each asbestos product, Johns-Manville participated to a significant degree in the Government's writing of the specifications for all of the asbestos products at issue except for Johns-Manville's amosite asbestos felt. Johns-Manville's participation manifested itself in various forms, including developing a commercial product around which a government specification was later written, submitting samples for testing by the Government prior to the drafting or revision of a specification, and commenting on and making suggestions on proposed specifications. By joining in the process of the drafting of specifications in these ways, Johns-Manville vitiated any implied warranty of specifications running in its favor from the Government because Johns-Manville could no longer claim to be relying on the Government's expertise with regard to the safe production of a suitable product. *See Bethlehem Corp., id.* With regard to amosite asbestos felt, even though Johns-Manville's development of the product began after the Navy's issuance of the specification covering that type of product and that specification was drafted by the Government, Johns-Manville did not rely on any superior knowledge of the Navy in developing the product. Rather, the company's extensive manufacturing experience with asbestos felt products and its awareness of the hazards associated with asbestos overshadowed any guidance from, or reliance on Navy specifications that Johns-Manville might have perceived.

For these reasons Johns-Manville's claim under a theory of an implied warranty of specifications fails for all asbestos products sold to the Navy or the Maritime Commission during World War II.

## VII. *Breach of the duty to reveal superior knowledge*

### A. *Background*

 Johns-Manville claims that the Government breached its duty to reveal superior knowledge affecting the cost of performing its World War II supply contracts for asbestos-containing products. According to Johns-Manville, the Navy and the Maritime Commission failed to reveal information about the hazards to the health of shipyard workers caused by asbestos dust exposure and about the lack of enforcement of industrial hygiene regulations, resulting in unsafe working conditions in shipyards. To recover on such a claim, a contractor must prove that the Government did not meet its "duty to disclose its superior knowledge covering factors that may affect the cost or duration of contract performance." *Helene Curtis Industries, Inc. v. United States,* 160 Ct. Cl. 437, 444, 312 F.2d 774, 778 (1963). On defendant's motion for judgment on the pleadings, the questions whether the Government's knowledge about health hazards to shipyard workers and shipyard conditions was actually superior and whether the Government breached the duty such superior knowledge would impose to reveal that knowledge to the contractor were fact questions that required trial. *Johns-Manville Corp.,* 12 Ct. Ct. at 31.

The Court of Claims in *American Ship Building Co. v. United States,* 228 Ct. Cl. 220, 225, 654 F.2d 75, 79 (1981), specified four elements of the cause of action:

(1) [A] contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

(Citation omitted.) Trial confirmed a failure of proof on the first element, as discussed in part X, so that the balance of this

section serves only to make the record complete,[20] underscoring Johns-Manville's inability to satisfy the second through fourth elements. The opinion on the motion for judgment on the pleadings also addressed the claim by plaintiff manufacturers in two other asbestos cases that the Government had superior knowledge of health hazards incident to the manufacture and use of asbestos containing products. *See* 12 Cl. Ct. at 31. Johns-Manville does not make this claim, but the second element of the *American Ship Building* standard requires proof that the contractor had no knowledge on point. The question in this case becomes whether Johns-Manville's knowledge of the health hazards incident to the manufacture and use of asbestos-containing products applied to their use in the shipyard context.

Trial also disclosed a questionable track record in the Government's health and safety activities in the shipyards. However, it is the task of cases like this to dissect the Government's conduct over 40 years after the fact in an antiseptic context removed from the harsh realities of war. As Johns-Manville's witness, Dr. Leonard J. Goldwater, a former Navy Industrial Health Officer during World War II explained, the Navy and the Maritime Commission could have built ships in a way to minimize health and safety hazards in shipyards, but he "recognized the fact that if we tried to do all the things that might have protected these people, we would have gotten no ships built and that seemed to me a more important concern." One could argue that Johns-Manville should not bear the consequences of wartime realities, but that argument fell before the purveyors of retrospective strict liability in *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). The issue for decision here is not whether

the Government sacrificed the health of shipyard workers to the war effort (and the court finds that the record does not support a finding that shipyard workers were compromised, but that the Government took reasonable health and safety measures regarding asbestos use in the shipyard environment consistent with the knowledge of the incidence of asbestosis among shipyard workers at the time). The issue, rather, is whether the Navy and the Maritime Commission possessed knowledge superior to what Johns-Manville knew or should have known about shipyard asbestos exposure and its health consequences to workers in the shipyards.

The evidence will be reviewed, first, to determine the shipyard conditions during World War II and, second, the Government's knowledge about both the risks of exposure to asbestos dust and enforcement of health standards in shipyards. Finally, the evidence on Johns-Manville's knowledge during the period will be evaluated to determine if the Government's knowledge, indeed, was superior.

### B. *Shipyard conditions*

#### 1. *In general*

During World War II, the United States experienced an unprecedented need for increased shipbuilding capacity, with initial efforts supporting Great Britain. Following the attack on Pearl Harbor and the entry of the United States into the war, President Roosevelt stated that "[t]he moving of men and munitions of war to the appropriate theaters of operation [became] one of the most vital necessities of our war program." In addition to new construction, substantially increased shipyard capacity was needed to repair war-damaged ships. To meet these needs, 99 new shipyards with capacity to build large combat or merchant ships were constructed, and

20. This is the lead case of ten cases, and the efforts of the parties deserve findings on this major cause of action. Johns-Manville was insistent that the trial was the first opportunity to display the Government's role in the asbestos health crisis and to allow Johns-Manville's responsibility to be adjudicated in view of the Government's conduct. Although this opinion considers the evidence on the second through fourth elements of the *American Ship Building* standard, the court views its ruling as signaling that a claim alleging superior knowledge about injuries and consequent third-party liabilities occurring after fixed-price contracts have been performed fails to state a claim for a breach of the duty to reveal superior knowledge.

existing yards were expanded at a cost to the Government of more than $2 billion by the end of 1944, as discussed in part III. In order to meet a production schedule described as "nothing short of fantastic" by S.M. Robinson of BuShips in a memorandum to the Secretary of the Navy, shipyards operated on a 24-hour basis and the typical workweek had increased to 48 hours by August 1941. New workers were hired at an unprecedented rate, such that the number of workers increased from 120,000 in 1939 to 1,700,00 in December 1943. Inevitably, many of these new workers were inexperienced and required training in the trade to which they were assigned, and the substantial rate of turnover intensified this training need. John B. Crawford, sales engineer for UNARCO Industries, Inc., during the war, who was responsible for training insulators in the proper use of the company's asbestos-containing products, found turnover a problem:

Q. Did this turnover pose any problem to you in trying to get your point across as to techniques?

. . . .

A. Well, when you preach the gospel one week and you come back two weeks later and you've got out of a crew of 10 people, eight new people, frustration sets in. I mean you've got to go back over and cover the same ground again. And this was a continual problem.

The combined effects of the large number of workers and the frantic pace necessary to meet wartime production schedules created a shipyard environment variously described as "an anthill with a million ants crawling around" or a "beehive". Several witnesses testified that frequently men from several trades, such as pipe fitters, welders, electricians, and pipe insulators, worked simultaneously within the same working space aboard ships. According to Richard B. Couch, Naval Architect at Puget Sound Navy Yard in Washington, a repair yard, different trades worked together so that ships could be put back in service more expeditiously.

Because a ship's interior would have been divided into compartments by the time pipe insulation was applied, insulation work was performed in confined spaces. Nelson L. Best, a district engineer with Johns-Manville on the West Coast who made repeated business visits to shipyards during the war, testified that ship compartments typically measured about 15-by-20 feet with 9-foot ceilings. Clyde Barnett, head of Johns-Manville's Government Department in New York during the war, was called to the Brooklyn Navy Yard for advice about installation of pipe insulation. He left after only a half hour in part because he found the conditions so unpleasant. There were 40 or 50 men working in a 40-by-40 foot room, requiring him to crawl over some workmen to reach the area where pipecovering was applied.

Practically any work with insulating materials released asbestos-containing dust into the air. Witnesses testified that 1) the process of applying pipe covering to pipes created dust because the covering was cut to fit the pipe length and often mitered; 2) tearing asbestos cloth from 100-foot rolls to proper length released dust; 3) mixing asbestos cement released dust because it involved first dumping the dry powder into a bucket; 4) cleaning up debris on ships under construction put dust in the air as it was swept into buckets and dumped into a scrap box on the open deck or was blown away with air hoses; and 5) removal of pipe insulation was a dusty operation since it involved cutting and ripping of the material.

When a ship was nearing completion, its own air ventilation system could be used to help eliminate some of the dust from the air, but in earlier stages ventilation generally was impractical because portable equipment took up too much space. Some witnesses reported having seen makeshift ventilation equipment that was more or less effective. Pasquale Orlando, a former ship cleaner at Fore River, reported that there was no suction-type ventilation on the ships he cleaned, but remembered a "barrel-type air mover" that circulated the air in a room. He also testified to having seen no one wearing respirators, although the dust was so thick you could "cut it with a knife."

Most of the eleven former shipyard workers who testified at trial or by deposition recalled that there was no ventilation on ships under construction. H.L. Olson, who worked at the Boston Navy Yard as a machinery ship superintendent on construction of new ships, testified that he saw no mechanisms for dust removal. Thomas P. Drinan, a boilermaker at the Boston Navy Yard, frequently removed asbestos insulation in order to repair a boiler. This process released a great deal of dust, but there was no exhaust system to remove the dust and he never wore a respirator.

Although insulation workers in shipyards worked for the most part on the ships themselves, many shipyards had fabrication shops for preliminary work, including cutting and sewing asbestos fabric to cover irregularly shaped objects, such as flanges and valves, and cutting and pounding pipe covering to shape. These shops more closely resembled a manufacturing plant setting, and attempts were made to provide dust protection for workers. Dr. Goldwater, who served as Industrial Health Officer at the Brooklyn Navy Yard, told of the use of local ventilation to remove the dust at its source and of measures to moisten the material in the shops, an impractical process aboard ship because of lack of drainage.

These anecdotal reports were borne out by a study conducted late in the war, commonly referred to as the Fleischer-Drinker Report, of two Navy and two private shipyards. The Fleischer-Drinker Report found that there was no ventilation aboard ships under construction and that the local exhaust system present at sawing and cutting areas largely was inadequate. Fleischer, Viles, Gade & Drinker, *A Health Survey of Pipe Covering Operations in Constructing Naval Vessels*, 28 J. Indust. Hygiene and Toxicology, 8, 12–13 (1946) [hereinafter the *Fleischer-Drinker Report*]. The dust counts taken in the course of the study show that there were higher counts aboard ship than in shops and that cement mixing and bandsaw cutting of pipe covering created the most dust.

## 2. *Test shipyards*

The Boston Navy Yard employed shipfitters, pipefitters, pipe insulators, sheetmetal workers, electrical workers, welders, boilermakers, machine workers, electronics workers, riggers, and forgers, as well as all the management and professional staff required to construct 65 large combat ships, convert and repair Navy vessels, and outfit ships constructed at non-Navy yards. Most of this work force, that swelled from 12,000 in 1940 to 46,000 in 1944, were putting in six nine-hour days per week to enable the yard to meet or exceed its construction quotas and to repair large numbers of ships (887 in 1943 alone). Both construction and repair work required large quantities of asbestos insulation materials, and there was an awareness at least from 1942 of a dust hazard, as section C. of this part discusses in connection with a survey of private shipyards undertaken by Dr. Philip Drinker at the request of the Navy and the Maritime Commission. Attempts to deal with the problem included activities by the Safety Section to discover and eliminate unsafe conditions, including industrial dust hazards.

One of the seven test claimants from the Boston Navy Yard, Chester H. Anderson, performed a variety of jobs involving asbestos insulation. He removed asbestos pipe covering from damaged pipes, applied new pipe coverings, mixed asbestos cement, and worked in the fabrication shop cutting amosite sheets for valve covers. Although most of these tasks produced dust, the only precaution that Mr. Anderson recalled in his deposition testimony was the wetting of the amosite sheets. He heard no warnings about dust hazards, saw no respirators being worn, and remembered no exhaust ventilation.

The Philadelphia Navy Yard built 25 vessels during the war, including battleships, aircraft carriers, heavy cruisers, destroyers and destroyer escorts, and a minelayer, requiring an increase of from 19,000 to 53,000 civilian workers. Although none of the three test claimants from this shipyard testified, Edward J. Downey, who worked on ship construction at the Philadelphia Navy

Yard, testified to being present when pipes were insulated and when insulation was being removed. Both operations caused dust, but he never saw respirators being worn, nor did he observe any exhaust system in the area. During this work other tradesmen usually were in the area, also not wearing respirators. Mr. Downey had no memory of having been told that asbestos dust was dangerous or that he should wear a respirator. He reported never having seen any dust counts being taken.

Consolidated, a newly built contract yard in Orange, Texas, constructed more than 130 destroyers and destroyer escorts during the war. According to test claimant W.D. Smith, an electrician who testified by deposition, the working atmosphere aboard ships was confined and hot, with workers from several trades all working in close proximity. Mr. Smith usually worked on engines or turbines in the lower section of the hull aboard ship while insulation workers were insulating steam pipes over his head. He was exposed to dust because insulators would leave behind pieces of asbestos-containing material on catwalks that would powder and fall on him when walked on. Although Mr. Smith was told to wear a hard hat and goggles, he was never warned to wear a respirator. He left his job with the shipyard because he felt that the smoke and dust in the air had begun causing breathing problems.

Fore River, in Quincy, Massachusetts, built 45 combat vessels for the Navy and eight cargo vessels for the Maritime Commission. The work force increased from 17,000 before Pearl Harbor to 32,000 in 1943. Test claimant Joseph Teta, Jr., also testifying by deposition, described a scenario similar to that in other shipyards. As a welder, Mr. Teta frequently worked near people in other trades, including pipe coverers. He did not remember seeing anyone except painters wearing respirators, nor was he told that inhaling asbestos dust was dangerous. Exhaust ventilation aboard ships under construction consisted of "suckers" that would remove smoke from a welder's torch, but were not used for removal of asbestos dust.

C. *Knowledge of the Navy and the Maritime Commission*

Government publications well before the beginning of World War II indicated an awareness of a health hazard from exposure to asbestos dust and the efficacy of various precautions. The Department of Labor in 1918 reported a finding that inhalation of asbestos dust led to shortness of breath and physical incapacity and "that 13 deaths from asbestosis had occurred among asbestos textile workers...." U.S. Treasury Dept., Public Health Service, *A Study of Asbestosis in the Asbestos Textile Industry*, Pub. Health Bull. No. 241, 1 (1938) (citing the published findings of F.L. Hoffman) [hereinafter the *Dreessen Study* ]. A 1922 Naval Medical Bulletin included asbestos work in a list of hazardous occupations and noted the wearing of respirators as means of curtailing the risk. Navy Dept., Bureau of Medicine & Surgery, Div. of Preventive Medicine, *Instructions To Medical Officers*, 17 U.S. Naval Med. Bull. 886, 898 (1922).

In 1930 Dr. E.R.A. Merewether published in England the first industry-wide survey of health hazards to asbestos workers. His study focused on asbestos textile workers, since they were exposed to pure asbestos dust. The investigation was prompted by the discovery of workers with lung fibrosis who had been exposed to asbestos dust and the resultant need to establish whether those were exceptional cases or evidence of a grave health risk. Dr. Merewether found that there was a direct link between the intensity of exposure and length of latency, a concept explaining the delayed manifestation of symptoms of asbestos-related disease. Dr. Merewether was aware from his acquaintance with publications in the medical literature that a unique attribute of pulmonary fibrosis, which had acted to retard recognition of some dust-related diseases, was its latency:

The insidious onset and unobtrusive signs and symptoms of the disease in its earlier course, its covert advance by imperceptible stages, its points of resemblance latterly to fibroid tuberculosis, with which infection it is sometimes asso-

ciated, and the migration of those affected from the industry, have all combined to delay its recognition as an entity, and to obscure the causal agent.

E.R.A. Merewether & C.W. Price, *Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry* 17 (1930). Dr. Merewether also found that the intensity of exposure, *i.e.*, the amount of dust in the air, varied as a function of the process being performed, such as carding, spinning, and so forth. *Id.* After analyzing the various processes and specific preventive measures, Dr. Merewether gave overall recommendations for control of asbestos dust: 1) local exhaust ventilation at the source; 2) use of enclosed methods for processing; 3) use of wetting methods; and 4) separation of dust producing processes. *Id.* at 32, 33. This report was published in full in 1930 both in the *American Journal of Industrial Hygiene* and in summary form in the U.S. Labor Department's *Monthly Labor Review*, indicating knowledge by the Government of this British research.[21]

There is evidence from as early as 1933 of recognition within the Government of asbestosis' latency characteristics. A review of a study published by the Department of Labor stated that one of the clinical features of the disease is "the slow development of a characteristic type of fibrosis in which the patient may be comparatively free from symptoms for several years." U.S. Dept. of Labor, *Pulmonary Asbestosis*, 37 Monthly Labor Rev. 1385 (1933). A pioneer course given at Harvard and Columbia Universities to train Naval officers in industrial hygiene included the concept that X-rays could show indications of asbestosis well before the worker was aware of symptoms.

The United States Navy itself was aware before the war that symptoms of asbestosis could be manifested years after initial exposure. For example, the Surgeon General of the Navy in 1939 indicated knowledge of the characteristics of asbestosis and warned that the non-occurrence of symptoms or negative X-ray indications found in men exposed to asbestos dust for periods of 1.7 to 10 years did not "preclude . . . the future development of asbestosis by continued exposure to present occupational conditions." *Annual Report of the Surgeon General to the Secretary of the Navy* 24 (1939).

At the request of the North Carolina State Board of Health, the United States Public Health Service (the "USPHS") conducted a survey of asbestos textile plants under the direction of Dr. Waldemar C. Dreessen, past Assistant Surgeon General

---

**21.** In commenting on Dr. Merewether's study of health conditions of the asbestos industry in England, Dr. Edward A. Gaensler, Johns-Manville's medical expert on asbestos diseases, highlighted the different approaches to asbestos health problems taken in England and in the United States. According to Dr. Gaensler, Dr. Merewether in 1930 recommended that all cases of asbestosis be reported to the central government, asbestos-related deaths be autopsied, and central records be maintained noting which factories and industries led to the most complaints. He also recommended that all workmen in the country, regardless of what industry they were hired from, should receive equal compensation through a common evaluation board for all asbestos-related claims. Dr. Gaensler said that England's Asbestos Board was established by 1933 patterned on its experience with the pneumoconiosis Board dealing with coal mining and silicosis. Dr. Gaensler remarked, "In other words, . . . [Dr. Merewether] suggested all these things in 1930 that we have not been able to accomplish in 1987 in the United States."

The approach taken in the United States was *ad hoc* litigation. The first lawsuit filed against Johns-Manville in 1929 by a former employee was settled in 1933 for $2,000. In the late 1970's and early 1980's, Johns-Manville settled claims for lawsuits with five of the 15 test claimants for $3,000 or less. These claimants were all represented by counsel. It was the view of former district judge H. Curtis Meanor, who had presided over a mass settlement of 683 asbestos cases in the District of New Jersey against manufacturers, including Johns-Manville, and was qualified as an expert on the reasonableness of settlements in asbestos-related cases, that many of the 15 settlements were premature. Had claims been settled after the diseases progressed, the claimants could have been recompensed in an amount more reflective of their medical disability and economic dislocation. Indeed, the evidence on settlements and judgments in the case at bar demonstrated that a claimant's recovery was not dependent on the disease or disability, but, rather, on where suit was brought and the expertise of plaintiff's counsel. *See supra* note 16.

of the USPHS, with the following objectives:

(1) [t]o make a medical study of the effects of long-continued inhalation of asbestos dust on the human body;

(2) to identify the manufacturing processes that create dust and to recommend practices and, when necessary, equipment that will reduce the dust exposure of workers; and

(3) to find out what concentration of asbestos dust can be tolerated without injury to health.

The survey results, published as the *Dreessen Study* in August 1938, included a detailed clinical picture of the disease asbestosis, a statistical analysis of incidence, the conclusion that the incidence increases with increases in concentrations of and length of exposure to dust, and a threshold value for safe exposure to asbestos dust. This value, which became known as the Dreessen Standard, was 5 million particles per cubic foot ("mppcf") of air. Dr. Dreessen observed: "It would seem that if the dust concentrations in asbestos factories could be kept below 5 million particles ... new cases of asbestosis probably would not appear." *Dreessen Study, supra*, at 117. The study describes exhaust/ventilation techniques for controlling asbestos dust in various industrial settings.

Although the *Dreessen Study* was conducted in a factory setting, several statements made by the Navy following its publication indicated awareness that a similar hazard could be found from work with asbestos in shipyards. In a handbook published by the Navy for its hospital corpsmen, there are instructions to check, preferably on a daily basis, for asbestos hazards that exist in the shipyard to which they are assigned, that masks should be available to those working with asbestos, and that workers should be given special physical examinations. Navy Dept., Bureau of Med. and Surg., *Handbook of the Hospital Corps—United States Navy* 519 (1939).

The Commandant of the Norfolk Navy Yard ordered in April 1940 that since those employees of the shipyard working with amosite, asbestos, or pipecovering were "[e]ngaged in [h]azardous [w]ork," they should be given medical examinations, including X-rays, twice a year. Norfolk Navy Yard, *Cmdt. Order No. 21/40* (Apr. 11, 1940). A November 1940 statement by Navy Medical Corps Captain Ernest W. Brown cited asbestosis as a potential occupational disease in Navy yards "among workers engaged in the manufacture of asbestos insulating covers for flanges, valves, and high temperature steam turbines." Brown, *Industrial Hygiene and the Navy in National Defense*, War Med., 3, 12 (1941). In December 1940 an Assistant Secretary of the Navy warned the Commandant of the Charleston Navy Yard, routing a copy of his memorandum to the Bureau of Medicine and Surgery, of the dangers of working with amosite and recommended that those so engaged wear respirators and have semi-annual physical examinations. A 1941 Navy Bulletin recognized that asbestos was an occupational health hazard in Navy yards and described several methods for avoiding inhalation of asbestos dust by workers. Navy Dept., Bureau of Med. and Surg., *Industrial Hygiene and the Navy in National Defense*, 39 U.S. Naval Med. Bull. 321 (1941).

There was also an awareness within the Navy of the standard for safe exposure identified by the *Dreessen Study*. A 1944 memorandum from the Navy's Assistant Chief Health Consultant refers to the fact that most states had adopted the 5 mppcf standard as the maximum allowable concentration. Also, from 1941 on, many Navy industrial hygienists were trained in a three-month course at Harvard and Columbia Universities in which specific reference was made to the *Dreessen Study*.

It is important to note that, although 5 mppcf is referred to as the Dreessen Standard, at the time it was published it was merely a pragmatic best guess. "Because clean cut cases of asbestosis were found only in dust concentrations exceeding 5 ... [mppcf], and because they were not found at lower dust concentrations, 5 ... [mppcf] may be regarded tentatively as the threshold value for asbestos-dust exposure until

better data are available." *Dreessen Study, supra,* at 91. It was referred to in writings on industrial hygiene, referenced in commenting upon the meaning of dust counts, and taught in the 90–day courses at Harvard and Columbia Universities, primarily because it was the only standard available. In addition to the fact that the standard was not derived through scientific experimentation, the dust counts upon which the Dreessen Standard were based are believed to be total dust, not asbestos dust, since the technique Dreessen used required counting all dust. Thus, since the various asbestos products used in shipyards contain widely varying percentages of asbestos, a total dust count did not indicate accurately worker exposure to asbestos. That was the best that could be done at the time, however. For example, the leading study published in 1946 as the *Fleischer-Drinker Report,* which attempted to differentiate between total and asbestos dust counts, was criticized years later in part because the technology of the time did not permit the differentiation to be made reliably.

Commander C.S. Stephenson, Chief Naval Officer for Preventive Medicine, in a March 1941 memorandum to the Surgeon General of the Navy, listed the various health and accident concerns found in Navy yards and his assessment of how well the problems were being addressed. As to workers exposed to asbestos, he opined that "I am certain that we are not protecting the men as we should."

Cmdr. Stephenson's concerns arose out of a tradition of leadership by the Navy in the industrial hygiene/occupational medicine field dating back to the Navy's response in 1917 to enactment a year earlier of the Federal Workmen's Compensation Act. As the employer of the largest heavy industrial work force in the Government, the Navy first sought to reduce the high payment rate by creating a safety engineer position within shipyards and by appointing 16 industrial hygiene medical officers in 1922. An occupational medicine program which in 1925 was considered "state of the art" has been in effect ever since. Dr. Samuel A. Forman, Johns-Manville's expert on the history of Navy industrial hygiene and occupational medicine, considers that the Navy pioneered the field in the 1920's. The leadership continued. Publications in the *Naval Medical Bulletin* included concepts for protecting workers exposed to toxic substances that were the "underpinnings of optimal practices of those professions in the 1930's," in Dr. Forman's opinion.

Although when Cmdr. Stephenson became head of the Preventive Medicine Division in 1938 he inherited an organization at the forefront of knowledge, there was concern after Pearl Harbor about the ability of the existing organization to cope with the inevitable increase in safety and industrial hygiene problems. Preferring to develop a capability to handle the problem within the Navy and thus to be in a position to reject the USPHS's offer of assistance, Cmdr. Stephenson worked with Dr. Drinker to develop three-month programs at Harvard and Columbia Universities. The programs trained both physicians and laymen in investigating industrial hazards and implementing preventive measures, since medical officers already in the shipyards were occupied totally with treating illness and accidents. The first of these courses, conducted in spring 1941, produced industrial medical officers to fill newly created positions within the medical departments of Navy yards. These industrial hygiene medical officers had responsibility for pre-employment physical examinations; periodic examinations of workers exposed to potential hazards (including asbestos); inspection of the shipyards for potential hazards; and advice to the Safety Engineer on measures for their control.

In a Navy Department press release dated March 3, 1941, Acting Secretary of the Navy Forrestal is quoted as saying that the newly augmented preventive medicine program was undertaken "[t]o continue the excellent work of the past, and to cope with the new problems constantly arising incident to technological advances, and the increased hazards due to the increasing number of civil employees incident to the existing emergency." The press release includ-

ed a reference to the three-month courses and a statement that as soon as the necessary personnel are trained, an "Industrial Health Office will be established in each Naval district to tackle the task of minimizing occupational diseases."

In his more detailed description of the enhanced industrial hygiene program in shipyards, Dr. Ernest W. Brown, a captain in the Medical Corps, listed asbestosis among the chief occupational health hazards found in shipyards and indicated that the cause was breathing asbestos dust. Although Dr. Brown found no asbestosis in X-rays of workers in the pipe insulating shop at the New York Navy Yard nor in reports from two other Navy yards, he recommended that all those in the trade be examined. In addition to X-rays, he proposed wetting the material, ventilation, and use of respirators as preventive measures. Brown, *Industrial Hygiene and the Navy in National Defense*, War Med. 3 (1941).

The concern about health in shipyards within both the Navy and the Maritime Commission led to the appointment in late 1942 of Dr. Philip Drinker of the Industrial Hygiene Department of Harvard University to undertake a study of 20 non-Naval shipyards. Although the impetus was an increase in accidents, the jointly sponsored study was to examine the shipbuilding industry "from the standpoint of accident prevention *and* the control of industrial diseases." Roche, *Joint U.S. Navy Department-Maritime Commission Safety and Health Program*, 7 Personnel Admin. 20 (1944) (emphasis added). The study, conducted by Dr. Drinker with a number of Navy industrial hygienists and safety officers, surveyed six yards with Navy contracts, eleven Maritime Commission contract shipyards, and three shipyards doing work for both agencies. It included findings on availability of medical personnel in the yards, sanitation, food preparation, vermin control, a wide range of industrial hazards, and suggestions for improving conditions. The 20 surveys revealed the following problems with regard to asbestos dust exposure:

—Ventilation and exhaust systems were either not used, or were used ineffectually;

—Neither foremen or workers knew the risk of breathing asbestos dust;

—Dust was all over—asbestos work was not segregated; and

—Yards were "careless or ignorant or both in the use of respiratory protective equipment."

*See* Talk by Dr. Philip Drinker before the Maritime Commission (Oct. 20, 1942).

Following the survey, Dr. Drinker and his associates developed a manual of tentative minimum standards for health and industrial safety in contract shipyards. These standards were adopted unanimously by a national conference of shipbuilders in December 1942; in early 1943 were adopted jointly by the Secretary of the Navy and the Chairman of the Maritime Commission; and in January 1943 were published as U.S. Navy Dept. and U.S. Maritime Commission, *Minimum Requirements for Safety and Industrial Health in Contract Shipyards* (1943) [hereinafter the "Minimum Requirements"]. The Minimum Requirements established standards for medical personnel in shipyards as a function of number of persons employed; established an inspection program for sanitation; and identified eight industrial diseases common to shipyards, including asbestosis. For each disease the work producing the risk was listed and recommended measures for safe working conditions were given. The recommended measures for asbestosis were

1. [s]egregation of dusty work and,

2. (a) Special ventilation: Hoods enclosing the working process and having linear air velocities at all openings of 100 feet per minute, or

 (b) Wearing of special respirators

3. Periodic medical examinations.

When published, the Minimum Requirements were accompanied by a cover letter dated January 1943, stating:

Each contractor is hereby given notice that the Navy Department and the Maritime Commission will expect full and complete compliance with the minimum

standards which bear the approval of the Navy Department and the Maritime Commission, ...

Overseeing implementation of the Minimum Requirements was the responsibility of the Supervisors of Shipbuilding in the private shipyards and the Resident Plant Engineers in Maritime Commission yards.

The confusion engendered in trying the same claims as torts in federal district court and as contract actions in this court, as discussed in *Keene Corp. v. United States*, 12 Cl.Ct. 197, 209, 211 (1987) (order granting and denying motion to dismiss pursuant to 28 U.S.C. § 1500), *appeal docketed*, No. 87–1332 (Fed.Cir. May 7, 1987), manifested itself most strikingly during trial of the Government's alleged breach of duty to reveal superior knowledge. Johns-Manville's direct and third-party actions in federal district court charge the Navy and the Maritime Commission with breaching tort duties to enforce health and safety standards in shipyards. With respect to the World War II period, an appeals court has held that the Minimum Requirements, *inter alia*, did not supply such a duty. *Shuman v. United States*, 765 F.2d 283, 292 (1st Cir.1985); *accord In re All Maine Asbestos Litigation* (B/W Cases), 651 F.Supp. 913, 922 (D.Me.1986), *reconsid. denied*, 655 F.Supp. 1169 (D.Me.1987).

At issue in *Shuman* was whether the discretionary function exception of the Federal Tort Claims Act, 28 U.S.C. § 2680(a) (1982), barred a tort action alleging that the Navy failed to enforce the Minimum Requirements at Fore River, one of the test shipyards in this case. The issue was resolved adversely to plaintiff, a shipyard worker's widow, on appeal after a detailed discussion of the same documentary evidence relating to the background and intendment of the Minimum Requirements that Johns-Manville introduced in the case at bar. *See* 765 F.2d at 287, 292–93 & n. 7. The First Circuit concluded that the Minimum Requirements and their "compliance structure" were "basically an advisory and educative program for contracting shipyards so as to augment the war effort." *Id.* at 293.

Johns-Manville contends that it does not seek to prove that the Government breached a tort duty in its claim involving superior knowledge. Because the Minimum Requirements were mandatory and promulgated by the Government, according to Johns-Manville, the failure of the Navy and the Maritime Commission to enforce them in the shipyards was all the more egregious, suggests a heightened knowledge on the part of the Government, and actively misled the unwitting public (including asbestos manufacturers) who reasonably believed that the Minimum Requirements were being enforced. Johns-Manville also examined the record in *Shuman*, pointing out the much less comprehensive trial record in that case. *Shuman* was a four-day trial, with a 435–page transcript and ten volumes of exhibits, primarily workers' compensation files and statutes. In addition to the same documentary evidence on the Minimum Requirements considered in *Shuman*, testimony and introduction of other documents on the superior knowledge issue in this case consumed approximately 2,000 pages of transcript, and the case at bar had the benefit of the testimony of Dr. Kenneth W. Nelson, a Navy Health Consultant who was involved in the survey leading to the Minimum Requirements. There was no witness on point in *Shuman*. Nonetheless, comparison of the record in this case with the discussion in *Shuman* reveals that the key directives as to the force and effect of the Minimum Requirements were before the First Circuit and that Mr. Nelson's testimony, although illuminating as to his understanding that the Minimum Requirements were mandatory, would not be dispositive, in any event.

This court could not find that the Minimum Requirements were obligatory without intruding into the province of other federal courts charged with administering the Federal Tort Claims Act. The parties did not even argue the body of law that interprets with no little difficulty the discretionary function exception. *See, e.g., Baker v. United States*, 817 F.2d 560 (9th Cir.1987). Since Johns-Manville is not charging that the Minimum Requirements

established a contractual duty, this court would flycast to determine whether the Minimum Requirements form the basis of any duty pertinent to Johns-Manville's breach of contract claims. The documentary evidence concerning implementation of the Minimum Requirements displays an evolving confusion as to whether the Navy and the Maritime Commission had authority to order compliance in the private shipyards. The First Circuit resolved the question in the negative, reserving to the Government a reportorial and advisory role.

Furthermore, a determination that a duty existed would be urged to the district courts before which the precise issue is pending as a finding which could be deemed binding, even though this court was not called upon to analyze the tort law that instructs whether the Minimum Requirements created an actionable duty. *See, e.g., Johns-Manville Sales Corp. v. United States,* 622 F.Supp. 443 (N.D.Cal. 1985) (order granting and denying motion to dismiss). For these reasons, the court declines to make any findings with respect to whether the Minimum Requirements were mandatory. Instead, the focus will be what the Navy and the Maritime Commission knew through developing and administering the Minimum Requirements— to the extent they were put into effect—in public and private shipyards.[22]

The Navy and the Maritime Commission assumed responsibility for monitoring industrial hygiene practices in the private shipyards and established four regional offices employing some of their newly trained industrial hygienists to conduct periodic reinspections of the shipyards to determine to what extent the Minimum Requirements were being implemented. Dr. Nelson, who also participated in many of the shipyard inspections following adoption of the Minimum Requirements, testified that his "general impression was that the Minimum Requirements were not being complied with." Contemporary reports of these inspections also indicate that difficulties were encountered in obtaining compliance. For example, a July 1943 report on inspection of the Seattle-Tacoma Shipbuilding Corporation noted that "[m]ost of the dust that escapes from the cutting operations finds its way eventually to the rafters overhead, where it is thickly settled. Frequent removal of this dust from the shop is not practiced."

After a reinspection on January 20–21, 1944, of the Defoe Shipbuilding Company in Bay City, Michigan, inspectors reported that "[t]he accumulation of dust on rafters and wires as well as conspicuous quantities of dust floating in the air of the room point to a dangerous dust hazard." This finding was particularly noteworthy since, as Dr. Nelson testified, 5 mppcf of dust is not visible in normal conditions. Moreover, although the Minimum Requirements called for use of respirators whenever local exhaust systems were inadequate to remove most dust, as discussed previously, they were infrequently used. This was due, in part, to shipyard workers not being warned of the necessity to wear respirators, but also because of substantial worker resistance to their use.

Dr. Goldwater, the Navy Industrial Health Officer, testified for Johns-Manville that the proper use for respirators, due to their engineering limitations at the time, was for short durations of a matter of minutes or intermittent exposure. His experience lay in Navy, not private shipyards. Because they have made claims against Johns-Manville, the court credits Dr. Goldwater's testimony over that of former shipyard workers who testified that respirators were not provided. Not only was Dr. Goldwater more disinterested, but he was an exceptionally acute witness. Respirators were available in at least Navy yards, but, as Dr. Goldwater testified: "They were around, they were supplied, but usually,

---

22. *Shuman* disposes of Johns-Manville's argument that the Walsh-Healey Act, 41 U.S.C. § 35(e), imposed enforceable obligations on the Government running to employees of government contractors. 765 F.2d at 290. The question can be resolved as a matter of statutory construction, and this court concurs fully with the First Circuit's analysis that the act created no such duties.

they were hanging on the wall somewhere." Respirators became hot and uncomfortable and obstructed vision. When a respirator "would be required for an entire work period, then there is serious objection on the part of the wearer.... They were very, very rarely worn.... As a practical matter, people won't wear respirators...." He agreed that even if told to do so, workers generally did not wear respirators.

Norman J. Adams, the former senior sales engineer for Johns-Manville, shared a vivid anecdote:

> I remember at one time Dan Rather was going to really blow the top off on Manville plant. And he went down there and one man had died, and after he made the survey, we were going to get a real blast. And he went in to have a few drinks with the gang at the Pulaski hall there, and as it turns out, the other members there said, well, old Joe, that damn fool. He never would put on a filter and we told him so. And that blew Dan Rather's story. And that's the human element you face.

In addition to worker resistance, respirators were not considered complete protection from dust and were recommended only as a "second line of defense" where exhaust systems were not effective. E.R.A. Merewether & C.W. Price, *Report on Effects of Asbestos Dust on the Lungs and Dust Suppression in the Asbestos Industry, supra,* 17. In 1930 Dr. Merewether strongly emphasized procedures to remove dust locally. Because respirators only provide partial protection, "there is a real danger that the use of them may give a sense of false security...." *Id.*

In these circumstances there is no justification in fact for the assumption that shipyard workers would have worn respirators had the Navy and the Maritime Commission been more vigilant in enforcing their use, or that, had respirators been used, they would have significantly decreased later incidence of lung disease. However, the issue is not whether the Navy and the Maritime Commission neglected to enforce the wearing of respirators, but whether the

Government's knowledge about the extent that respirators were used was superior to Johns-Manville's.

In response to a concern expressed by pipe coverers at Bath Iron Works, a private shipyard in Bath, Maine, that their exposure to amosite dust was producing respiratory problems, Dr. Drinker directed that an investigation be made of working conditions and physical examinations of employees. A progress report dated December 19, 1944, indicated that 38 of the workers with the longest exposures to asbestos dust had been X-rayed; four "were consistent with a diagnosis of asbestosis," six showed minimal changes insufficient for a "definite diagnosis of asbestosis," and the remaining 28 were negative. W.C. Dreessen & W.E. Fleischer, U.S. Navy-U.S. Maritime Comm'n War Shipping Admin. Safety and Indust. Health Program, *Report on Investigation of Asbestosis from Amosite Pipe Covering at Bath Iron Works* (1944) [hereinafter *Bath Shipyard Survey*]. The report concluded with a list of recommendations: 1) the remaining workers be X-rayed; 2) dust be controlled by segregating the dustiest operations, installing local exhaust systems, and wearing of respirators if the other two measures were inadequate; and 3) follow-up X-rays be taken of exposed workers.

In reporting the results to the Navy's Bureau of Medicine and Surgery by letter of January 31, 1945, Dr. Drinker stated that these results indicated "a fairly serious dust risk ... and make it probable that the same sort of thing will be found in other plants and yards where the same type of pipecovering materials are used." Dr. Drinker consequently recommended that similar investigations be performed at other shipyards, and a series of additional surveys was undertaken. These, however, were engineering surveys and did not include physical examinations. The results of these 1945 surveys indicated that little progress had been made in implementing the Minimum Requirements. In most surveyed yards, dust hazards continued because recommended exhaust systems had not been installed and respirators were not furnished or worn.

Since these surveys were undertaken at the behest of the Navy, conducted by Navy personnel, and the results were distributed to senior Navy and Maritime Commission officers, the conclusion is inescapable that the Navy and the Maritime Commission knew that the Minimum Requirements were not being implemented.

Another follow-up to the findings in the *Bath Shipyard Survey* was the 1946 *Fleischer-Drinker Report*, undertaken because the Bath survey had found dustiness and, most significantly, a few apparent cases of asbestosis. Moreover, because "[i]t was not felt that experience in a single yard was enough to justify any general statements on the working conditions in other yards," further investigations were warranted. *Fleischer-Drinker Report, supra*, at 9. The *Fleischer-Drinker Report* examined chest X-rays of pipe coverers in two Navy yards and two private shipyards and noted working conditions, including dust counts.

No cases of asbestosis were found in the Navy yards; two "moderate" cases were found in one private yard, and one "advanced" case in the other private shipyard out of a total of 1074 pipe coverers examined, for an incidence of 0.29 percent. In commenting upon the fact that this was a very low rate in view of what were characterized as "high dust concentration[s] found in several of the pipe covering operations," *id.* at 15, the authors offered the explanation that a pipe coverer's usual practice is to move from one operation to another, so that the dust counts recorded do not give a true picture of actual exposure. The total dust counts found in the *Fleischer-Drinker Report* for the most part are well above the 5 mppcf Dreessen Standard. The authors indicate awareness of the Dreessen Standard, but point out that it was established in a textile plant and that the dust counts taken by Dreessen used the impinger method, while Fleischer-Drinker used the Konimeter method. The reliability of the methodology and, therefore, the value of the results of the *Fleischer-Drinker Report* have been criticized, but Johns-Manville's expert witness in the history of occupational medicine in the Navy, Dr. Forman, testified that, for the 1945–1947 time period, the methods and analysis were the best of their time, even though in hindsight the Report may have been flawed.

It is clear from the foregoing that the Navy was aware in 1930 from reports about the British studies of some attributes of asbestosis and in 1938 from the *Dreessen Study* of its latency, its dose-response nature, its clinical description, and the recommended preventive measure to ventilate in order to keep dust counts below 5 mppcf. It is also clear that there was a recognition that shipyard workers were at risk. The Navy and the Maritime Commission took steps to reduce the risk by: 1) promulgation of the Minimum Requirements; 2) training and employing industrial hygienists in shipyards; and 3) undertaking numerous surveys of shipyard conditions, some including examination of workers.

The Navy learned late in the war that in spite of these efforts, the conditions continued to pose a health risk from asbestos dust, at least in part due to not implementing the Minimum Requirements. From this Johns-Manville would have the court find breach of the duty to reveal superior knowledge of that lack of implementation. As discussed above, the court makes no finding as to the mandatory nature of the Minimum Requirements. The testimony of all the medical observers, combined with the documentary evidence, justify a finding that the Government was attempting to deal with a medical hazard even before it manifested itself in worker illnesses. The shipyard environment was a warren of health and safety hazards, and industrial accidents by far were more prevalent than occupational diseases. The danger of asbestosis was known, as were methods of minimizing the risks of exposure.

The exigencies of the shipyard environment may not excuse failing to enforce precautions specific to asbestos exposure, but the lack of incidence of the disease coupled with the rudimentary precautions available and the medical uncertainty concerning the 5 mppcf standard do not

render the Government's conduct unreasonable or irresponsible. In any event, whether or not the Government failed to fulfill a duty to shipyard workers is not dispositive of whether or not the Government knew more about shipyard conditions than did Johns-Manville, or whether it had reason to believe that Johns-Manville did not know about these conditions. To satisfy the requirements of *American Ship Building,* these questions must be addressed in light of Johns-Manville's actual knowledge about the health hazards to shipyard workers and shipyard conditions.

### D. *Johns-Manville's knowledge*

Johns-Manville became aware at least as early as 1929 that exposure to asbestos dust and ensuing illness was a potential basis for suits against the company. In that year Ann Pirskowski, a former Johns-Manville employee, filed suit alleging illness and inability to work as a result of inhaling asbestos, claiming that Johns-Manville had not provided proper engineering controls nor warned her to wear protective equipment. *Pirskowski v. Johns-Manville Corp.,* No. L–1897 (D.N.J., filed May 8, 1929). Johns-Manville's Board of Directors determined to settle her claim, along with ten others, since plaintiffs' attorney had offered to settle on a favorable basis.

Although no evidence was presented as to Johns-Manville's assessment of the provability of a causal connection between those workers' inhalation of asbestos dust and their disability, Johns-Manville's attorney, Allan Wardwell, by 1929 was receiving information about asbestosis from Dr. A.J. Lanza, of Metropolitan Life Insurance Company ("Metropolitan Life"). Considered an authority on industrial dust disease, Dr. Lanza sent Mr. Wardwell in November of that year a bibliography on asbestosis and a promise to obtain copies of three articles from a British journal.

The items in the bibliography have not been identified, but it is probable that they were by Gloyne and Wood, the leading experts of the day on industrial dust diseases, who were publishing in British journals. John Page Woodard, who had re-

sponsibility for Johns-Manville's health and safety efforts from 1938 throughout the war, characterized Dr. Lanza's consultancy to Johns-Manville, which will be discussed in detail, as supplying the function of an in-house medical director during this period. Mr. Woodard indicated in his deposition a conviction that the impetus for Johns-Manville's pursuit of information on health problems from inhaling asbestos dust was awareness of the growing belief among the British experts that there was such a connection. In any event, it is clear that Johns-Manville was aware of the British research from at least the late 1920's.

There were discussions between Dr. Lanza and Mr. Wardwell about the inclusion of asbestosis in the New Jersey Workmen's Compensation Act, after which Dr. Lanza supplied Mr. Wardwell with a proposed statutory definition of "asbestosis" by letter dated November 11, 1930. Dr. Lanza attended a Johns-Manville's Board of Directors meeting on July 15, 1931, at which he indicated that including asbestosis as a compensable disease was "the only protection which the industry has and that permitting the disease to remain outside the compensation class lends encouragement to unethical lawyers and physicians to work up claims."

Evidence was presented that even before the *Pirskowski* case Johns-Manville had taken steps to acquire information about the effects of inhaling asbestos dust. Starting in 1925 Johns-Manville had paid at least part of the cost of studies of asbestosis in animals conducted by Dr. Leroy U. Gardner at the Saranac Lake Laboratory in New York. By 1936 Johns-Manville and eight other asbestos product manufacturers were jointly funding this research. At trial defendant made much of the fact that those funding the research at Saranac Lake requested, and Dr. Gardner agreed, that the results would not be published until approved by all the manufacturers, in an attempt to imply a conspiracy to withhold information learned about asbestosis and its causes. However, this editorial control was a reasonable precaution taken by the companies funding the research to reserve property rights in the results, par-

ticularly at this early stage when no one had a clear idea as to what those results would be.[23]

Johns-Manville also was involved with Metropolitan Life in actively acquiring information about the risks of inhaling asbestos dust by humans. In 1929 a study of Johns-Manville's New Jersey plant was undertaken by Dr. Lanza and Metropolitan Life, expressly because recent articles in medical journals described asbestosis as:

> a pulmonary disease presumably due to the inhalation of asbestos dust and called asbestosis. Studies of this condition are suggestive, but still fragmentary and incomplete. In the United States compensation has been claimed and allowed in several cases of so-called asbestosis and the industry is desirous of knowing whether this disease is a true occupational hazard of asbestos manufacture and fabrication and if so, what can be done to lessen or prevent the hazard.

Metro. Life Ins. Co., *Report of Dust Study of the Manville Plant of the Johns-Manville Co.* 1–2 (1930). These questions were to be resolved by a series of studies, including the 1929 Johns-Manville study, which would be a pilot, to

A. Study ... dust conditions in asbestos plants.

B. [make] [p]hysical examinations of asbestos workers, correlated with known exposures to dust.

C. Study ... pathological effects of the inhalation of asbestos dust through autopsy of human subjects and by animal experimentation.

*Id.* at 3. In the introduction to this study, Dr. Lanza delineated the known latency of pulmonary dust diseases based on his knowledge of the literature and expressed an awareness that his findings might be tainted by the fact that Johns-Manville's New Jersey plant was newer than those in the British studies. His description of that latency was of pulmonary dust diseases in general and not, as defendant argued, an indication of Johns-Manville's knowledge in

1929 of the latency characteristics of asbestosis.

The Manville plant studies include dust counts (no correlated physical reports on workers), along with descriptions of work performed in various departments. The dust counted was less than 10 microns in diameter, since it was "generally considered impossible for particles larger than 10 microns to penetrate the finer air passages into the lung tissue." *Id.* The highest dust counts were found in the Fire Felt department where finished asbestos insulation material was cut into shape by saws, which, defendant pointed out, is the factory process most similar to the uses made of asbestos-containing products by the end user. The Fire Felt department was the only one in which dust counts were found that exceeded the then-existing USPHS standard of 10 mppcf of silica dust less than 10 microns diameter, and the study concluded that, since "dust exposure of Manville employees falls far below" the standard "in the plant in question the probability of asbestosis, so called, is remote." *Id.*

The follow-up study to this pilot, encompassing five asbestos fabricating plants, including Johns-Manville's New Jersey plant, was sent to Mr. Wardwell in March 1931. The introduction indicated an increased conviction that inhaling asbestos dust was hazardous and "produce[s] pathological results quite distinct from true silicosis" and made specific reference to articles in British journals. Met. Life Ins. Co., *Effects of the Inhalation of Asbestos Dust upon the Lungs of Asbestos Workers* 2 (1931).

This five-plant study comprehended dust counts, consideration of dust control equipment, and physical examination of some of the plant workers. The plant-by-plant dust counts, excluded from one version presented to the court and illegible in the other, were of total dust. The writers concluded that, except for the preparation room, the amount of dust attributable to asbestos was relatively low since it makes up a

---

**23.** Similarly, Johns-Manville makes makeweight aspersions about the pre-publication review and editing procedures utilized by the Navy and the USPHS in their studies of asbestos in shipyards.

small proportion of the working material. A total of 124 plant workers, each with more than three years' employment, were selected at random for X-ray examination. A conservative reading of the X-rays revealed four with second-degree asbestosis, 63 with first-degree, and 39 with doubtful asbestosis. However, no correlation could be made between the incidence of positive X-rays and amount of asbestos dust inhaled during employment because history of employment in various departments was not collected. Although most workers with positive asbestosis complained of symptoms associated with lung disease, the symptoms were not considered severe, and the study concluded that "[a]sbestosis as observed in this series of cases does not cause any marked degree of disability...." *Id.* at 21. The study also concluded that not enough was known to establish standards for safe dust counts, although since cases were found despite low dust counts, it was suspected that low exposures could be hazardous. It was also concluded that dust in the plants could be reduced and that the most effective method of doing so was by using local exhaust systems.

A report of these findings was made available to Mr. Wardwell in 1931, but defendant's expert witness Dr. Barry Castleman, who has written about the industry's response to asbestos hazards and is currently an independent consultant on environmental issues, pointed out that it was not published until 1935, with a material alteration. The 1931 study listed among its conclusions "asbestosis as observed in this series of cases does not cause any marked degree of disability. However, it is possible for uncomplicated asbestosis to result fatally." The second sentence was omitted in the 1935 published report.

In 1929 and 1930, Dr. Frank G. Pedley, an author of articles on asbestosis in Canadian medical journals, undertook a study, apparently unpublished, of Canadian asbestos workers, involving physical and X-ray examinations, which was sponsored by Metropolitan Life as part of its study of the asbestos industry. The workers were from Canadian Johns-Manville in Asbestos, Quebec, where asbestos was mined, milled, and

manufactured, and from three companies in Thetford Mines, Quebec, where mining and milling of asbestos took place. Of the group of 141 men examined from Asbestos, who were younger and only 22 percent of whom had worked in the asbestos industry for more than ten years, 18 were found to have asbestosis, a rate of 13 percent. Of those at the Thetford Mine, 83 percent of whom had more than ten years' experience, 24, or 44 percent, showed indications of asbestosis. Dr. Pedley suggested that the difference in part was attributable to the greater age and length of exposure of the Thetford Mine group. He expressed surprise that the rate of disease was approximately equal between the mine and mill workers, since the amount of exposure was believed to be higher for the mine workers. Although Dr. Pedley concluded that asbestosis is not an incapacitating disease, since those affected indicated a general absence of disabling symptoms, the important finding was confirmed cases of asbestosis. Having undertaken to determine whether the disease existed, he also recognized that "[p]rolonged exposure to asbestos dust causes a pulmonary fibrosis of a definite type, distinct from silicosis, demonstrable on X-ray film." Metro. Life Ins. Co., *Effects of the Inhalation of Asbestos Dust upon the Lungs of Asbestos Workers* 12 (1931). Metropolitan Life sent a copy of Dr. Pedley's study to Mr. Wardwell in July 1931.

Although much was made during trial of the fact that two articles published by Dr. Pedley in 1930 were misleading because they indicated that there was no asbestosis found in Canada in 1930, those articles actually stated that no cases had been reported from Canada. Since Dr. Pedley's report on the Metropolitan Life study is dated November 1930, the articles no doubt were written earlier, at which time his results had not been reported.

In a report on his research findings sent to Johns-Manville in 1938, Dr. Gardner indicated a preliminary conclusion that exposure to longer asbestos fibers, even in lower concentrations, led to significantly more fibrosis than exposure to shorter length

148

fibers. He proposed this result as a possible explanation of the anomalous findings of Dr. Pedley, since the fibers in the air in a mine are mostly short. Dr. Gardner speculated that the implications of his findings for a factory setting, where "the amount of disease has not always paralleled the atmospheric concentration of dust," may instead be a function of whether a particular procedure releases long or short fibers.[24]

In 1932 Johns-Manville's headquarters surveyed the physical condition of employees in its New Jersey plant to "ascertain just what the conditions are among our employees, and ... to use all reasonable efforts to improve the health of our employees and the conditions under which they work," according to a letter from S.A. Williams, Vice President and Director of Operations of Johns-Manville, to Dr. F.V. Meriwether, Surgeon in Charge of the United States Bureau of Mines Cooperative Clinic in Picher, Oklahoma. First on a selective basis, and later plantwide, employees were examined by fluoroscope and X-ray and their employment history determined.

During its case defendant introduced 27 documents written between February 12 and June 7, 1932, which trace how Dr. Meriwether came to read and interpret the X-rays for Johns-Manville in that 1932 study. The correspondence was among officers of Johns-Manville Corporation; Dr. F.V. Meriwether; Dr. Lanza working out of General Motors Corporation in Detroit; Dr. H.H. Fellows at Metropolitan Life; Dr. R.R. Sayers, Chief Surgeon, Bureau of Mines; and H.S. Cumming, Surgeon General, USPHS. Defendant sponsored the documents after they appeared in a pretrial

listing by plaintiffs Eagle-Picher Industries, Inc., No. 170–83C, and UNR Industries, Inc., and UNARCO Industries, Inc., No. 16–84C, for the proposition that a conspiracy was evidenced between Johns-Manville and the Government not to disclose the results of the 1932 study or the Government's involvement in it. These documents were not on Johns-Manville's exhibit list, although in August 1985 the Government delivered 13 on microfilm and the balance were publicly available in the National Archives. Even Johns-Manville had difficulty expressing enthusiasm for the documents that arguably demonstrated the Government's awareness that Johns-Manville was involved in litigation brought by its former employees, or that arguably put the Government on notice that there were incidents of asbestosis.

The documents reveal that Dr. Lanza approached Dr. Meriwether to read the X-rays, explaining that the survey was intended to determine the number of cases of asbestosis in Johns-Manville's New Jersey plant. Dr. Meriwether was intrigued because the approach was to make diagnosis by X-ray and fluoroscope independently to see if the fluoroscope could identify asbestos. Dr. Meriwether responded that he would require permission of the Surgeon General of the USPHS. The Surgeon General's initial response was negative, cautioning "the results obtained might be introduced as evidence in court, or the officer who made the interpretations might be subpoenaed as a witness." Mr. Williams of Johns-Manville wrote Dr. Meriwether:

> I do not know whether Dr. Lanza informed you of the facts, but we have had several suits brought against us by for-

24. In the litigation concerned with the obligation of insurers that became liable to policy holders in the asbestos business for asbestos-related bodily injury claims arguably arising under comprehensive general liability policies, the court found "that there is no reason to distinguish between the different kinds of asbestos." *Asbestos Insurance Coverage Cases,* Judicial Council Coordination Proceeding, No. 1072, slip op. at 26 (Cal.Super.Ct. May 29, 1987). Since the kinds of asbestos vary as to their typical length, Judge Brown's statement reasonably may be extended to indicate that he saw no reason to distinguish between different fiber lengths. The *Insurance Coverage Cases* were concerned with what events trigger liability for previously diagnosed disease. For purposes of this opinion, Dr. Gardner's fiber-length theory explains Dr. Pedley's data, but does not establish that Johns-Manville's use of long-fiber amosite principally was responsible for asbestos disease. *See supra* note 17. As discussed in part VI, the Navy specifications did not require Johns-Manville to produce a more dangerous product since Johns-Manville utilized longer fibers when it was to its commercial advantage.

mer employees alleging pulmonary disorders induced by dusty conditions at the factory. There is a possibility other suits may be instituted by the same attorney who represents the plaintiffs in the pending suits. Such being the case, you will readily appreciate that we desire the results of your readings to be held in strictest confidence and that no unnecessary publicity be given to the fact that you are making these readings for us. We are making an honest effort to ascertain just what the conditions are among our employees and intend to use all reasonable efforts to improve the health of our employees and the conditions under which they work, but we wish, if possible, to prevent the results of our efforts being used against us either in the pending suits or in any suits which may be brought against us.

The Surgeon General of USPHS was persuaded in a personal meeting attended by Dr. Lanza and others, and thereafter Dr. Meriwether received his authorization from the Chief Surgeon, Bureau of Mines to proceed to "read the negatives for the investigative purpose ... [provided] that the interpretations made by you are for scientific purposes only, the negatives being identified by number and not by the individual." Dr. Meriwether undertook to read the X-rays, writing Dr. Lanza: "I am very interested in seeing how the X-ray readings will check with the fluoroscope readings."

The correspondence from Dr. Meriwether concerning his readings indicates his continued interest in the quality of the X-rays and comparisons with fluoroscope diagnosis. Johns-Manville advised Dr. Meriwether that his readings were inconsistent with the fluoroscopic readings, in that the latter differentiated between individuals who had not been exposed to asbestos and those whose past medical history was complicated by other dust occupations, principally coal mining. Johns-Manville asked Dr. Meriwether to distinguish between those cases with no significant past history, which were to be classified as asbestosis, and the more numerous past histories complicated by other dusty occupations classified as pneumoconiosis. "This has been done because passing an opinion of Asbestosis on a patient who previously worked in dust brings up a medical legal problem before us...." Dr. Meriwether therefore was asked to reread the X-rays that he had completed.

Having carefully reviewed these documents, the court discerns no conspiracy, nor any basis to infer anything more than that the correspondence put the Government on notice that Johns-Manville's employees had brought suits for asbestos-related diseases from its manufacturing operations at the New Jersey plant. There is no basis for the inference that the Government was aware of the results of the study revealing cases of asbestosis at low-level exposures, since the information furnished Dr. Meriwether did not disclose details of the employment history with Johns-Manville. Moreover, the court finds that it stretches the notion of government responsibility to impute the USPHS's limited knowledge in 1932 based on this study to corporate knowledge of the Navy, the Maritime Commission, and the USPHS during the war.

The results of the 1932 study indicated that of the 1140 workers in the plant 327, or 28 percent, had some form of fibrosis of the lungs, 207 of whom were classified as having pneumoconiosis. The remaining 120 workers with positive fibrosis readings, 10.5 percent of plant employees, were classified as having asbestosis. The most interesting aspect of this finding is that 43, or 35.8 percent, of those with asbestosis were considered to have had no exposure to asbestos dust. Although the meaning of this result was vigorously disputed by the parties, the most reasonable interpretation derives from the fact that the determination of whether or not an individual was exposed was made independently of the reading of the X-rays by looking at the department within which he worked. Thus, those in the spinning, fiber, and machine departments were listed as having exposure, and those in shipping, hard shingle, and paper mill departments as having no exposure. The positive X-rays of 43 workers who were classified as having as-

bestosis and therefore fell into the group without dust exposure prior to employment with Johns-Manville presumptively resulted from dust exposure while working for Johns-Manville. Since they had to have some exposure in order to develop fibrosis, it is safe to presume that their exposure was either from walking through the plant or working in an area that was considered safe from exposure or from a prior work assignment in a different department. In any event, the finding that nearly 36 percent of the incidence of asbestosis occurred in workers with no exposure is sufficient to have put Johns-Manville on notice that exposures to low amounts of asbestos dust could be hazardous.

Johns-Manville introduced a lengthy series of documents, consisting primarily of letters and memoranda between Johns-Manville's headquarters and its various plant managers during 1931–1933, concerning efforts to install dust control equipment in its plants. The Board of Directors instructed each plant and mine to develop plans for controlling dust problems and to submit a budget proposal for installation of needed equipment. In addition, there was correspondence tracking efforts at compliance and a summary of progress on controlling dust and concomitant costs, plant by plant. Also scattered through this correspondence are indications that where dust collection equipment was ineffective, respirators were supplied and required to be worn.

The extent and actual enforcement of the requirement to wear respirators in Johns-Manville's plants are uncertain. Although some documents indicate an absolute requirement that respirators be worn when foremen instructed workers to do so, there was evidence from contemporaneous observers that they were not in fact worn even in very dusty areas, in part because respirators were hot and interfered with vision. Roger Hackney, Johns-Manville's former Treasurer, testified by deposition that there was clear awareness of the difficulty in enforcing the wearing of respirators. But, even when worn, respirators were only partially effective. This latter difficulty was recognized in a British jour-

nal in 1930 and was reported to Johns-Manville's management by Dr. McConnell of Metropolitan Life in 1931. Clarence L. Sager, *Minutes of Meeting* 1 (July 15, 1931).

In late 1933 Johns-Manville's management accepted a suggestion by the President of Raybestos-Manhattan, Inc., to coordinate efforts in dust control by having Dr. Lanza continue his study of the asbestos industry for Metropolitan Life, extending its scope to include the Raybestos-Manhattan plants. In the course of the study, Dr. Lanza would resurvey Johns-Manville's plants, re-X-ray the workers, and offer suggestions as to the effectiveness of the dust control efforts. However, three years later in a letter attempting to recruit additional asbestos manufacturers to join the information-gathering effort and spread the costs, Sumner Simpson, President of Raybestos-Manhattan, admitted in a letter dated November 10, 1936, to the President of Thermoid Rubber Company that in spite of "considerable work" they had "not reached the point where we can eliminate a large part of the [d]ust."

When Johns-Manville began its dust-control program, there was no accepted standard representing a "no danger" point, but the aim was to reduce dust levels as far as possible. Johns-Manville spent $153,000 on dust collection equipment and in 1938 hired Otto L. Binder, former Metropolitan Life employee, as Industrial Hygiene Engineer to take dust counts at its various plants, make recommendations for reducing high counts, and work with engineers to implement needed changes. High dust counts nonetheless continued to be a problem. A 1938 report to management by Mr. Binder on conditions at Johns-Manville's Pittsburgh plant compared dust counts he found at various locations with dust counts made in 1936. Although most counts decreased dramatically, two had increased. Mr. Binder recommended changes to reduce counts further, consisting primarily of exhaust fans and suction equipment at the point at which the dust was created and improved enclosure of dust-generating operations.

On the eve of the war, Johns-Manville's President, Louis H. Brown, began a process of centralizing control of a company that had been made up of fairly autonomous plants. As part of the process, Mr. Woodard, Johns-Manville's Pittsburgh plant manager, in 1938 was transferred to headquarters in New York to be Assistant Director of Industrial Relations with company-wide responsibility for health and safety. Contemporaneously, Frederick G. Lippert was hired as Safety Engineer and Mr. Binder as Industrial Hygiene Engineer to make their expertise available to all plant managers. Under Mr. Woodard the two established parallel programs to decrease accidents and industrial disease risks. Mr. Woodard testified that in carrying out his specific charge to learn about the effect of asbestos on health, he consulted with Dr. Lanza on developments in the field and received information on the experimental program conducted at Saranac Lake.

During the war acquisition of any equipment involving materials needed for the war effort was tightly controlled by the WPB, using a system of priority ratings based on relative need for a commodity. *See* part III. In order to obtain scarce materials within this system, a business had to justify the need in terms of its contribution to the war effort. At Johns-Manville's New Jersey plant, this task fell to Peter Soroka, Priorities Manager from 1940 to 1945. Mr. Soroka testified that his requests to the WPB were based on a description of needed equipment provided to him by the Engineering Department following the equipment request initiated by the department superintendent. One such request to the WPB, put into evidence and recognized by Mr. Soroka, was for additional equipment to control "the bad dust condition" because "[t]his department is working twenty-four hours a day six days per week...."

In 1944 Dr. Kenneth Smith, who later became Chief Physician for Johns-Manville, joined Canadian Johns-Manville ("CJM") as an assistant medical officer. In his deposition Dr. Smith testified that he knew when he graduated from medical school in 1941 that inhaling asbestos dust was related to asbestosis. When asked whether he made this connection known to management, Dr. Smith responded that "[m]any people at C.J.M. in supervisory positions already knew about the association of inhalation of asbestos fibers and disease. I just amplified that made [sic] much more explicit the disease process."

Mr. Hackney testified that although he had never visited any shipyards, he believed that dust conditions were worse there than at other construction sites because shipbuilding is done in a more confined setting. Mr. Hackney believed that this "was a very common knowledge or common presumption in the company." He also indicated a perception that there was a greater hazard from exposure to asbestos fibers in shipyards than in Johns-Manville's plants, "particularly after our dust reduction program had time to mature." Although Mr. Hackney had no firsthand knowledge of shipyard conditions and his language indicates only "perceptions" and "beliefs," the court gives his statements weight in indicating management's understanding of working conditions in the shipyards. First, Mr. Hackney's statements are consistent. He was questioned at several different points in the two-day deposition, and his testimony did not vary. Second, defendant strenuously protested the court's reception of his testimony by deposition, thus depriving defendant of a fuller opportunity to elicit his knowledge. The deposition must be viewed in the light most favorable to defendant, *i.e.*, that Johns-Manville's management did appreciate the qualitative differences between factory and shipyard working conditions.

In June 1943 Johns-Manville's attorney, Vandiver Brown, received a copy of a letter dated June 14, 1943, forwarded to him by Sumner Simpson and written by Elliott De-Forest, Secretary of the Northwest Magnesia Association, to the Washington State Department of Labor and Industries. The letter, in response to proposed regulations governing asbestos hazards and protective devices, indicated opposition to the regulations as unnecessary since asbestos dust

was no different than any other industrial dust. Mr. DeForest believed that adequate precautions were already in place except "when it comes to installing our material in cramped quarters of war vessels, [where] we have proven that it is of more value to consider safety in regard to giving a man proper vision and not allowing him to be encumbered with respirators, air hoses, hoods, etc." Presumably, if Mr. Brown had no previous knowledge that work on war vessels took place in cramped quarters, or that in those circumstances there was resistance to the wearing of respirators, he would have expressed surprise in his reply to Mr. Simpson, rather than stating, "I am inclined to let Mr. DeForest learn the facts of life and asbestosis from the State of Washington Department of Labor and Industries, and shall merely file his letter unless you feel strongly there is something I should do about it and so advise."

Johns-Manville's Safety Engineer, Mr. Lippert, was in the Navy from 1941 until 1945, serving in the Brooklyn Navy Yard and running a program for training newly-hired workers in the building trades. During this time he was also on retainer with Johns-Manville to continue part-time oversight of its safety program and received messages from Mr. Brown containing information about Dr. Gardner's work. Although he had adequate opportunity and knowledge to observe shipyard conditions, Mr. Lippert's deposition indicates a lack of interest in industrial disease problems, and there was no evidence that Mr. Lippert actually reported to management about asbestos-related hazards in the Brooklyn Navy Yard.

All of Johns-Manville's knowledge of shipyard conditions during the war was not inferential. Johns-Manville's sales people were routinely in the shipyards to take orders, to demonstrate use of their products, and to solve specific installation problems. For example, as discussed above, Mr. Barnett, Chief Sales Clerk in Johns-Manville's Government Department, was asked by the Navy to visit the Brooklyn Navy Yard in 1942 or 1943 to advise about the application of pipe covering. Mr. Bar-

nett testified that Navy personnel escorted him during the entire time he was in the shipyard. The room to which Mr. Barnett was taken was crowded with 40 to 50 workers, some of whom he had to step over. The conditions were "unbelievable" with dust "hanging all over the place."

Charles O. Garcelon, the Johns-Manville salesman in the Boston Office during the war, regularly went to the Boston Navy Yard for bid openings, as did representatives of other bidding companies at the Navy's invitation. On entering the yard, Mr. Garcelon was required to obtain a pass from the gateman, but then was free to go anywhere in the yard except aboard ships.

Another of Johns-Manville's former salesmen, senior sales engineer Norman J. Adams, was in an excellent position to be aware of the differences between working with asbestos insulation both on and off board ships. Before the war as part of his training, Mr. Adams visited the Boston Navy Yard and Fore River. Although he did not see the actual application of pipe covering aboard ships, he observed work in the pipe shops, large buildings within the shipyards where pre-cutting and making of flange covers was carried out. Getting into the Navy yards before the war simply meant signing in and out at the gate, and displaying his Johns-Manville identification. After Pearl Harbor, he was required to have an FBI clearance number on his pass to be admitted.

Union Asbestos & Rubber Company salesman, John B. Crawford, headquartered in San Francisco during the war, called regularly on Navy and private shipyards in California, Oregon, and Washington. Although security was tighter at the Navy yards, Mr. Crawford experienced no difficulty in gaining access. He remembers seeing Johns-Manville's name in the log book "[q]uite a few times."

Nelson L. Best, the former Johns-Manville's salesman working out of San Francisco during the war, visited many shipyards in Northern California, Nevada, Utah, Washington, Oregon, and Hawaii, each about twice a year. He found no

difficulty in obtaining access to private shipyards, merely showing his company identification with a photograph attached and signing the log book. At Mare Island Navy Yard, security was much tighter. Entry procedures were the same, but the Navy required that he be escorted at all times while in the yard. While in the shipyards, Mr. Best observed that the cutting of asbestos created dust; that ship construction involved work in small, confined spaces; that many workers might be in a given area; and that the workers wore respirators only rarely. Although he was in contact with people at Johns-Manville's New Jersey plant, visiting on an average once a year to learn of new developments by the Research Department, he made no reports about shipyard conditions, nor was he asked about them. Mr. Best saw no reason for making such reports since he believed that management was already aware of shipyard conditions.

To support its claim that its knowledge of shipyard conditions was inferior to the Government's, Johns-Manville contended that its access to shipyards was restricted substantially by war-time security measures. Defendant responded during trial by eliciting from many witnesses, some of whom are referred to above, that the security measures required identification of the person and purpose of visit and in some cases placed restrictions on where the individual could go in the shipyard, but there was no evidence that visitors were prevented entry. The proof is convincing that Johns-Manville's salesmen visited shipyards on a regular basis, although there was no direct proof that the salesmen's impressions of shipyard conditions were relayed to management. The only evidence of ongoing contact between management and an employee observing shipyard conditions first-hand was that regarding Mr. Lippert, who retained a connection with Johns-Manville as a consultant while serving in the Navy. His testimony does not provide a basis upon which to impute his knowledge of conditions to management, since he testified that he had no communication with management during the war, never discussed his war experiences with Johns-

Manville personnel after the war, and indicated a lack of interest in industrial hygiene matters. Even if salesmen's knowledge is not imputed to Johns-Manville, *American Ship Building* requires that the Government be aware that the contractor lacked knowledge needed to perform the contract and was unaware of that lack. Johns-Manville has not proved that the Government had reason to believe it had no knowledge, since both parties were aware that Johns-Manville's employees were making routine visits to both Navy and private shipyards.

During the war Johns-Manville was not a centralized operation in the sense that term connotes contemporary corporate structures, and communication systems during the war years were neither as speedy nor available as today. Nonetheless, the record supports the findings that Johns-Manville both knew and should have known of the conditions in which its products were being applied and removed in the Navy and private shipyards. The testimony of Messrs. Hackney and Best and Dr. Smith, Mr. Brown's reaction to the DeForest letter, and Johns-Manville's own difficulties in reducing dust counts and getting workers to wear respirators show that the policymakers in the company had at least presumptive knowledge of conditions in which ship construction personnel worked. In essence, Johns-Manville knew over a decade before the Government, in the microcosm of Johns-Manville's asbestos plants, that exposure to asbestos in heavy concentrations over short periods of time led to asbestosis and that low-dose exposures could also be hazardous. That the Government's knowledge derived from a macrocosm does not make its knowledge superior.

Additionally, Johns-Manville argues that it was kept from knowledge of shipyard conditions by the Government's active misrepresentation of information by statements that much more vigorous efforts to enforce the Minimum Requirements were being made than was the case and that the *Fleischer-Drinker Report* contained inten-

tional misstatements of fact.[25] It is determined that the public statements were a reasonably accurate indication of intent as borne out by later events. The Navy was attempting to monitor and improve compliance with the Minimum Requirements. The difficulties with the *Fleischer-Drinker Report* have more to do with technological limitations than attempts to mislead.

The evidence does not establish superior knowledge of asbestos health hazards and shipyard working conditions on the part of the Government.

## VIII. *Mutual mistake*

### A. *Background*

In its complaint Johns-Manville pleaded reformation on two grounds. First, Johns-Manville charged that the terms of its fixed-price supply contracts did not accurately memorialize the parties' intention at the time of drafting, seeking reformation to reflect the Government's express or implied-in-fact agreement to assume the risk of loss for third-party personal injury liabilities. It was determined on defendant's motion for judgment on the pleadings that since the Anti-Deficiency Act barred formation of such contracts, decisional law under the Anti-Deficiency Act also barred their reformation. *Johns-Manville Corp.*, 12 Cl. Ct. at 27. Johns-Manville's second theory, which was tried, was that reformation is warranted due to mutual mistake of fact. According to Johns-Manville, two mutual mistakes went to the basis of its contracts with the Navy and the Maritime Commission: 1) The 5 mppcf limit of exposure to asbestos dust was adequate to protect all shipyard workers, and 2) neither the Government nor Johns-Manville knew of the connection between exposure to asbestos dust and mesothelioma.

### B. *Basis of the bargain and allocation of risk of loss under Johns-Manville's fixed-price contracts*

The Restatement of Contracts describes a mutual mistake:

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of the mistake under the rule stated in § 154.

*Restatement (Second) of Contracts* § 152(1) (1982).

The Court of Claims "consistently held that the contractor in a fixed-price contract assumes the risk of unexpected costs." *McNamara Constr., Ltd. v. United States*, 206 Ct.Cl. 1, 8, 509 F.2d 1166, 1169 (1975) (citing cases). Both parties place reliance on *National Presto Industries, Inc. v. United States*, 167 Ct.Cl. 749, 338 F.2d 99 (1964), *cert. denied*, 380 U.S. 962, 85 S.Ct. 1105, 14 L.Ed.2d 153 (1965). *National Presto* ruled that an equal division of unanticipated expenses between parties to a fixed-price contract is permissible if 1) a mutual mistake caused these expenses; 2) the contract allocates the risks to neither party; and 3) the party from whom relief is sought "received a benefit from the extra work of the type it contemplated and would have been willing, if it had known the true facts from the beginning," to bear a substantial portion of the additional expense. 167 Ct.Cl. at 769, 338 F.2d at 112. If "reformation ... [is] the child of equity," *id.*, subsequent Court of Claims decisions have labored to keep the child out of the Pandora's Box that *National Presto* said should not be feared by the admittedly unprecedented approach it adopted. *See, e.g., McNamara Constr.*, 206 Ct.Cl. at 9, 509 F.2d at 1170 (citing cases).

*National Presto* is the formulation of the doctrine of mutual mistake in this Circuit. *See American Employers Ins. Co. v. United States*, 812 F.2d 700, 705 (Fed.Cir. 1987). Incident to applying *National Presto*'s standard to the facts of this case, it is interesting to repeat the Court of Claims'

**25.** Johns-Manville's misrepresentation claim was dismissed before trial. *Johns-Manville Corp.*, 12 Cl.Ct. at 31–32. However, because so much evidence came in during trial that went to the misrepresentation claim, as well as the other points for which it was offered (a few newspaper articles were excluded), the finding in the text is made to complete the record.

approach in *McNamara* by observing the factual disparities between this case and *National Presto*.

During the Korean War, plaintiff in *National Presto* contracted with the Department of the Army to produce artillery shells utilizing a new production process which the Army anticipated would eliminate the need for a turning step, thereby reducing the amount of scrap steel. The contract obligated the Army to pay for the cost of the production equipment that plaintiff was to provide, although the price for the shells was fixed. The new production method was experimental, and its efficiency uncertain. During negotiations the Army had rejected certain turning equipment that plaintiff felt should be included for implementing the new process. Eventually the Government paid for the additional equipment, but plaintiff nonetheless had incurred substantial losses in trying to manufacture the shells without the turning equipment. The Court of Claims concluded in *National Presto* that mutual mistake had occurred as to "two essential facts:" Both parties misapprehended that the new process would succeed without the additional equipment, and both were unaware of the amount of time and work required to determine its necessity. 167 Ct.Cl. at 764–65, 338 F.2d at 108.

Characterizing the undertaking as a "new and joint enterprise," *id.* at 764, 338 F.2d at 109, the court concluded that neither the negotiations nor the contract allocated the entire risk to plaintiff and that the Government had not disclaimed liability. Because the Army was to pay for the equipment, the agreement was similar to a cost-plus or research and development contract, without any implication that the fixed-price included all uncovered risks. *Id.* at 765, 338 F.2d at 109. The *National Presto* court found that the Army was willing to bear a part of the testing expenses because of its desire to eliminate unnecessary equipment and minimize steel waste. Finally, it should be noted that the product involved was both experimental and complex.

By its fixed-price supply contracts, Johns-Manville sold to the Navy and the Maritime Commission asbestos-containing products that, in some cases, were sold to the Government for years prior to World War II. Some products were also sold to commercial vendees, and some products were customized, adjusted, or refined during World War II to meet the Navy's wartime needs. Compared with the new manufacturing process in *National Presto*, neither the products nor the processes utilized could be called experimental or complex. Even if they could, the damages sought by Johns-Manville result not from manufacturing processes, since in most products the asbestos content and type of fiber used did not vary from commercial products to meet Naval or Maritime Commission specifications, so that the damages cannot be traced to varying the asbestos content to meet the needs of the Navy or the Maritime Commission. Involved in this action are simply fixed-price supply contracts, exemplified by the contracts in the record for thermal insulation products with manufacturers other than Johns-Manville, and the alleged mistakes regarding asbestos hazards cannot be characterized as forming the basic assumption or the basis of the bargain on which the supply contracts were entered into. *See McNamara Constr.*, 206 Ct.Cl. at 11, 509 F.2d at 1171.

Johns-Manville's own 1932 study at its Manville plant indicated asbestos disease among individuals performing jobs who had no exposure to asbestos dust. Even assuming the study erroneously reported no exposure since some exposure is necessary, the study is consistent with a finding that the exposure was not substantial. Moreover, Johns-Manville knew before it entered into the World War II-era contracts that the 1938 5 mppcf Dreessen Standard was subject to question. During the war Johns-Manville learned, through its continuing studies, that even though it was monitoring asbestos dust levels to adhere to the 5 mppcf standard, cases of asbestosis still occurred among its workers. Although Johns-Manville did not know of specific incidences of mesothelioma, Johns-Manville knew by 1943 through Dr. Gard-

ner that another malignancy, lung cancer, had been associated with inhalation of asbestos dust.

That Johns-Manville was aware when entering fixed-price contracts with the Navy and the Maritime Commission that exposure to asbestos dust over time could cause asbestosis is not persuasive that ignorance of other health risks associated with asbestos exposure, even at low levels, constitutes a mistake. It is unnecessary to attempt the elusive determination whether the mistake was one of hard fact or a predication of future events. On this record it cannot be said that a basic assumption on which Johns-Manville entered into supply contracts with the Navy and the Maritime Commission was that the health hazards caused by exposure to asbestos dust were containable at dust levels not exceeding 5 mppcf or that the health risk did not include a potential and unknown form of cancer.

It is difficult to conceive that Johns-Manville and the Government, as contracting parties, had any expectation as to asbestos exposure. The court has already ruled as a matter of contract law that there is no implied warranty that the Navy and the Maritime Commission would safely use the products bought from Johns-Manville. *Johns-Manville Corp.*, 12 Cl.Ct. at 29–30. Whether the Government had a duty to reveal allegedly superior knowledge about use of asbestos products in shipyards is another issue that has been resolved in the negative. *See* part VII. That there is no contractual duty concerning use of a product running from a vendee to the vendor, however, highlights the fact that assumptions about use did not enter into the parties' calculus of their bargain. It also has been found that the Navy did not adopt a policy to assume the risk for third-party liabilities resulting from its buying asbestos-containing products under fixed-price supply contracts. *See* part IV.

Johns-Manville argues that unless the assumption of risk policy applied to its supply contracts, the contracts did not allocate or assign risks concerning the connection between asbestos exposure and mesothelioma or lung cancer to either party. The Restatement of Contracts provides:

A party bears the risk of a mistake when

(a) the risk is allocated to him by agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

*Restatement (Second) of Contracts, supra,* § 154. There is no requirement that a risk must be allocated contractually unless it relates to a basic assumption on which the contract was made and has a material effect on the agreed exchange of performances. In short, the assumptions about health hazards were not the basis of Johns-Manville's bargain. As discussed previously, President's Bulletin No. 19–362 of January 30, 1942, instructed Johns-Manville's Sales Division that the profit margin for new or revised products should "counterbalance any hazard involved in the sale of the product due to factors which are not fully known at the time the decision must be made." Even though the court is not prepared to rule that the issue of risk is reached, since the alleged mistakes were not central to the making of supply contracts, setting an appropriate price to take liabilities into account was Johns-Manville's responsibility consistent with a fixed-price contract.

It is interesting to speculate whether the Government would have suffered interruption of the supply of asbestos-containing thermal insulation and fireproofing material if it had been threatened during World War II by a health crisis relating to asbestos. In *National Presto* the court was not required to speculate, because the Army had expressed interest in the "perfection of the new process" during pre-contract negotiations. 167 Ct.Cl. at 764, 338 F.2d at 108–09. To resolve the issue in this case on the assumption that the Government could have insisted on continued production of asbestos-containing products, in this

court's view, would be fallacious. What occurred, in fact, was that Johns-Manville, knowing certain risks associated with production of asbestos because of its experience with its own employees since the late 1920's, supplied asbestos-containing products, increased its production of supplies to the Navy and the Maritime Commission in an amount beyond which the court is willing to find was required, and had a policy to take into account product hazards in pricing new or revised products.

In these circumstances it is found that the alleged mistakes did not relate to a fundamental assumption underlying the contracts and that the risk of the mistakes was borne by Johns-Manville. The facts and circumstances under which these contracts were entered into do not warrant relief based on mutual mistake.

## IX. *Equitable adjustment*

On defendant's motion for judgment on the pleadings, the court ruled that because the Government did not change Johns-Manville's contract performance, but allegedly failed to disclose superior knowledge bearing on performance, Johns-Manville's claim probably would be held after trial not to seek an equitable adjustment. *Johns-Manville Corp.*, 12 Cl.Ct. at 33.

 Johns-Manville argues that damages can be measured by settlements, judgments, and attorneys' fees, but the determinative issue is whether Johns-Manville's claim is one for an equitable adjustment. "Equitable adjustments ... are simply corrective measures utilized to keep a contractor whole when the Government modifies a contract...." *Bruce Constr. Corp. v. United States,* 163 Ct.Cl. 97, 100, 324 F.2d 516, 518 (1958). Johns-Manville contends that performance of its fixed-price supply contracts was changed constructively by the Government's failure to enforce shipyard asbestos safety standards and to disclose the hazardous conditions under which asbestos-containing products were being used in the shipyards. *See Johns-Manville Corp.*, 12 Cl.Ct. at 32. The trial record

bore out that the Government's actions or inactions regarding its allegedly superior knowledge did not modify any of the terms or conditions of Johns-Manville's contracts or change the work required or contemplated under these contracts. *See* part X.

Johns-Manville put in evidence no contracts with the Navy or the Maritime Commission for asbestos-containing products. The "Changes Clause" typically appearing in contracts of this vintage would have contained a provision like that in the April 18, 1945 contract between the Navy and the Asbestos Manufacturing Company. That Changes Clause obligates the contractor to propose an equitable adjustment in the contract price "within 4 months from the date of receipt of the Change Order ... or within such further time as the contracting officer may allow." The Federal Circuit has reaffirmed that the terms of a Changes Clause can bar a claim after final payment. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1391 (Fed. Cir.1987) (citing cases). Accordingly, Johns-Manville failed to submit its claim either within the time specified in the Changes Clause or before final payment and thus cannot qualify for an equitable adjustment.[26]

## X. *Indemnification of third-party liabilities as costs of performance of fixed-price supply contracts and as foreseeable damages*

### A. *Background*

The reader who has persevered this far will recall that part IV of this opinion earmarked two damages issues for later discussion: In an action for breach of the implied warranty of specifications or the duty to reveal superior knowledge, 1) whether third-party liabilities or indemnification for third-party liabilities are recoverable costs of performance of fixed-price supply contracts; and 2) whether third-party liabilities or indemnification for third-party liabilities, in any event, constitute foreseeable damages. Characterizing

---

**26.** The other grounds urged by defendant in its pretrial brief for rejecting this claim also have

merit. *See* Def's Br. filed Mar. 16, 1987, at 82–86.

Johns-Manville's damages as costs of performance became an issue because the cases recognizing and applying these two causes of action speak of recovery in terms of making a contractor whole for increased costs of performance.

It was decided in part IV that as a matter of fact Johns-Manville and the Navy had no discussions, negotiations, agreements, or shared understanding that the Navy would assume the risk of third-party liabilities resulting from products supplied by Johns-Manville. Resolution of this factual issue, however, is not dispositive of the two issues that are the subject of this discussion. Post-trial briefing was received only on damages issues.

■■■ In *Johns-Manville Corp.*, 12 Cl.Ct. at 19, 28–29, this court ruled before trial that plaintiff manufacturers must prove that third-party liabilities were considered costs of performance at the time of entering their contracts, in order to avoid the holding of *Lopez v. Johns-Manville*, 649 F.Supp. 149, 160 (W.D.Wash.1986), *appeal docketed, sub nom. Lopez v. Raymark Indus., Inc.*, Nos. 87–1543, 1544 (Fed.Cir. Aug. 21, 1987), that indemnification for tort judgments or settlements incurred by a contractor is "manifestly collateral to contract performance." Implicit in *Lopez* is the notion that a contractor may expense a third-party liability as a cost of performance for a given contract, but that the Government will not be held to indemnify the contractor unless the liability is directly connected with or necessary for the actual work under the contract. This court's ruling alarmed the plaintiff manufacturers because it appeared to foreclose indemnification damages as foreseeable or proximately caused breach damages after *Lopez* had concluded that they were not costs of performance. *Lopez* was decided on summary judgment, and that court's preemptory discussion does not address all the arguments made by the parties in the case at bar.

The task of defining costs of performance has been complicated because plaintiffs in these cases are trying to adapt tort actions into breach molds. *See Keene*

*Corp.*, 12 Cl.Ct. 197 (order granting and denying motion to dismiss pursuant to 28 U.S.C. § 1500), *appeal docketed*, No. 87–1332 (Fed.Cir. May 7, 1987). The purpose served by the implied warranty of specifications and the duty to reveal superior knowledge is to redress the Government's failure to deal fairly with its contractors by frustrating or delaying contract performance. The defect in the specifications must give rise to the harm, so that the article produced is defective, or the withheld superior knowledge must affect cost or duration of performance. Instead, plaintiff manufacturers contort their causes of actions to reach breaches of duty that occurred after the contracts had been performed fully. Equating the damages claimed to costs of performance in these circumstances has led to groping by counsel and the court.

Regarding the implied warranty of specifications, the court does not decide whether, as an element of the cause of action for breach of the implied warranty of specification, a plaintiff must prove that the defect manifested itself during contract performance. *See* part VI. Nor does the court decide whether asbestos products could not be safely used no matter what precautions were taken. Johns-Manville's counsel took the position that the harm came from use.

■■■ The cause of action for breach of the duty to reveal superior knowledge is defined by reference to increased costs of performance. The contractor must show that it undertook to perform without vital knowledge of a fact that affected the cost or duration of performance. *American Ship Bldg. Co. v. United States*, 228 Ct.Cl. 220, 225, 654 F.2d 75, 79 (1981); *see* part VII. Defendant argues that if third-party liabilities were viewed as costs of performance resulting from the failure to reveal superior knowledge that a product could be misused and thereby subject its manufacturer to strict liability, the result would contradict this court's holding that there is no duty running from the Government to Johns-Manville to use Johns-Manville's products safely. *See Johns-Manville Corp.*, 12 Cl.Ct. at 29–30. Trial has per-

suaded the court that defendant's position is well taken.

■ The duty to reveal superior knowledge is rooted in the notion of actual performance experience. Johns-Manville wants to extend the duty to advising a contractor of the consequences bearing on price or cost of a product that might be experienced as a result of, not during, contract performance. Such a proposition transports the cause of action light years beyond its origin. Accordingly, this court modifies its ruling on the motion for judgment on the pleadings, insofar as rejecting the concept that a breach of the duty to reveal superior knowledge can be proved by evidence that the price or cost of a product would have been altered if the Government advised the manufacturer that it could incur third-party liabilities as a result of events that occurred after the contract was performed. *See* 12 Cl.Ct. at 31. Cost of performance is integral to the cause of action itself. If the alleged superior knowledge does not bear directly on cost or duration of contract performance, liability cannot be established.[27]

B. *Third-party liabilities and indemnification for third-party liabilities as costs of performance*

The term "cost of performance" is tied closely to equitable adjustment consequent to a change in the original agreement. *See* 4 J.C. McBride, *Government Contracts* ¶ 28.260, at 28–555 (1987). The term "increased costs of performance" has carried over to breach damages and implies the concept of reimbursing a contractor for its increased expenditures in fulfilling a contract following the Government's breach by furnishing defective plans and specifications or by failing to disclose superior knowledge. Because third-party liabilities previously have not been considered compensable breach damages as costs of performance in the Court of Claims or the Claims Court, however, does not mean that they cannot be considered as such. As a corollary, no case has rejected third-party liabilities as compensable breach damages under the cost of performance standard.

Regarding breach of warranty, *La Crosse Garment Manufacturing Co. v. United States*, 193 Ct.Cl. 168, 432 F.2d 1377 (1970), stands for the proposition that the measure of damages as a result of increased costs occasioned by defects in government drawings in connection with a government contract is the degree of interference with satisfactory performance. Performance may become unsatisfactory and costs may increase, in varying degrees, by reason of defects in the drawings causing difficulties, interruptions, slow downs, and delays, which interfere with production without making it impossible. 193 Ct.Cl. at 180, 432 F.2d at 1384. Although the third-party liabilities at issue here do not represent deficiencies in construction, which have been the norm for compensation in the past, *see, e.g., Spearin v. United States*, 248 U.S. 132 (1918) (damages for actual work completed on project up to the breach, less payments made by Government, plus lost profits); *Poorvu v. United States*, 190 Ct.Cl. 640, 420 F.2d 993 (1970)

---

**27.** Johns-Manville had many fixed-price supply contracts with the Navy and the Maritime Commission. Arguably, while Johns-Manville was performing one contract, the Government could have alerted Johns-Manville of its allegedly superior knowledge gleaned from the use of products supplied under a previously completed contract. Johns-Manville, in turn, may have tried to increase the price of the contracts not yet fully performed or increase its prices on future contracts. It was not the Government's responsibility, however, to provide Johns-Manville with information relevant (directly or indirectly) to the latter's formulation of price. The relationship between price and contract performance that Johns-Manville urges is not direct and does not provide the required nexus to costs of contract performance that is needed to sustain the cause of action under a superior knowledge claim. The duty of the Government to disclose superior knowledge does not include knowledge of potential consequences subsequent to contract performance that may affect a manufacturer's pricing structure, *see* Answer filed Sept. 26, 1983, ¶ 84, or that could otherwise be factored into the cost of the product. The ability to avoid added costs of performance can be distinguished from knowledge that would have allowed the contractor to recoup losses through setting prices for future sales. The court cannot heighten this duty to avoid increasing the cost or duration of performance to include pricing variables as costs of performance.

(damages for costs incurred by contractor to repair original construction deficiencies in a building several years after construction completed); *Luria Bros. & Co. v. United States*, 177 Ct.Cl. 676, 369 F.2d 701 (1966) (damages due to delays precipitated by defective specifications, overrun period costs, and costs incurred due to defective government designs); *J.D. Hedin Construction Co. v. United States*, 171 Ct.Cl. 70, 347 F.2d 235 (1965) (increased overhead costs and additional expenditures directly attributable to breach of warranty in construction), third-party liabilities similarly can be characterized as interferences with satisfactory performance resulting from an alleged breach of the implied warranty of government specifications.

Courts in recent years have intimated a willingness to allow third-party liabilities to be considered costs of performance in breach actions against the United States. In *Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 670, 609 F.2d 462, 479 (1979), the Court of Claims stated that it is not necessary, when computing costs of performance, to spell out that specifications having major safety defects are as fully in breach of the implied warranty as defects in the feasibility, practicability, or commercial possibility of performance. This holding is compatible with the view that breaches of safety duties, *i.e.*, injuries to employees or agents and the consequences thereof, should be considered compensable costs of performance as much as construction-related building deficiencies.

The Third Circuit in *Travelers Insurance Co. v. United States*, 493 F.2d 881 (3d Cir.1974), held that the insurer of a government employee who was killed when a tower he was working on collapsed due to the builder's faulty design had a right of action against the United States under the theory of implied contractual indemnity. The significance of *Travelers* is the establishment of a cause of action against the Government for third-party liability stemming from defects in the design specifications which the Government provided to the contractor/builder. The court further held that the absence of tort liability of the Government to the injured federal employ-

ee should not preclude the Government's liability to the contractor's insurer, particularly where the contractor appeared to be secondarily at fault.

Regarding the duty to reveal superior knowledge, *Helene Curtis Industries, Inc. v. United States*, 160 Ct.Cl. 437, 445, 312 F.2d 774, 778 (1963), held that a contractor is entitled to recover for additional costs incurred when the Government fails to disclose superior knowledge of an additional procedure not given to the contractor at the time of bidding. The court stated further that "specifications so susceptible of a misleading reading (or implication) subject the defendant to answer to a contractor who has actually been misled to his injury." *Id.* This doctrine has been applied to give restitution to a contractor who, because of a lack of information or possession of misleading information, has acted to his detriment in a contract performance and is consequently reimbursed for his additional costs of performance. *See, e.g., Aerodex, Inc. v. United States*, 189 Ct.Cl. 344, 358, 417 F.2d 1361, 1368 (1969) (contractor entitled to recover costs relating to delay due to inability of Government to furnish a source of supply on material specifications for a component of an article to be produced); *Hardeman-Monier-Hutcherson v. United States*, 198 Ct.Cl. 472, 458 F.2d 1364 (1972) (contractor could recover in breach extra costs resulting from failure to advise of adverse sea conditions). There is no indication in the case law that third-party liabilities could be viewed as costs of performance unless they occurred in a manner to frustrate or impede performance of the contract.

Although this court has held in part IV that the Navy's policy of assumption of risk did not extend to Johns-Manville's fixed-price supply contracts and although the precise nature of the risks the Navy assumed with respect to CPFF contracts is not certain, the Navy viewed amounts paid to contractors for uninsured losses as "a part of the cost of performance under the respective contracts and should be accounted for as such." *Navy Procurement Directives, supra,* ¶ 12,770, at 7019. Third-

party liabilities arising from uninsured risks under CPFF contracts, such as those covered by automobile insurance, were costs of performance of the affected contracts. Reimbursement for replacement or repair of property as to which the Navy assumed the risk of loss or damage in CPFF and fixed-price contracts was considered a cost of performance. Likewise were costs and expenses of defending against lawsuits arising out of the performance of the contract if it provided that such costs and expenses were reimbursable. It should be emphasized that designating payments for third-party liabilities as allowable costs for purposes of administering CPFF contracts does not equate to recognizing the items as the basis for any adjustment to a fixed-price contract, *see* H.W. Wright, *Accounting for Defense Contracts* 3 (1962), or as costs of performance in a breach action on a fixed-price contract four decades later.

The "Cost Principles" in effect during World War II reinforce the language of the *Procurement Directives* to express a close temporal relationship between cost of performance and contract performance that is not met by the circumstances of this case. Treas.Reg. § 26, at 407 (TD 5000) (June 28, 1940), and the "Green Book", War Dept., Navy Dept., *Explanation of Principles for Determination of Costs Under Government Contracts* 13 (1942), for example, state that losses suffered or payments incurred under a contractor's policy of self-insurance will be recognized only to the extent of actual losses suffered or payments incurred during performance of the contract or subcontract and properly chargeable thereto.

Dr. Howard W. Wright, who testified for Johns-Manville as an expert in cost accounting, considered third-party liabilities as costs of performance of a contract if the seeds of the loss were sown during performance of the contract. When queried as to the treatment of such liabilities many years after the completion of contract performance, he explained that they were reflected on an income statement as a prior period adjustment, but not assigned to any particular year.

■ Based on a review of the case law and evidence, it can be said that, as a general proposition, indemnification for third-party liabilities may be considered a cost of performance for a breach of warranty of specifications, if the injury to the third-party occurs, or liability is incurred, incident to contract performance. The relationship between contract performance and liability becomes attenuated when liability occurs both after the completion of performance and not as a direct result of contract performance. In this case the relationship is too attenuated. Johns-Manville's third-party liabilities cannot be considered costs of performance of its fixed-price supply contracts.

■ In order to be recoverable in an action for breach of duty to reveal superior knowledge, the event marking liability must occur during contract performance. In this case the third-party injuries did not take place before completion of the contracts, and the damages sought do not represent increased costs of performance. But whether certain costs in the abstract can be termed costs of performance does not supplant the issue whether they are damages foreseeably resulting from a breach. In other words, even if third-party liabilities could be classified theoretically as costs of performance, they are not recoverable directly or by way of indemnification in a breach action unless they satisfy the requirement that breach damages be foreseeable. A ruling that such liabilities are not costs of performance similarly does not foreclose consideration of the damages as nonetheless foreseeable.

## C. *Damages recoverable for breach*

■ Johns-Manville seeks as breach damages reimbursement for settlements, judgments, attorneys' fees, costs, and expenses, increased insurance costs, and loss of business and business reputation.[28] *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng. Rep. 145 (1854), charts the rule for

---

**28.** Other plaintiff manufacturers claim, in addi- tion, lost profits.

**162**

breach damages. The damages to the injured party (Johns-Manville) should arise foreseeably or proximately from the breach itself, or have been in the contemplation of the parties when they contracted, or flow from special circumstances attending the contract known to both parties, or be the subject of a contractual provision specifying the measure of damages claimed. Johns-Manville's distillation of *Hadley* is apt: "[R]ecovery is limited by reasonable foreseeability under the facts of a given case, or is defined by the contract itself." Johns-Manville's Br. filed June 26, 1987, at 2. Johns-Manville did not prove that the Navy assumed the risk of third-party liabilities apart from explicit contractual provisions, and the contracts are silent on point. Nor was there proof that third-party liabilities were contemplated by either contracting party at the time of contract.

■ The first guidepost in determining whether third-party liabilities are foreseeable is that Johns-Manville asks for damages for breach of contract, not breach of a contract of indemnification. *Cf. Terteling v. United States,* 167 Ct.Cl. 331, 334 F.2d 250 (1964). Thus, it is immaterial that breach damages may encompass recovery of awards and litigation expenses when contractual provisions expressly provide for indemnification for judgments or settlements and related legal fees and costs, or when contracts are terminated for the convenience of the Government. Nor is the issue whether the injuries sustained by the Navy's own shipyard workers and employees of the private shipyards were the direct and proximate result of exposure to asbestos. Employees made claims under workmen's compensation for asbestos related-diseases before World War II, and Johns-Manville, as an employer, was familiar with

the possibility of such claims.[29] Dr. Drinker wrote Under Secretary Forrestal on April 9, 1941:

I question very much whether either the Army or the Navy realizes how vulnerable they will be to demands for occupational-disease compensation by former employees when this war is over and we are settling up. The Navy's present system of employment physical exams and so-called discharge exams is excellent, but the Navy is not getting records routinely of working conditions and, therefore, will not have the records to prove what conditions were like when a man allegedly was harmed. . . .[30]

The *Navy Insurance Manual* lists asbestosis as one of the seven most frequently encountered occupational diseases. *Id., supra,* at 39–40. The Insurance Division of the OPM and its counterpart in the Maritime Commission were concerned with occupational disease, according to Dr. Drinker's memoranda of July 18 and September 21, 1945, although the Navy did not see incidence of asbestosis in the shipyards until 1944.

■ That the Government was aware that shipyard workers exposed to heavy concentrations of asbestos could contract diseases and make workers' compensation claims against their immediate employers does not translate to a foreseeable or proximate relationship between the third-party liabilities sustained by Johns-Manville and alleged breaches by the Navy or the Maritime Commission. During the period in which these contracts were performed and in which the shipyard workers were exposed to asbestos, manufacturers were not strictly liable for injuries caused to users of their products. The decision in *Borel v. Fibreboard Paper Products Corp.,* 493

**29.** *American Employers Insurance Co. v. United States,* 812 F.2d 700 (Fed.Cir.1987), held that settlement in 1950 of premiums between an insurer and the Maritime Commission was final and precluded the insurer from seeking additional premium payments to cover subsequently filed claims for injuries from asbestos exposure. Because the "insurance companies were aware of the possibility of ... asbestos claims surfacing in the future ...," the court faulted the insurer for failing to take into account the possi-

bility that former employees would bring workmen's compensation claims for asbestos-related injuries years after the final settlement had been reached. 812 F.2d at 705 & n. 5. The case draws on a 1950's factual context, and the parties had contracted expressly for indemnification.

**30.** Dr. Drinker did not mention asbestos or asbestosis.

F.2d 1076 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974), recently was characterized as a "landmark case." *Asbestos Ins. Coverage Cases,* Judicial Council Coordination Proceedings No. 1072, slip op. at 6 (Cal.Super.Ct. May 29, 1987). Johns-Manville argues that legal scholars predicted the evolution of negligence into strict liability to users who were not employees of the manufacturer, but defendant rejoins persuasively that during the World War II years the cause of action had not been recognized judicially. *See* Prosser, *The Fall of the Citadel (Strict Liability to the Consumer ),* 50 Minn.L.Rev. 791 (1966). The intervening legal development blocks indemnification for third-party liabilities from being characterized as foreseeable or proximate from the breach or within the contemplation of either contracting party or as a special circumstance known to either party until the early 1960's. (Prosser pinpoints 1960 as the fall of the citadel of privity between a manufacturer and the user of a product. *Id.*)

In *United States v. Franklin Steel Products, Inc.,* 482 F.2d 400 (9th Cir.1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472 (1974), the Government sued a manufacturer for breach of express warranty to provide aircraft engine bearings conforming to contract specifications, seeking the contract price and consequential damages for an emergency retrofit operation. The appeals court held that the manufacturer was liable for direct and proximate damages resulting from the breach of warranty, including replacement of defective goods or damages for injuries caused by the defective goods. 482 F.2d at 404. Because the defective bearings posed a great hazard, the manufacturer also was held to have known or should have known that unless it supplied the Government with the proper bearings, the costs of emergency repairs would be sustained. 482 F.2d at 404–05.[31]

■ The parallel to this case that Johns-Manville constructs compares liability for third-party injuries resulting from the breach in *Franklin Steel Products* with its claim for damages measured by costs of indemnification. Although it was foreseeable that disease was associated with exposure to asbestos, the notion that a manufacturer of asbestos-containing products could be held strictly liable to non-employee users and that the manufacturer would look to the Government for indemnification of this new liability was beyond the parties' actual or implied expectations when Johns-Manville entered into its contracts with the Navy and the Maritime Commission or at the time of alleged breach.[32] Since these threshold damages were not foreseeable, the damages to Johns-Manville's business and increased insurance costs *a fortiori* are not recoverable as foreseeable damages. Thus, the semantic contortions over costs of performance are immaterial, as the damages sought were not foreseeable at the time of breach or when the contract was made.[33]

## XI. *28 U.S.C. § 1500 update*

On April 6, 1987, in response to defendant's motion to dismiss, the court ruled

---

**31.** The case is readily distinguishable because the implied warranty of specification running from the Government to a manufacturer calls for more exacting proof than the warranty of fitness from a manufacturer to the Government. For example, the contractor must show that the Government had superior knowledge regarding the risks associated with the product. *Bethlehem Corp. v. United States,* 199 Ct.Cl. 247, 254, 462 F.2d 1400, 1404 (1972) (citing cases).

**32.** Judicial recognition of strict liability does not make damages for third-party liabilities foreseeable. Other factors pertinent to Johns-Manville's 1960s' claims may render the damages sought unrecoverable.

**33.** The asbestos insurance litigation is distinguishable. The asbestos manufacturers obtained insurance to indemnify them for damages that they were required to pay because of bodily injury caused by an occurrence, including injurious exposure, during the policy period. The issue was not whether the occurrence of the obligation to indemnify was foreseeable, but whether the risk insured against, *i.e.,* exposure to asbestos sufficient to instigate disease, took place during a given coverage period. *See Asbestos Ins. Coverage Cases,* Judicial Council Coordination Proceeding No. 1072, slip op. at 14.

that 28 U.S.C. § 1500 (1982), foreclosed the Claims Court's jurisdiction in this case, as well as in Nos. 688–83C & 1–84C, because before commencing the instant suit Johns-Manville had filed the same claims as tort claims in federal district court. It was also ruled that, with respect to tort claims filed in other courts after Johns-Manville's three pending Claims Court cases, jurisdiction was foreclosed, but the court declined to dismiss on the ground that any change in law should be prospective. *Keene Corp. v. United States*, 12 Cl.Ct. 197, *appeal docketed*, No. 87–1332 (Fed.Cir. May 7, 1987). Johns-Manville moved for certification pursuant to this court's order, thereby placing the issue with respect to the earlier-filed claims before the Federal Circuit. Defendant pursued the certified issue as to the later-filed claims, and the Federal Circuit accepted the certification. The Federal Circuit also granted Johns-Manville's request to stay briefing until the record was closed after trial.

Thereafter, during trial, defendant advised that it was withdrawing its appeal with respect to the later-filed claims. Apparently, another branch of the Justice Department's Civil Division and the Tax Division were of the view that a decision that 28 U.S.C. § 1500 blocked prosecution of claims in the Claims Court that were the subject of later-filed suits in federal district court would permit manipulation of this court's jurisdiction. The abandonment of defendant's argument seems questionable in light of the many authorities standing for the proposition that a statute cannot be interpreted to reach a plainly unreasonable result, *see, e.g., United States v. Missouri Pacific R.R.*, 278 U.S. 269, 277–78, 49 S.Ct. 133, 136, 73 L.Ed. 322 (1929); *Texas State Comm'n for the Blind v. United States*, 796 F.2d 400, 406 (Fed.Cir.1986) (en banc), *cert. denied*, — U.S. —, 107 S.Ct. 874, 93 L.Ed.2d 828 (1987), and the precedents of the Court of Claims disallowing a plaintiff to invoke 28 U.S.C. § 1500. *See Keene Corp.*, 12 Cl.Ct. at 215–16 (citing cases). The Federal Circuit has advised by order that it will consider all issues raised by the lower court's decision.

In addition to the Department of Justice's fickle advocacy, two other developments affect this court's earlier decision. The first relates to Johns-Manville's argument before this court, which is being pressed as a separate issue on appeal, that a *de facto* stay serves the purpose of section 1500, so that the Claims Court is not deprived of jurisdiction by virtue of the pendency of a stayed earlier-filed suit. None of the briefs filed before this court argued that any stays had been entered due to the pendency of Claims Court litigation. Nor was it argued that any party to stayed litigation had the power to influence lifting of a stay. That *de facto* stays do not substitute for the dismissal required by section 1500 was dramatized during trial. On May 5, 1987, the District of Columbia Circuit issued its opinion in *GAF Corp. v. United States*, 818 F.2d 901 (D.C.Cir.1987), involving appeals of two other plaintiffs in the asbestos litigation in this court, Keene Corporation and Eagle-Picher Industries, Inc. All three plaintiffs filed in federal district court tort actions based on the same claims asserted as predicates for breach of contract in the Claims Court. The three cases had been stayed effectively since November 5, 1985, when they were submitted to the D.C. Circuit after argument. Eighteen months later, however, the stay was lifted, and two of the cases have been remanded to proceed in the district court. Now the United States is defending the same claims at the same time in two courts in the same city.

The second development is that a full trial of all the issues in this case confirms that Johns-Manville's theories of liability based on breach of contract and tort do not turn on claimant-specific claims. *See Keene Corp.*, 12 Cl.Ct. at 210. Trial has been held on liability and on the reasonableness of settlements, legal fees, and costs with respect to the 15 test claimants. As discussed above, the parties selected the test claimants, and their number was expanded at Johns-Manville's request to make them more representative. Defendant is correct that experiences in the shipyards of these workers reveal different trades, different situations in which they were ex-

posed to asbestos, different durations of exposure, and different illnesses—and, of course, somewhat different facts as to the reasonableness of settlements with each test claimant. The facts as they may distinguish the theories of liability in the tort actions from the breach actions in this court, however, were "incidental." Trial has demonstrated that selecting a test claimant and framing a tort action based on his experience does not change the case one whit from an action in contract against the United States based on settlements and judgments with respect to other shipyard workers. The Government's conduct in the shipyards is not shipyard-worker specific, nor does Johns-Manville attempt to prove that the Government had superior knowledge in any shipyard-specific situation not common or imputable to all Navy and private shipyards. Thus, there is no meaningful differentiation between Johns-Manville's tort and contract claims in terms of the identities of the individual test claimants.

Further, trial has confirmed that for the World War II time period, Johns-Manville's proof in *Johns-Manville Sales Corp. v. United States*, No. C 81–4561 RFP (N.D. Cal., filed Dec. 7, 1981), will be identical.

### CONCLUSION

Based on the foregoing, it is concluded that Johns-Manville has failed to establish by a preponderance of the evidence its entitlement to recovery on any of the theories of liability that have been tried. It is also concluded that the damages sought are unrecoverable. Accordingly, the Clerk of the Court shall dismiss the complaint and defendant's counterclaim.

At the close of argument on defendant's motion for involuntary dismissal, the court indicated that it would revisit its earlier decision to assess equally the costs of the independent digester and the associated costs for immediate copy of the transcript of trial. Having reviewed the entire record, it is the court's view that trial should not have ended when Johns-Manville rested its case. Thus, defendant will recover its costs, other than as follows:

1. Johns-Manville and defendant each shall bear one half the cost of the independent digester.

2. Taxable costs shall include charges for daily copy of the transcript, which would have been indispensable absent the independent digester. Johns-Manville and defendant shall each bear one half the difference between the cost of daily and immediate copy.

A copy of this opinion shall be served on counsel of record in all the asbestos cases (Nos. 579–79C, 170–83C, 287–83C, 16–84C, 514–84C, and 515–85C).

IT IS SO ORDERED.